James E. Magleby (7247)
magleby@mcpc.law
Yevgen Kovalov (16297)
kovalov@mcpc.law
**MAGLEBY CATAXINOS, PC**
141 W. Pierpont Avenue
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000

Christopher A. Seeger (*pro hac vice*)
cseeger@seegerweiss.com
Scott A. George (*pro hac vice*)
sgeorge@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: 973.639.9100

Scott A. Kitner (*pro hac vice*)
scott@kitnerwoodward.com
Martin D. Woodward (*pro hac vice*)
martin@kitnerwoodward.com
**KITNER WOODWARD PLLC**
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: 214.443.4300

Steven A. Schwartz (*pro hac vice*)
steveschwartz@chimicles.com
Beena M. McDonald (*pro hac vice*)
bmm@chimicles.com
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500

*Interim Liaison and Class Counsel*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br><br>*This document relates to all actions* | **Consolidated Class Action Complaint**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiffs Daniel Chappell, Masen Christensen, John Oaks, Mark Wilson, Joel Long, Brandall Brawner, Kevin Risdon, Gene Judson, and Michelle Judson bring this action for themselves and all others similarly situated against The Church of Jesus Christ of Latter-day Saints ("LDS") and Ensign Peak Advisors, Inc. ("Ensign") (collectively "Defendants"). Upon

personal knowledge of the facts pertaining to Plaintiffs and on information and belief as to all other matters, and upon the investigation conducted by Plaintiffs' counsel, Plaintiffs allege as follows:

## Preliminary Statement

1.      Beginning in and about 1997 with its establishment of Ensign, the Corporation of the President of the Church of Jesus Christ of Latter-day Saints[1] ("COP") created a slush fund for the charitable donations it actively solicited from donors from both within and outside of the membership of LDS.  Ensign maintained the funds in an intentionally obscured series of hidden, opaque accounts, without disclosing the extent of the accounts' holdings or the use of the funds to donors or government regulators.  This obfuscation had the purpose and effect of preventing donors from learning about the existence of the accounts, the scale of funds accumulated by Defendants and the actual use, if any, to which the donations were being put.

2.      Defendants have engaged in a multi-decade scheme to solicit donations by representing that donated funds would be used to fund charitable work, while intentionally concealing from donors that they were actually secreting tens of billions in donated funds into an undisclosed slush fund held by Ensign.  Defendants used this slush fund to obscure the fact that they were undertaking no charitable work with the donations LDS gave to Ensign while also

---

[1] In 2020, the Corporation of the President was absorbed into the LDS, which continues as the successor organization. While this Complaint uses "COP" to refer to the Corporation of the President during periods prior to the merger, the COP currently exists and continues operations as Defendant LDS, and the COP's actions prior to the merger are imputed to LDS.  Conversely, when the complaint discusses actions taken by LDS that were underway or begun prior to the merger of COP, such actions by LDS are necessarily those of COP.

using the donated funds for unrelated business uses after making explicit public representations that the donated charitable funds would not be so used.

3.      Throughout the relevant time period, Defendants actively concealed the extent of Ensign's holdings, as well as how it used (and did not use) those holdings.  The purpose and effect of these misrepresentations and omissions was to induce donors to continue to make donations to LDS.  Defendants induced donations by convincing donors 1) that their donations were necessary, even though Ensign's holdings alone are large enough to fund operations in perpetuity; and 2) that their donations were being used for LDS's solicited purposes.

4.      A significant, but not sole, source of donated funds obtained by LDS are tithes, which are traditionally 10% of any income or profits earned by members of LDS.

5.      Separately, members are encouraged to make local "Fast Offerings" which LDS, time and again, states will be used to feed and help the poor, but are gradually rolled up to LDS and into Ensign.

6.      In addition to donations in the form of tithes and as "Fast Offerings," LDS also solicits additional donations from members and nonmembers alike to fund specific charitable work. LDS's official website represents that "[p]eople who are not members of the Church may also make contributions." [2]

7.      For instance, LDS maintains various philanthropies, including the "Humanitarian Relief Fund," which provides "immediate emergency assistance to victims" of disasters. On its website, LDS solicits donations to the Humanitarian Relief Fund by stating that "One hundred

---

[2] "Finances and Audits," https://www.churchofjesuschrist.org/study/manual/general-handbook/34-finances-and-audits?lang=eng#title6 (Last visited June 5, 2024).

percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin."[3]



## You Can Help

One hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin.

Make a Gift to Humanitarian Aid

8.     Despite these representations to donors, it is apparent —based on public reports from third parties—that COP (and, subsequently, LDS) deliberately hid that some, if not all, of these donations (including tithes, Fast Offerings, and donations made to an LDS philanthropy) are permanently invested in accounts it never uses for any charitable work, so that every year, an enormous portion of the donations are set aside but never used for these purposes.

9.     While Defendants have never directed the funds contained within the accounts managed by Ensign to charitable work, they have repeatedly tapped these funds to prop up and fund unrelated business interests, though their scheme to conceal the business of the funds has obscured the full extent of this fraud.

10.     COP went to extreme lengths to conceal from the public and its members the actual disposition of donations.  It created its special non-profit entity, Ensign, to hold and invest the donations.  COP (and, subsequently, LDS) had Ensign egregiously understate the value of its

---

[3] "Humanitarian Relief," Philanthropies,
https://philanthropies.churchofjesuschrist.org/humanitarian-services/funds/humanitarian-general-fund/ (last visited July 12, 2024)

holdings in public filings with the Internal Revenue Service and the Securities and Exchange Commission.  This allowed COP (and, subsequently LDS) to ensure the extent of its assets, and how those assets were disbursed, remained hidden.

11.     In December 2019, a whistleblower with extensive knowledge of Defendants' finances divulged that over the past two decades, COP has funneled billions of dollars of donations into covert permanent investments through Ensign.

12.     In response, COP (and, subsequently, LDS) continued and expanded its efforts to conceal its practices, including issuing a statement that it "complies with all applicable law governing our donations, investments, taxes and reserves."[4]

13.     By February 2023, the Security and Exchange Commission ("SEC") brought charges against Ensign and LDS related to their evasion of public reporting requirements through the use of shell corporations "to avoid negative consequences in light of the size of The Church's portfolio."[5]  As part of a nearly unprecedented, negotiated settlement with the SEC, LDS and Ensign agreed to pay a total of $5 million in civil penalties to settle the charges.

14.     Defendants engaged in an on-going and concerted scheme based in Utah to solicit funds from donors for specific purposes, while actually using those funds for different purposes and hiding their actual use (and, as importantly, non-use) of funds from donors.  Accordingly,

---

[4] "First Presidency Statement on Church Finances," https://newsroom.churchofjesuschrist.org/article/first-presidency-statement-church-finances (last visited July 12, 2024).

[5] *See* Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order. https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf

Plaintiffs, on behalf of a national Class of donors, are entitled to money damages and injunctive relief under Utah law.

15.     Plaintiffs, on behalf of a Class of other people who made donations to LDS and its charitable arms, now ask the Court to determine that LDS has breached the fiduciary and other duties it owed donors in its solicitation, collection, use, and disposition of these charitable donations.  Defendants continued to misrepresent their use of funds, including concealing their illegal scheme to hide their assets using shell companies, even after the whistleblower first came forward in 2019.

## Jurisdiction and Venue

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars exclusive of recoverable interest and costs, and minimal diversity exists.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are residents of this District, are incorporated in this District, maintain principal places of business in this district, and because a substantial part of the events and omissions giving rise to the claims of Plaintiffs and the Class occurred in this District.

## Parties

**Plaintiffs**

18.     Plaintiff Daniel Chappell ("Mr. Chappell") is a resident of Virginia.

19.     Between January 1, 1998 and today, Mr. Chappell donated at least $108,926 to LDS.

20.     Plaintiff Masen Christensen ("Mr. Christensen") is a resident of Utah.

21.     Between January 1, 1998 and today, Mr. Christensen directly donated at least $166,000 to LDS, which includes contributions of $120,000 in direct donations, and another $46,000 through donor-advised funds.

22.     Mr. Christensen is an active member of the Church who made his most recent annual donation to LDS on November 11, 2022 and plans to continue making donations if the equitable and injunctive relief sought in this litigation is realized.

23.     Plaintiff John Oaks ("Mr. Oaks") is a resident of Utah.

24.     Between January 1, 1998 and today, Mr. Oaks donated at least $74,277.73 to LDS.

25.     Plaintiff Mark Wilson ("Mr. Wilson") is a resident of Texas and at relevant times was a resident of Utah.

26.     Between January 1, 1998 and today, Mr. Wilson donated at least $183,256 to LDS.

27.     Plaintiff Joel Long ("Mr. Long") is a resident of Missouri and at relevant times was a resident of Illinois.

28.     Between January 1, 1998and today, Mr. Long donated at least $31,000 to LDS.

29.     Plaintiff Brandall Brawner ("Mr. Brawner") is a resident of Tennessee.

30.     Between January 1, 1998 and today, Mr. Brawner donated at least $3,700 to LDS.

31.     Plaintiff Kevin Risdon ("Mr. Risdon") is a resident of Washington.

32.     Between January 1, 1998 and today, Mr. Risdon donated at least $60,000 to LDS.

33.     Plaintiffs Gene Judson and Michelle Judson ("the Judsons") are residents of California.

34.     Between January 1, 1998 and today, the Judsons donated at least $60,000 to LDS.

**Defendants**

35.     Defendant The Church of Jesus Christ of Latter-day Saints ("LDS") is a Utah corporation with its principal place of business at 50 East North Temple, Salt Lake City, Utah 84150.  It may be served with process through its registered agent, Corporate Agent Services, LLC, at 36 S. State Street, Suite 1900, Salt Lake City, Utah 84111.  LDS is the primary legal entity representing the institutional business of the church bearing the same name (the "Church").

36.     Historically, the core functions of the LDS were concentrated in the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints ("COPB"), a Utah corporation incorporated in 1916, and the Corporation of the President ("COP") of the Church of Jesus Christ of Latter-Day Saints, incorporated in 1923. In a process beginning in 2019, the two entities merged into a single entity called The Church of Jesus Christ of Latter-Day Saints.

37.     On or about June 18, 2019, the Corporation of the Presiding Bishop amended its articles of incorporation to, among other things, change its name to the Church of Jesus Christ of Latter-day Saints.

38.     On about December 31, 2020, the COP merged with the LDS, and was subsumed into the organization.

39.     LDS is the umbrella organization for the various entities that together operate non-religious businesses and investments on behalf of the Church.  LDS is the owner, operator,

and overseer of a significant number of for-profit and non-profit entities, including dozens of office and apartment buildings, four universities, and three media companies.[6]

40.     LDS is registered with the Utah Secretary of State as "Doing Business As" various other entities, including but not limited to Deseret Transportation, Latter-Day Saint Philanthropies, Deseret Industries, Tabernacle Choir At Temple Square, Deseret Soap, Mormon Tabernacle Choir, Deseret Pasta, Joseph Smith Memorial Building, Millennial Star Network, Vernon Utah Livestock, Mortgage Loan Service, Farm Management Company, Beehive Clothing, and Elberta Valley Ag.

41.     LDS (including its employees, subsidiaries, affiliates, volunteers, and agents) promoted, advertised, provided instructions for, administered, oversaw, and collected donor funds from donors throughout Utah and the United States.[7]  LDS continued this activity after the merger.

42.     Defendant Ensign Peak Advisors, Inc. ("Ensign" or "Ensign Peak Advisors") is registered as a Utah nonprofit corporation with its principal place of business at 60 East South Temple St., Suite 400, Salt Lake City, Utah 84111.  It may be served with process through its registered agent, Corporate Agent Services, LLC, at 36 S. State Street, Suite 1900, Salt Lake City, Utah 84111.

---

[6] Lars Nielsen, "Letter to an IRS Director," https://www.scribd.com/document/439385879/Letter-to-an-IRS-Director, at 5 & nn. 5-9. For ease of reference, this document will be referred to throughout this complaint as the "Whistleblower report," even though its author is not the actual whistleblower.

[7] All allegations regarding LDS's conduct include the conduct of LDS's employees, subsidiaries, affiliates, volunteers, and agents.

43.     Ensign is governed by a board of trustees that includes all three members of
LDS's Presiding Bishopric, and a managing director appointed by the President of LDS.
Ensign's Director, Wayne Christopher Waddell, is the First Counselor of the Presiding Bishopric
of LDS.  The Presiding Bishop, Gerald Causse, is listed as an officer and trustee; and Second
Counselor L. Todd Budge is a trustee.

44.     Ensign is the entity responsible for managing the donations at issue in this case.

45.     Plaintiffs reserve the right to amend this Complaint to name additional party
defendants revealed by discovery or further investigation to have been involved with the
solicitation, collection, and clandestine investment of donations.

**Any Applicable Statues of Limitations are Tolled**

46.     Plaintiffs and Class members did not discover and could not discover through the
exercise of reasonable diligence that Defendants had been engaged in a scheme to defraud
Plaintiffs and other donors by soliciting charitable donations using false and misleading
representations, actually directing donor funds towards Ensign's investment portfolio, and
engaging in a series of sham transactions and securities law violations in order to obscure the
true use of the funds from donors and regulatory authorities.

47.     Any applicable statutes of limitation have been tolled by the Defendants'
knowing, active, and ongoing fraudulent concealment of the facts alleged herein.  Defendants
knew (or should have known) that while they were soliciting, collecting, and receiving donations
that a significant amount would be invested instead of being used for charitable purposes as LDS
represented to members and the public at large.  Defendants suppressed this information and
affirmatively misrepresented to Plaintiffs and Class members that they were obeying all

applicable laws and that donor funds were not being misdirected from the purpose for which they were solicited.  Thus, Defendants actively concealed from, and failed to notify, Plaintiffs, Class members, and the public of the critical material fact that a significant portion of donations made to LDS are not applied to the purpose for which they were solicited.

48.     Defendants were under a continuous fiduciary duty to disclose to Plaintiffs and Class members the true character and nature of the disposition of all donated funds collected, including the critical material facts that a significant portion of donated monies are not used for any religious or charitable purpose, but rather are diverted to non-charitable investments. Plaintiffs and Class members reasonably relied on Defendants' affirmative representations regarding their use of donated funds, and their concealment of the truth about how the funds are used, which rendered their statements misleading.

49.     Plaintiffs relied upon and trusted Defendants' representations, and (to the extent relevant) exercised reasonable diligence but were prevented from uncovering the full extent of Defendants' scheme as a result of Defendants' own omissions and direct misrepresentations regarding the underlying facts.

50.     Under these circumstances, the hardship that enforcing any limitations period would impose on the Plaintiffs would outweigh any prejudice to Defendants from difficulties of proof caused by the passage of time.

51.     As a result, enforcing the limitations period here would be irrational and unjust.

52.     Based on the foregoing, Defendants are estopped and otherwise unable to rely upon on any statutes of limitation or other limitations on the timeliness of the claims asserted in defense of this action.

## Factual Allegations

A.   FORMS OF DONATION

53.     LDS expects, as part of membership, that its members tithe.  Tithing is the practice of donating a fixed percentage of earnings to the church (as opposed to contributions that are made at the members' discretion).  Members are expected to tithe ten percent (10%) of their income and profits.

54.     LDS has publicly, continually, and repeatedly declared in no uncertain terms that tithing funds are "always used" for purposes like building construction, missionary work, education of Church members, and care for the poor and needy.

55.     Church members can make tithing donations online through a dedicated website operated by or on behalf of LDS.[8]  LDS also uses "tithing slips" in its solicitation, collection, and recordkeeping.  The following are examples of two such slips used in recent years; the older version is shown on the left, and a revised version LDS introduced in 2012, is on the right:[9]

---

[8] "Online Donations, United States," LDS, https://www.churchofjesuschrist.org/help/support/finance/online-donations?lang=eng (Last visited July 12, 2024).

[9] https://mormonisminvestigated.files.wordpress.com/2013/06/tithing-slip3.jpg (Last visited July 12, 2024) (image on left); https://store.churchofjesuschrist.org/tithing-and-other-offerings-form/5639508599.p?color=General&style=English (Last visited July 12, 2024)(image on right).

56.     Referring to its tithing slips, LDS explains, "Donors use this form to itemize their

offerings when submitting to a bishopric or priesthood member."[10]

---

[10] Tithings and Other Offerings Form, LDS Online Store,
https://store.churchofjesuschrist.org/tithing-and-other-offerings-
form/5639508599.p?color=General&style=English (last visited July 12, 2014).

57.     LDS members also frequently make monthly "Fast Offerings," which are donations in addition to the tithe, which donations LDS repeatedly represents to donors are earmarked exclusively for aid to the poor.

58.     On April 1, 2001, during the Church's bi-annual General Conference, Joseph B. Wirthlin, one of 15 of LDS's governing apostles, made the following representations regarding fast offerings:

> Fast offerings are used for one purpose only: to bless the lives of those in need. Every dollar given to the bishop as a fast offering goes to assist the poor. When donations exceed local needs, they are passed along to fulfill the needs elsewhere.[11]

59.     On April 4, 2015, Henry B. Eyring, the First Counselor in the First Presidency, represented that "a generous fast offering" is "for the benefit of the poor and the needy" and "[t]hat which is not needed to help people in your local Church unit will become available to bless other Church members across the world who are in need."[12]  The Fast Offerings not used locally are delivered to LDS which places these funds with Ensign.

60.     Notably, these collections are not exclusive to LDS members.  LDS also directly solicits donations for its charitable arms from the public at large.

61.     The Church of Jesus Christ of Latter-day Saints – Philanthropies ("Philanthropies"), operates as the charitable arm of LDS.  As the associated website describes,

---

[11] Joseph B. Wirthlin, "The Law of the Fast", April 2001 bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2001/04/the-law-of-the-fast?lang=eng#p22 (Last visited July 12, 2024).

[12] Henry B. Eyring, "Is Not This the Fast That I Have Chosen?" April 2015 bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2015/04/is-not-this-the-fast-that-i-have-chosen?lang=eng#kicker1 (Last visited July 12, 2024).

"Philanthropies is the department of [LDS] responsible for facilitating philanthropic donations (not tithing or fast offerings) to [LDS] and its affiliated charities."[13]  The organization has existed in some form since 1955.  In 2018, its name was changed to "The Church of Jesus Christ of Latter-day Saints – Philanthropies."

62.     The "Philanthropies" webpage on the Church's official website represents that the objective of presidents of various LDS colleges and universities was to inspire "Latter-day Saints and non-members to financially support these prophetic priorities."[14]

63.     LDS has consistently held out its philanthropies as meeting generally accepted standards for charities.  In April 1993, Thomas S. Monson,[15] then Second Counselor in the First Presidency, announced collaborations with well-known charitable organizations having reputations for "honest, effective service."[16]

64.     LDS represents that donations to Philanthropies will be used entirely to help the needy:

> **100 percent of all donations** go to help those in need. No administrative costs are deducted by Philanthropies or our affiliated charities.[17]

---

[13] "Who is Philanthropies," Philanthropies, https://philanthropies.churchofjesuschrist.org/philanthropies/about/ (Last visited July 12, 2024).

[14] "GPC Spotlight," https://philanthropies.churchofjesuschrist.org/gift-planning/for-professional-advisors/gpc/newsletter/winter-2019/gpc-spotlight-dowse (Last visited July 12, 2024).

[15] Thomas S. Monson ascended to the position of President of the Church in 2008.

[16] Thomas S. Monson, "Search and Rescue," April 1993 bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/1993/04/search-and-rescue?lang=eng#p7 (Last visited June 6, 2024).

[17] "Who is Philanthropies," Philanthropies, https://philanthropies.churchofjesuschrist.org/philanthropies/about/ (Last visited July 12, 2024) (bold in original).

65.     On October 3, 2021, L. Todd Budge, the Second Counselor in the Presiding Bishopric, represented that "[h]umanitarian donations …have been converted to life- sustaining food, oxygen, medical supplies, and vaccinations for those who might otherwise have gone without."[18]

66.     Philanthropies oversees the administration of donations to various charitable projects, including several Church-affiliated universities and Latter-day Saint Charities, a non-profit corporation also headquartered in Salt Lake City, Utah.  Donations solicited by LDS, however, are not restricted to the entity for which they were solicited, but are disbursed across a baroque web of subsidiary organizations and holding companies, many of which serve no charitable purpose at all or are even commercial in nature.

67.     In the portions of its website soliciting donations, LDS represents that money donated to humanitarian relief will be spent — "is used"— solely on charitable activities.  The "Humanitarian Aid" portion of its website has historically described how "100% of every dollar donated is used to help those in need—without regard to race, religion, or ethnic origin,"

---

[18] L. Todd Budge, "Giving Holiness to the Lord," October 2021 bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2021/10/52budge?lang=eng (Last visited June 10, 2024).

alongside multiple links to "Make a Gift to Humanitarian" by donating money:[19]



[19] "Humanitarian Services," Philanthropies (Sep. 28, 2023),
https://web.archive.org/web/20230928001702/https://philanthropies.churchofjesuschrist.org/humanitarian-services/.

68.     While the current website still contains this solicitation for donations, the language describing 100% of every dollar as used to help those in need has been removed some time after the Plaintiffs filed their original complaint in October of 2023.[20]

69.     A separate page for Philanthropies soliciting donations likewise solicits donations to Humanitarian Aid with the promise that "one hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin."  Immediately below this promise is another link inviting the reader to "Make a Gift to Humanitarian Aid."[21]



You Can Help

One hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin.

Make a Gift to Humanitarian Aid

70.     Clicking through this link delivers the reader to a giving page of LDS.  The top of the giving page, which invites the reader to enter the amount of their donation, has historically contained language suggesting that the purpose of the donation is "[t]o relieve suffering, foster

---

[20] "Humanitarian Services," Philanthropies, https://philanthropies.churchofjesuschrist.org/humanitarian-services (Last accessed July 12, 2024).

[21] "Humanitarian Relief," Philanthropies, https://philanthropies.churchofjesuschrist.org/humanitarian-services/funds/humanitarian-general-fund/ (Last accessed July 12, 2024).

self-reliance and provide opportunities for service.  Relief is provided to people around the globe without regard to race, religious affiliation, or nationality." [22]



_____

[22] "Your Gift," Philanthropies, https://donate.churchofjesuschrist.org/donations/church/humanitarian-services/humanitarian-aid-fund.html?cde2=475-Humanitarian-home&cid=Humanitarian-home-donate-button& (Last Accessed October 28, 2023).  The language in the current version of the form was modified sometime after Plaintiffs filed their original complaint in October 2023.

71.     LDS also solicits donations for its Missionary Fund.  In its solicitation page, LDS describes the purpose of these donations as to "provide needed funding so that all who want to serve a full-time mission may do so." [23]



72.     When the reader clicks through the "make a gift" link, they are taken to a payment page.  At the top of the page, near the field for entering the donation amount, the page has historically contained language explaining that "Funds allow thousands of young men and young women from around the globe to have the opportunity to serve a full-time mission for the Church

---

[23] "General Missionary Fund," Philanthropies, https://philanthropies.churchofjesuschrist.org/missionary (last visited July 12, 2024).

of Jesus Christ of Latter-day Saints who otherwise would not have the financial ability to do so."
[24]



---

73. While historically LDS has solicited and collected donations for other targeted Philanthropies, such as Church History, it recently stopped soliciting donations meant to be specifically directed towards them, and instead solicits donations directly to a general fund: [25]

# Church History

Thank you for your interest in supporting Church History activities. We are grateful for your continued faithfulness and generosity. The Church has changed its fundraising policies and now accepts donations for three funds:

Humanitarian Aid Fund
General Missionary Fund
Church General Fund

Church History activities and projects, including restoring and maintaining sacred sites, will be addressed through the Church General Fund. This change allows you to contribute funds that will be used to meet ever-changing needs while being guided by prophetic direction. Thank you for continuing to seek and do good.

74. These representations are consistent with how LDS has represented its work, the work of its Philanthropies, and the use to which it would put donated funds for decades.

75. In a 2005 article in The Church News, an official publication of the Church, LDS representatives described why the organization was changing its name from the "LDS Foundation" to "LDS Philanthropies."

---

[25] "Church History," Philanthropies, https://web.archive.org/web/20230928004709/https://philanthropies.churchofjesuschrist.org/church-history (Nov. 2, 2023). This webpage was deleted sometime after Plaintiffs filed their original complaint in October 2023.

76.     In the article, representatives from LDS explained that donors' "gifts are sacred and they are treated as such."[26]

77.     The article goes on to paraphrase a statement by Richard C. Edgley, the first counselor in the Presiding Bishopric in 2005: "One hundred percent of everything that is contributed through LDS Philanthropies goes to the specific purpose it was contributed for. 'There is zero overhead' taken out of the donation for administrative costs."[27]

78.     As a result, the article continues, "Donations are often accepted from those not of our faith — mostly for The Church's humanitarian efforts."  Edgley attributes this to the fact that "The Church has a reputation of using the funds appropriately and wisely and for purposes that general populations feel good about."

**Ensign Peak Advisors**

79.     Despite LDS's representations to the contrary, a substantial and significant amount of the donations it receives are not directed towards humanitarian aid, nor any other philanthropic or charitable purpose.  Instead, they are transferred through a complex hub of entities to Ensign.[28]  A chart from the Whistleblower report highlights the complicated interplay between these various organizations: [29]

---

[26] Sarah Jane Weaver, "LDS Philanthropies depicts organization," The Church News, https://www.thechurchnews.com/2005/9/17/23236006/lds-philanthropies-depicts-organization (Last visited July 12, 2024).

[27] *Id.*

[28] Whistleblower report, Ex. H.2.

[29] *Id.*



Fund Flows/Grants Among Church Entities

March 2013, New Staff Orientation Deck

80.     Once funds are transferred to Ensign, they are continually reinvested and never used to fund any Church organizations or efforts.  They are, however, used to provide informal funding for unrelated business interests.

**B.    THE HISTORY OF ENSIGN PEAK ADVISORS**

81.     In 1997, COP created a non-profit entity called Ensign Peak Advisors, Inc. Ensign's articles of incorporation specify that it "is organized and shall be operated exclusively for religious, educational and charitable purposes, within the meaning of Section 510(c)(3) of the Internal Revenue Code, to benefit, perform the functions of, or carry out the purposes of" COP.[30]

---

[30] Whistleblower report at Exh. E.

They further specify that its "property is irrevocably dedicated to religious, educational and charitable purposes meeting the requirements for exemption provided by Section 501(c)(3) of the Internal Revenue Code."[31]

82.     But—in coordination with COP and, subsequently, LDS, and contrary to its only reason for existing—Ensign has never fulfilled its purported purpose for LDS nor functioned as a charitable entity.[32] Instead, for more than two decades, it has done only one thing: it has collected donations collected by LDS, without ever disbursing these funds towards any charitable purpose.[33]

83.     In fact, Ensign has never made a single expenditure for any religious, educational, or charitable objective—and it has no plans to ever spend any of the money it has gathered, instead acting as a massive hedge fund that never reinvests funds into the LDS. As the Whistleblower Report describes it, Ensign "is the reserve of the reserves" of LDS; LDS "does not draw down on it, and it has no mission—no liability stream, no schedule of activities, no plans for use, and no efforts to even model the future."[34]

84.     LDS deliberately keeps its use of Ensign shrouded in secrecy. "The $100+ billion corporation has remarkably few employees (20 people in 2010, and 75 people in 2019); it doesn't even have a sign on the building or in the lobby downstairs."[35]  Ensign employees are siloed from each other, separated by portfolio team; only four employees (the President, Chief

---

[31] Whistleblower report at Exh. E.

[32] *See generally* Whistleblower report; *see also id*. at 6.

[33] *See generally* Whistleblower report; *see also id*. at 6.

[34] Whistleblower report at 6.

[35] Whistleblower report at 21 & n.oo.

Investment Officer, Chief Financial Officer, and Senior Accountant) are permitted to see Ensign's actual financial statements.[36]

85.     But LDS is taking advantage of Ensign's non-profit status to receive billions of dollars in tax breaks on the interest its investments generate, even though Ensign does nothing demonstrably charitable, religious, or educational.[37]

### C.     DEFENDANTS ACTED TO CONCEAL THE EXTENT OF ENSIGN'S HOLDINGS

86.     By sequestering funds in Ensign and concealing the extent of Ensign's holdings from the public, Defendants have induced donations by misleading donors to believe that LDS's assets are less extensive than they are.

87.     Defendants have, in coordination, made additional misleading statements in sworn financial reports to the IRS.  As a non-profit, Ensign is required only to file an abbreviated financial disclosure using a Form 990 ("990").  On Ensign's 990 for 2007, its President signed under penalty of perjury that the "Book value of all assets at end of year" was "1,000,000" dollars:[38]

---

[36] Whistleblower report at 15 & n.cc.

[37] Whistleblower report at 8.

[38] Screenshot of "Full video exposé" of "Letter to an IRS Director," https://youtu.be/KDlFZF3RyhE, at 41:00.



88.     In actuality, the book value of Ensign's assets at the time was approximately $38,000,000,000—meaning the declaration made under penalty of perjury reported a figure that was 38,000 times too small.[39]

89.     On Ensign's 990 for 2010, its President signed under penalty of perjury that the "Book value of all assets at end of year" was "over 1,000,000" dollars:[40]

---

[39] *See* Whistleblower report at Exh. K.

[40] Screenshot of "Full video exposé" of "Letter to an IRS Director," https://youtu.be/KDlFZF3RyhE, at 41:00.



90.     In actuality, the book value of Ensign's assets at the time was approximately

$40,000,000,000—meaning the declaration made under penalty of perjury reported a figure that

was 40,000 times too small (unless the handwritten word "over" was meant to convey, under

penalty of perjury, that the reader should multiply this number by 40,000 to identify the actual

"Book value of all assets at end of year").[41]

91.     Thus, LDS not only failed to disclose its large-scale hoarding of donated funds; it

also, through and in coordination with Ensign, hid as much information as possible about the

purported charitable non-profit whose investing has yielded more capital than some nations—

even by making misrepresentations to the IRS to keep the trove a secret.

---

[41] *See* Whistleblower report at Exh. K.

92.     As part of this effort to conceal the extent of its holdings from regulators and the public, Ensign and LDS participated in a scheme to hide the extent of its assets from the public because the "Church was concerned that disclosures of assets in the name of Ensign Peak, a known Church affiliate, would lead to negative consequences in light of the size of the Church's portfolio."[42]

93.     Section 13(f) of the Exchange Act requires institutional investors that control at least $100 million in securities, like Ensign, to publicly file quarterly public disclosures with the SEC listing the full market value of the public securities that it manages.  This 13(f) disclosure does not require a full accounting of all assets or activity—for instance, a 13(f) filer does not need to disclose cash or bond holdings.  Due to Ensign's extensive public holdings, however, a proper 13(f) filing would have revealed that the minimum floor of Ensign's assets far exceeded any public representations made by Ensign about its size.

94.     To evade these reporting requirements, LDS and Ensign conspired to create an increasingly complex series of shell entities that existed for the sole purpose of obscuring ownership of Ensign's assets and "to ensure that neither the 'Street' nor the media connect the new entity to Ensign Peak."

95.     Beginning in 2001, Defendants established a trust, which owned a separate LLC, which formally owned Ensign's public securities.  Ensign's managing director was the designated trustee of the trust, and Ensign controlled both entities.  Solely to obscure ownership

---

[42] *See* Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order at ¶ 8. https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf

of the shell entities, Ensign registered the LLC to a California address.  The sole purpose of this LLC was to allow Ensign to undermine the reporting requirements of the Form 13(f) by obscuring Ensign's public holdings in a nominally private entity.

96.     As they became concerned that the public might discover the link between this LLC and Defendants, Defendants created additional nesting shell entities to further hide their holdings from the public.  Over the next approximately 18 years, Defendants created at least 12 additional nesting shell entities, which further obscured the chain of ownership of the funds and successfully concealed the scheme.[43]  These entities exercised no independent control over the holdings that were nominally in their name and existed for no other purpose than to obscure the extent of Ensign's assets.

97.     Each shell entity had a registered address outside of Utah, but actually conducted no business outside of the state, in order to make it more difficult for the public to trace the entities' ownership back to Defendants.

98.     Each shell entity was nominally managed and staffed by people who were actually employees of Defendants.  Defendants selected these employees specifically because they had commonly occurring names and minimal social media presences, and so their names appearing in public filings would not serve to connect the shell entities to Defendants.  All of

---

[43] These entities include Ashmore Wealth Management LLC, Argyll Research LLC, Clifton Park Capital Management, LLC, Cortland Advisers LLC, Elkfork Partners LLC, Flinton Capital Management LLC, Glen Harbor Capital Management LLC, Green Valley Investors LLC, Meadow Creek Investment Management LLC, Neuburgh Advisers LLC, Riverhead Capital Management LLC, Tiverton Asset Management LLC, and Tyers Asset Management LLC.

these employees worked in Utah, and none of them exercised any independent decision-making authority on behalf of the shell entities.

99.     The full description of LDS's illegal scheme to hide its assets from scrutiny by, among others, those who entrusted funds to LDS for its mission and charitable work, is set forth in the SEC's Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order.[44]

100.     During this period, and prior to the intervention by the SEC, COP actively concealed this scheme from its members.  As part of the Church's Biannual General Conference, the COP's auditing department shares a report, which is made publicly available on the internet. As part of that report, the auditing department affirms that its department "has the responsibility to perform audits for the purpose of providing reasonable assurance regarding contributions received, expenditures made, and safeguarding of Church assets" and that "contributions received…have been recorded and administered in accordance with approved Church budgets, policies, and accounting practices."[45]

101.     COP's auditing department produced annual reports for at least 1998-2023, regularly affirming that "based upon audits performed, the Church Auditing Department is of the opinion that, in all material respects, contributions received, expenditures made, and assets of the

---

[44] *See* https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf.

[45] *See* Kevin R. Jergensen, "Church Auditing Department Report, 2013", April 2014 bi-annual General Conference,  https://www.churchofjesuschrist.org/study/general-conference/2014/04/church-auditing-department-report-2013?lang=eng (Last visited July 12, 2024).

Church for the year [] have been recorded and administered in accordance with approved Church budgets, policies, and accounting practices."  At no point did the Church's auditing department ever report the practice of isolating funds in Ensign without using or tracking them.

102.    Once the scheme was exposed, Roger Clarke, Ensign Peak's CEO, conceded that they "tried to be somewhat anonymous" regarding LDS's investments.[46]  The purpose of this, he explained, was to conceal the extent of LDS's reserves from donors.  In fact, Roger Clarke further stated the reason for the Church's silence on its multi-billion dollar fund: "[s]o they never wanted to be in a position where people felt like, you know, they shouldn't make a contribution".[47]

103.    Indisputably, by incurring millions in civil fines paid by LDS and Ensign for their orchestrated and illegal deception, the LDS and Ensign wasted these funds and diverted them away from any potential use for the purported charitable mission of LDS and Ensign.

**D.      LDS REPEATEDLY MISREPRESENTS WHAT IT DOES WITH THE DONATIONS THAT END UP IN ENSIGN**

104.    Despite the vast holdings stored within Ensign, Defendants have never directed any of those funds to be used for the solicited, charitable purposes.

105.    By December of 2019, Ensign had accumulated more than $120 billion from donations to LDS or returns on investments of those donations.[48]  As the Whistleblower report states: "[Ensign] made 0 distributions in the first 12 years of its existence. It has made 0

---

[46] *See* Ian Lovett and Rachael Levy, "The Mormon Church Amassed $100 Billion.  It Was the Best-Kept Secret in the Investment World," *The Wall Street Journal*, Feb. 8, 2020.

[47] *See* Peggy Fletcher Stack, "LDS Church kept the lid on its $100B fund for fear tithing receipts would fall, account boss tells Wall Street Journal," *The Salt Lake Tribune*, Feb. 8, 2020.

[48] Whistleblower report at 4-8 & Exh. A.

distributions in the past five years."  The report goes on to say that, as far as the whistleblower

was aware, Ensign "did have two outflows in 22 years. Neither was planned, and neither went to

the furtherance of Ensign's exempt purpose nor that of its parent[, LDS]."[49]

106.    Through publicly available reports, Plaintiffs are now aware of at least two

instances in which COP directed Ensign to disburse money to fund unrelated business projects.

In 2009, Ensign spent $600 million to bail out a failing for-profit life insurance company owned

by LDS.[50]  And between 2010 and 2014, Ensign made a series of payments—again using

donated dollars exclusively—for the construction of the City Creek Mall in Salt Lake City,

totaling $1.4 billion.[51]

107.    At the time these payments were made, COP expressly denied that donated funds

would be used for these purposes.

108.    In an October 8, 2003 press conference regarding the City Creek Mall project, H.

David Burton, then a Presiding Bishop, stated "None of this money comes from the tithing of our

faithful members…that is not how we use tithing funds."[52]

---

[49] Whistleblower report at 6.

[50] Whistleblower report at 7 & n.f.

[51] Whistleblower report at 7 & n.h.

[52] "Church to Move Campuses, Invest in Salt Lake City Redevelopment", LDS Church website, https://www.churchofjesuschrist.org/study/ensign/2003/12/news-of-the-church/church-to-move-campuses-invest-in-salt-lake-city-redevelopment?lang=eng (Last visited July 12, 2024).

109.     In the lead-up to the construction of the mall, an article in the December 2006 issue of the COP-owned *Ensign* magazine stated that "no tithing funds will be used in the redevelopment" of the mall.[53]

110.     An October 5, 2012 article in the Salt Lake Tribune, described Keith McMullin, a high-ranking Church official who was then leading another LDS-affiliated company, Deseret Management Corp., as stating that "not one penny of tithing goes to the church's for-profit endeavors," and also reported that "[s]pecifically, the Church has said no tithing went toward City Creek Center."[54]   But by this time, Defendants had already made payments from tithing dollars toward building the mall.[55]

111.     Despite these repeated explicit representations to the contrary, Defendants did use tithing funds to pay for the construction of City Creek Mall and to backstop Beneficial Life, an insurance company with multiple directors and board members who were themselves high-ranking authorities within LDS and Ensign.   As the whistleblower described, Ensign channeled $1.4 billion to City Creek and $600 million to Beneficial Life indirectly, by routing funds through other entities affiliated with LDS.[56]

---

[53] *Church Releases Plans for Downtown Salt Lake*, Ensign Magazine, Dec. 2006, *available at* https://www.churchofjesuschrist.org/study/ensign/2006/12/news-of-the-church/church-releases-plans-for-downtown-salt-lake?lang=eng ("No tithing funds will be used in the redevelopment").

[54] Whistleblower report at 7-8 & n.h., *see also The Money Behind the Mormon Message*, Salt Lake Tribune, Oct. 05, 2012, *available at* https://archive.sltrib.com/article.php?id=54478720&itype=cmsid ("McMullin said not one penny of tithing goes to the church's for-profit endeavors. Specifically, the church has said no tithing went toward City Creek Center.")

[55] Whistleblower report at 8 & n.h.

[56] [56] *Huntsman*, 21-cv-02504, Decl. of David.A. Nielsen in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (ECF 37) ¶ 10.

112.     Roger Clarke, Ensign's president, explained to the whistleblower that the reason Defendants decided to route these funds indirectly was so that "people would not know [Ensign] was the source of this funding" and "that it was important that people should not know [Ensign]'s role as the source of the funds."[57]

113.     While the whistleblower was not aware of any other instances of Ensign making secret payouts to business interests, Plaintiffs believe, based on the pattern and practice suggested by these known payments, that discovery will uncover additional transfers from Ensign.

114.     The Whistleblower described attending a March 2013 meeting in which Ensign's president, Roger Clarke, gave a presentation describing various outlays made by the fund, at which the following slide was presented:

---

[57] *Id.*



## Ensign Peak & Portfolio Purposes

**The Role of Ensign Peak Advisors**

- Balance wealth growth and preservation of principal
- Maintain adequate liquidity for Church operations & investment flexibility
- Add incremental return through active management
- Maintain cost-effective & secure operations
- Produce accurate & timely reports
- Provide investment alternatives and education to affiliated entities & presiding councils
- Comply with appropriate legal & regulatory conditions
- Avoid investments or activities that would detract from the mission of the Church

**Purpose of the investment reserve is to support the following:**

- Prophetic initiatives
- Budget supplement
- Backstop the pension plan
- Backstop the taxable entities
- Collateral for Church purposes

**Examples of withdrawals are*:**

- Conference Center: $0mm; funded out of budget
- Proliferation of temples: $0; funded out of budget
- City Creek: $1,400mm over 5 years
- Beneficial Life: $600mm in 2009
- Pension / Other: $0mm; underfunded
- Collateral: ~$200mm for church entities

*The draw on the investment reserves has been relatively small due to the conservative nature of Church finances and operations – i.e. a balanced budget. This is a very strong first line of defense. Furthermore, over the past several years, approximately $1bn has been granted to EPA on an annual basis.

58

115.     The slide lists "examples of withdrawals," which include the outlays to City Creek and Beneficial Life.  The plain meaning of the word "withdrawals" suggests that these payments were pure transfers from Ensign to other entities and not investments or otherwise arms-length transactions.  Similarly, the plain meaning of this slide suggests that these two items are "examples" of outlays but not a complete list, and that other similar outlays made by Ensign exist.  As a result, Plaintiffs reasonably believe that discovery will reveal other instances in which funds were withdrawn from Ensign to fund unrelated business work.

---

58 *Huntsman*, 21-cv-02504, Decl. of David.A. Nielsen in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (ECF 37) ¶¶ 8-9.

E.   **PLAINTIFFS DONATED MONEY TO LDS BECAUSE OF LDS'S SOLICITATIONS AND WERE UNAWARE OF THE ENSIGN INVESTMENTS AND DECEPTIONS.**

116.   Mr. Chappell donated at least $108,926 to LDS since January 1, 1998.

117.   Based on LDS's representations, Mr. Chappell reasonably believed that his donations would be used only for the purposes represented by LDS.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Mr. Chappell could not appreciate the true manner in which the LDS actually intended to (and did) use his donations.

118.   Mr. Christensen donated at least $166,000 to LDS since January 1, 1998.

119.   Based on LDS's representations, Mr. Christensen reasonably believed that his donations would be used only for the purposes represented by LDS.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Mr. Christensen could not appreciate the true manner in which the LDS actually intended to (and did) use his donations.

120.   Mr. Oaks donated at least $74,277.73 to LDS since January 1, 1998.

121.   Based on LDS's representations, Mr. Oaks reasonably believed that his donations would be used only for the purposes represented by LDS.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, Mr. Oaks could not appreciate the true manner in which the LDS actually intended to (and did) use his donations.

122.   Mr. Wilson donated at least $183,256 to LDS since January 1, 1998.

123.   Based on LDS's representations, Mr. Wilson reasonably believed that his donations would be used only for the purposes represented by LDS.  Because of Defendants'

ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign,

Mr. Wilson could not appreciate the true manner in which the LDS actually intended to (and did)

use his donations.

124.    Mr. Long donated at least $31,000 to LDS since January 1, 1998.

125.    Based on LDS's representations, Mr. Long reasonably believed that his donations

would be used only for the purposes represented by LDS.  Because of Defendants' ongoing

efforts to conceal from the public the nature and extent of the donations held by Ensign, Mr.

Long could not appreciate the true manner in which the LDS actually intended to (and did) use

his donations.

126.    Mr. Brawner donated at least $3,700 to LDS since January 1, 1998.

127.    Based on LDS's representations, Mr. Brawner reasonably believed that his

donations would be used only for the purposes represented by LDS.  Because of Defendants'

ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign,

Mr. Brawner could not appreciate the true manner in which the LDS actually intended to (and

did) use his donations.

128.    Mr. Risdon donated at least $60,000to LDS since January 1, 1998.

129.    Based on LDS's representations, Mr. Risdon reasonably believed that his

donations would be used only for the purposes represented by LDS.  Because of Defendants'

ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign,

Mr. Risdon could not appreciate the true manner in which the LDS actually intended to (and did)

use his donations.

130.    The Judsons donated at least $60,000 to LDS since January 1, 1998.

131.     Based on LDS's representations, the Judsons reasonably believed that their donations would be used only for the purposes represented by LDS.  Because of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, The Judsons could not appreciate the true manner in which the LDS actually intended to (and did) use his donations.

132.     Plaintiffs did not believe and had no reason to ever suspect that LDS would take any portion of their donations and invest it into Ensign, where it would sit and accumulate interest in perpetuity and otherwise be used in manners antithetical to the purported mission of LDS and Ensign.  And even if Plaintiffs had any suspicions that LDS was engaging in any such practice, they never could have discovered it.

133.     Plaintiffs reasonably relied on LDS's public statements, including that the "vast majority" of donated funds were "used immediately" and that LDS complied with "all applicable laws."  Defendants' scheme to conceal the extent of Ensign's holdings maintained the false understanding created by these public statements.

### F.     CLASS ALLEGATIONS

134.     Plaintiffs seek to represent the following Class:

All persons in the United States who donated money to Defendants from January 1, 1998 through the date the Class is certified. Excluded from the Class are all persons who make a timely election to be excluded, governmental entities, and the Judge to whom this case is assigned and his/her immediate family.

135.     Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

136.    In the alternative, Plaintiffs will bring claims and seek relief on behalf of subclasses of donors in California, Illinois, Tennessee, Rexas, and Washington, for the causes of action asserted herein but under the laws of those states.[59]

137.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

138.    Certification of Plaintiffs' claims is particularly appropriate as Utah law will serve as the minimal legal standard applicable to the claims of all Class members (in addition to other claims class members may have under their own states' laws).  In addition, Defendants are based in Utah and all representations, omissions, concealments and decisions that provide the basis for the claims asserted in this litigation were conceived of, made, orchestrated and realized in Utah, which has the most significant relationship to the challenged conduct and the parties.

139.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

A.    NUMEROSITY AND NATURE OF THE NOTICE

140.    Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are millions of members of the Class, the precise number is unknown.  Class members may be notified of the pendency of

---

[59] All allegations herein made as to "the Class" or "Class members" apply with equal force as to members of these subclasses.

this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

### B.   COMMONALITY AND PREDOMINANCE

141.   Pursuant to Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3), this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

     a.   Whether Defendants engaged in the conduct alleged herein, including omission of the use to which funds it solicited would be used and misrepresentation regarding the actual use to which it put such funds;

     b.   Whether the conduct of Defendants violates the law as asserted herein, including breaches of its duties to Plaintiffs and other Class members as donors;

     c.   Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution, declaratory, or injunctive relief; and

     d.   Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

### C.   TYPICALITY

142.   Pursuant to Federal Rule of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants as described above.

### D.   ADEQUACY

143.   Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in

complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

### E.     DECLARATORY, EQUITABLE, AND INJUNCTIVE RELIEF

144.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### F.     SUPERIORITY

145.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## FIRST CAUSE OF ACTION
## Common Law Breach of Fiduciary Duty

146.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

147.     The Utah Charitable Solicitations Act states: "Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity."  Utah Code § 13-22-23.

148.     The Act defines "charitable purpose" as "any benevolent, educational, philanthropic, humane, patriotic, religious, eleemosynary, social welfare or advocacy, public health, environmental, conservation, civic, or other charitable objective".  Utah Code § 13-22-2(3).

149.     As described in detail in the factual allegations above, LDS, including its employees, subsidiaries, affiliates, volunteers, and agents, promoted, advertised, provided instructions for, administered, oversaw, and collected donated funds from donors throughout Utah and the United States.

150.     At all relevant times, LDS was a fiduciary or acting in a fiduciary capacity in connection with its promotion, solicitation, expenditure, and handling of all charitable contributions by Class members.  It accordingly owed the members of the Class all applicable fiduciary duties, including the duty to fully disclose to them all material facts and information in connection with its disposition of the donations.

151.   At all relevant times, Ensign was a fiduciary or acting in a fiduciary capacity in connection with its promotion, solicitation, expenditure, and handling of all charitable contributions by Class members.  Among other things, it acted as a fiduciary in its capacity as the entity that held such funds, would make expenditure of donated funds, and purportedly used such funds for charitable purposes.  It accordingly owed the members of the Class all applicable fiduciary duties, including the duty to fully disclose to them all material facts and information in connection with its disposition of the donations.

152.   Further, Ensign aided and abetted in the breach of LDS's fiduciary duty to Plaintiffs and the Class by, among other things, concealing the use and disposition of funds it received, establishing shell companies and the use of other deceptions to conceal the full extent of the funds it held, and putting funds to uses other than those for which they were solicited.

153.   Under the circumstances described in detail above, LDS and Ensign breached their fiduciary duties to Plaintiffs and the members of the Class by, among  other things, misusing the donations, failing to use the donations as represented, failing to fully disclose to the Class all material facts and information in connection with their disposition of donated monies, and by continuing to misrepresent their use of donated funds and criminal activity after their scheme was partially disclosed to the public.

154.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and members of the Class donated money to LDS under the reasonable, but mistaken, belief that the funds would be used in the ways that LDS represented that they would when it solicited donations.

155.    However, some portion of those donated funds was actually diverted to Ensign, with no intention of ever being used for the solicited purpose at all, let alone "immediately."

156.    As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

## SECOND CAUSE OF ACTION
### Fraudulent Inducement

157.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

158.    In the course of soliciting donations from Plaintiffs and the Class, Defendant LDS made false representations regarding contemporaneously existing material facts and made promises of future performance with no contemporaneous intent to perform, including that:

        a.    donated funds would be directed towards charitable purposes,

        b.    funds donated to specific church organizations would be directed to those organizations and used exclusively for those purposes,

        c.    the "vast majority" of donated funds would be used for charitable purposes, and

        d.    LDS followed all applicable laws regarding its use of donated funds.

159.    These statements and promises were false and or made with no contemporaneous intent to perform.

160.    Alongside these statements and promises, LDS actively sought to conceal the disposition of donations in concert with Ensign, including concealment of the amount and status of funds held by Ensign.

161.     Defendant LDS knew that these statements were false, or recklessly made them without regard for their truth despite substantial evidence to the contrary and furthered its deception by a course of concealment of the disposition of the donations.

162.     Defendant LDS made these statements and undertook its concealment for the purpose of inducing Plaintiffs and Class members to donate money to LDS.

163.     Defendant Ensign contributed to LDS's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the LDS's holdings.

164.     Plaintiffs and Class members reasonably relied on these statements, which they believed to be true, and were unaware of the true disposition of the funds.

165.     As a result of their reasonable reliance, Plaintiffs and Class members were induced to donate money to LDS.

166.     Had Plaintiffs and Class members known how LDS actually used donated funds, they would have either not donated funds, or donated lesser amounts.

167.     As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

### THIRD CAUSE OF ACTION
### Fraudulent Concealment

168.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

169.     LDS intended to provide and was in the practice of providing funds it solicited from Plaintiffs and other Class members to Ensign for the purposes of holding such funds and

such other uses as alleged above. Defendants knew about this and other similar material information and had a duty to communicate this information to Class members.

170. Yet, Defendants deliberately concealed from Plaintiffs and other Class members their intention and practices about the donated funds they received.

171. Specifically, Defendant LDS concealed the full extent of its holdings, and also concealed that it was directing funds to Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities.

172. Defendant Ensign contributed to LDS's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the LDS's holdings.

173. Defendants had a legal duty to disclose to Plaintiffs and other Class members the disposition of the donated funds received, including because they were in a fiduciary relationship and/or acting in a fiduciary capacity with the Class members.

174. LDS had a further duty to disclose to Plaintiffs and other Class members the disposition of the donated funds it received because it made full and partial representations that were at odds with its intention and practice with donated funds.

175. Had Plaintiffs and Class members known how LDS actually used donated funds, they would have either not donated funds, or donated lesser amounts.

176. As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

## FOURTH CAUSE OF ACTION
### Fraudulent Misrepresentation

177.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

178.     LDS made false statements of material fact that tithing funds would only be used for the LDS Church's published purposes and would not be used for the financing of City Creek Center.

179.     These representations were false because Defendants knew the funds to finance City Creek Center would be, and were, withdrawn from Ensign's treasury account, which contained tithing funds.

180.     LDS made these statements with an intent to defraud Plaintiffs and the Class and to induce reliance on these misrepresentations.  Defendants knew that Plaintiffs and the Class would not have donated money, or would have donated less, had they known that the funds would be used for these purposes.

181.     Plaintiffs and the Class reasonably relied on these misrepresentations because Defendants were in a superior position over Plaintiffs and the Class to know how the funds were being used; Plaintiffs and the Class were not aware and could not have determined that tithing funds were being used for purposes explicitly denied by LDS; and Plaintiffs and the Class relied on Defendants as fiduciaries to administer donated funds according to their published purposes.

182.     As a result of the above, Plaintiffs and Class members suffered damages of an amount to be proven at trial, and are entitled to seek such other relief as may be ordered by the Court.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

183.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

184.    As described in detail in the factual allegations above, Defendants made material misrepresentations and omissions to Plaintiffs and the Class in the course of soliciting and use of donations.

185.    Specifically, Defendant LDS misrepresented the full extent of its holdings, and also concealed that it was directing funds to Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities.

186.    Defendant Ensign contributed to LDS's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the LDS's holdings.

187.    Plaintiffs and the Class donated money to Defendants in reliance on those misrepresentations and omissions.

188.    Those donations constituted a benefit conferred on Defendants by Plaintiffs.

189.    Defendants understood the donations to be benefits.

190.    Defendants accepted and retained the donated funds, despite their knowledge that the statements made to solicit the donations were false and misleading.

191.    Under these circumstances, the continued retention of the donated funds by Defendants would be inequitable.

192.    As a result, Defendants are liable in restitution to Plaintiffs and the members of the Class to disgorge and remit to Plaintiff and the Class monies contributed, in an amount to be proved at trial, and subject to the equitable relief that may otherwise be ordered by the Court.

**Request for Relief**

193.    Because Defendants induced Plaintiffs and their fellow Class members to donate money to LDS by misrepresenting how donated funds are and would be spent, they breached their duties to Plaintiffs and the Class.  As described in detail above, Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

**A.**    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

**B.**    An order temporarily and permanently enjoining Defendants from continuing the unlawful and deceptive practices alleged in this Complaint;

**C.**    Injunctive, declaratory and other equitable relief, including, but not limited to, a declaration that Defendants' practices are illegal and a breach of their duties to Plaintiffs and the Class; an injunction on these illegal practices; an order requiring regular public accounting by Defendants as to the collection, use and disposition of collected funds and interest and income earned from these funds; and the appointment of a Special Master or an equally authorized panel of neutrals to monitor the collection, use and disposition of collected funds and income earned from these funds.

**D.**     Costs, restitution, damages, and disgorgement in an amount to be determined at

trial;

**E.**     An order requiring the Defendants to pay both pre- and post-judgment interest on

any amounts awarded;

**F.**     An award of costs and attorneys' fees; and

**G.**     Such other or further relief as may be appropriate.

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated this 12th day of July, 2024

MAGLEBY CATAXINOS, PC

/s/ James E. Magleby
James E. Magleby
Yevgen Kovalov
*Interim Liaison Counsel*

**Seeger Weiss LLP**
Christopher A. Seeger (*pro hac vice*)
Scott Alan George (*pro hac vice*)
Frazar W. Thomas (*pro hac vice*)

KITNER WOODWARD PLLC
Scott A. Kitner (*pro hac vice*)
Martin Woodward (*pro hac vice*)

CHIMICLES SCHWARTS KRINER & DONALDSON-
SMITH LLP
Steven A. Schwartz (*pro hac vice*)
Beena M. McDonald (*pro hac vice*)

*Interim Class Counsel*

**CERTIFICATE OF SERVICE**

On this 12th day of July, 2024, I hereby certify that I electronically filed the foregoing

CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of the Court using the

CM/ECF system, which will send an electronic notification to counsel of record for all the parties.

/s/ H. Evan Gibson