James E. Magleby (7247)
magleby@mcpc.law
Yevgen Kovalov (16297)
kovalov@mcpc.law
**MAGLEBY CATAXINOS, PC**
141 W. Pierpont Avenue
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000

Scott A. Kitner (*pro hac vice*)
scott@kitnerwoodward.com
Martin D. Woodward (*pro hac vice*)
martin@kitnerwoodward.com
**KITNER WOODWARD PLLC**
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: 214.443.4300

Christopher A. Seeger (*pro hac vice*)
cseeger@seegerweiss.com
Scott A. George (*pro hac vice*)
sgeorge@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: 973.639.9100

Steven A. Schwartz (*pro hac vice*)
steveschwartz@chimicles.com
Beena M. McDonald (*pro hac vice*)
bmm@chimicles.com
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500

*Interim Liaison and Class Counsel*

---

## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br><br>*This document relates to all actions* | **PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

## TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................. 1

PLAINTIFFS' ALLEGATIONS OF FACT ......................................................... 2

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ..................................................................................................... 10

   I.   The Church Autonomy Doctrine does not Foreclose Plaintiffs' Claims ............... 10

      A.   The Doctrine is an affirmative defense which is not appropriate for decision on the pleadings ................................................................. 11

      B.   The Church Autonomy Doctrine does not apply here ....................................... 12

   II.   Plaintiffs' claims are well-pleaded ..................................................................... 20

      A.   Plaintiffs state a claim for breach of fiduciary duty ......................................... 20

      B.   Plaintiffs state claims for fraudulent inducement and fraudulent misrepresentation .............................................................................. 23

      C.   Plaintiffs state a claim for fraudulent concealment ........................................... 29

      D.   Plaintiffs state a claim for unjust enrichment .................................................... 32

   III.   Plaintiffs' claims are not time-barred ............................................................... 34

CONCLUSION ................................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*Abramson v. William Paterson College of New Jersey*,
260 F.3d 265 (3d Cir. 2001) .................................................. 27

*Alvarado v. KOB-TV, L.L.C.*,
493 F.3d 1210 (10th Cir. 2007) ................................................ 2

*American Target Advertisement, Inc. v. Giani*,
199 F.3d 1241 (10th Cir. 2000) ............................................... 29

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
387 F. Supp. 3d 71 (D.D.C. 2019) ........................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................... 8, 9

*Baugh v. Darley*,
112 Utah 1, 184 P.2d 335 (Utah 1947) ..................................... 33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................. 9

*Bell v. Judge Memorial Cathlic High School*,
2023 WL 3585247 (D. Utah May 22, 2023) ................................ 11

*Bell v. Presbyterian Church (U.S.A.)*,
126 F.3d 328 (4th Cir. 1997) ................................................. 15

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022) .................................................. 13

*Berenda v. Langford*,
914 P.2d 45 (Utah 1996) ................................................. 35, 36

*Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*,
680 A.2d 419 (D.C. 1996) ..................................................... 16

*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) ........................................... 34, 35

*Blackmore/Cannon Dev. Co., LLC v. U.S. Bancorp d/b/a U.S. Bank*,
2010 WL 1816275 (D. Utah May 3, 2010) .................................. 29

*Bryan R. v. Watchtower Bible and Tract Society of New York, Inc.*,
    738 A.2d 839 (Me. 1999) ............................................................... 21

*Bryce v. Episcopal Church in the Diocese of Colorado*,
    289 F.3d 648 (10th Cir. 2002) ...................................................... 15

*Cantwell v. State of Connecticut*,
    310 U.S. 296 (1940) .............................................................. 13, 20

*Carrier v. Ravi Zacharias International Ministries, Inc.*,
    2022 WL 1540206 (N.D. Ga. May 13, 2022) ............................... 19

*CGC Holding Co., LLC v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) .................................................... 26

*Chapman v. Primary Children's Hospital*,
    784 P.2d 1181 (Utah 1989) .......................................................... 36

*Checkley v. Allied Property & Casualty Insurance Co.*,
    635 F. App'x 553 (10th Cir. 2016) ................................................ 9

*Chinitz v. Ally Bank*,
    2020 WL 1692817 (D. Utah Apr. 7, 2020) .............................. 25, 31

*Christy Sports, LLC v. Deer Valley Resort Co.*,
    555 F.3d 1188 (10th Cir. 2009) ..................................................... 9

*Church of Scientology Flag Service Org., Inc. v. City of Clearwater*,
    2 F.3d 1514 (11th Cir. 1993) ....................................................... 17

*Coalville City v. Lundgren*,
    930 P.2d 1206 (Utah Ct. App. 1997) ........................................... 31

*Conder v. A.L. Williams & Associates, Inc.*,
    739 P.2d 634 (Utah Ct. App. 1987) ............................................. 25

*DeBry v. Valley Mortgage Co.*,
    835 P.2d 1000 (Utah Ct. App. 1992) ........................................... 29

*El Pescador Church, Inc. v. Ferrero*,
    594 S.W.3d 645 (Tex. App. 2019) ............................................... 16

*Emergency Physicians Integrated Care v. Salt Lake County*,
    167 P.3d 1080 (Utah 2007) .......................................................... 33

*Franco v. The Church of Jesus Christ of Latter-day Saints*,
    21 P.3d 198 (Utah 2001) .............................................................. 21

*Gaddy v. Corporation of President of Church of Jesus Christ of Latter-Day Saints,*
665 F. Supp. 3d 1263 (D. Utah 2023) ............................................................ 21

*Gaddy v. Corporation of President of Church of Jesus Christ of Latter-Day Saints,*
451 F. Supp. 3d 1227 (D. Utah 2020) ............................................................ 21

*Gaddy v. Corporation of President of Church of Jesus Christ of Latter-D*ay S*aints,*
551 F. Supp. 3d 1206 (D. Utah 2021) ................................................ 14, 29, 30

*Groff v. DeJoy,*
600 U.S. 447 (2023) .......................................................................................... 17

*Grynberg v. Total S.A.,*
538 F.3d 1336 (10th Cir. 2008) ........................................................................ 37

*Hampton v. root9B Technologies, Inc.,*
897 F.3d 1291 (10th Cir. 2018) .......................................................................... 2

*Harris v. Matthews,*
643 S.E.2d 566 (N.C. 2007) ............................................................................. 16

*Hawthorne v. Couch,*
911 So.2d 907 (La. Ct. App. 2005) .................................................................. 28

*Hill v. Allred,*
28 P.3d 1271 (Utah 2001) ................................................................................ 35

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.,*
565 U.S. 171 (2012).......................................................................................... 11

*Hughes v. Vanderbilt University,*
215 F.3d 543 (6th Cir. 2000) ............................................................................ 38

*In re Automotive Parts Antitrust Litigation,*
50 F. Supp. 3d 836 (E.D. Mich. 2014) ............................................................ 34

*In re Godwin,*
293 S.W.3d 742 (Tex. App. 2009)..................................................................... 16

*In re The Bible Speaks,*
869 F.2d 628 (1st Cir. 1989) ........................................................ 13, 14, 28, 32

*In re Wells Fargo Mortgage-Backed Certificates Litigation,*
712 F. Supp. 2d 958 (N.D. Cal. 2010) ............................................................ 36

*Jeffs v. Stubbs,*
970 P.2d 1234 (Utah 1998) ........................................................................11, 12

*Jensen v. IHC Hosps., Inc.*,
944 P.2d 327 (Utah 1997) ................................................................. 29, 30

*Johnson v. Blendtec, Inc.*,
500 F. Supp. 3d 1271 (D. Utah 2020) ....................................................... 34

*Kansas Penn Gaming, LLC v. Collins*,
656 F.3d 1210 (10th Cir. 2011) ............................................................... 8

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
344 U.S. 94 (1952) ........................................................................... 15

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) .......................................................................... 17

*Layton Construction Company, Inc. v. Wrapid Specialty, Inc.*,
2015 WL 7312896 (D. Utah, Nov. 19, 2015) ................................................. 9

*Libhart v. Copeland*,
949 S.W.2d 783 (Tex. App. 1997) ........................................................... 19

*Ludvik Elec. Co. v. Vanderlande Industries, Inc.*,
2023 WL 8789379 (D. Utah Dec. 19, 2023) ................................................ 30

*Maughan v. SW Servicing, Inc.*,
758 F.2d 1381 (10th Cir. 1985) .............................................................. 37

*McIntyre v. United States*,
367 F.3d 38 (1st Cir. 2004) .................................................................. 37

*Munn v. Algee*,
924 F.2d 568 (5th Cir. 1991) ................................................................ 27

*Murphy v. Gospel for Asia, Inc.*,
327 F.R.D. 227 (D. Ark. 2018) .............................................................. 26

*Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*,
889 P.2d 445 (Utah Ct. App. 1994) ......................................................... 31

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .......................................................................... 15

*Pearson v. University of Chicago*,
2018 WL 3214219 (N.D. Okla. June 29, 2018) ............................................. 21

*Pero v. Knowlden*,
336 P.3d 55 (Ut. App. 2014) ................................................................ 38

*Petrell v. Shaw*,
902 N.E.2d 401 (Mass. 2009) ............................................................................ 21

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*,
393 U.S. 440 (1969) ................................................................................. 12, 15

*Prowel v. Wise Business Forms, Inc.*,
579 F.3d 285 (3d Cir. 2009) .............................................................................. 27

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) ............................................................................ 19

*Purple Innovations, LLC v. Honest Reviews, LLC*,
2017 WL 3172810 (D. Utah July 25, 2017) .............................................................. 9

*Ramirez v. World Mission Society, Church of God*,
2024 WL 1366445 (D.N.J. Apr. 1, 2024) ............................................................... 18

*Roberts v. C.R. England, Inc.*,
318 F.R.D. 457 (D. Utah 2017) .......................................................................... 26

*Schmidt v. Catholic Diocese of Biloxi*,
18 So. 3d 814 (Miss. 2009) .............................................................................. 19

*Securities and Exchange Commision v. World Radio Mission, Inc.*,
544 F.2d 535 (1st Cir. 1976) ........................................................................ 14, 20

*Serbian Eastern Orthodox Diocese for United States of America & Canada v. Milivojevich*,
426 U.S. 696 (1976) ...................................................................................... 15

*Shinde v. Nithyananda Found.*,
2014 WL 12597122 (C.D. Cal. Jan. 3, 2014) ........................................................... 30

*Siebach v. Brigham Young University*,
361 P.3d 130 (Utah App. 2015) .......................................................................... 23

*Spears v. Warr*,
44 P.3d 742 (Utah 2002) ................................................................................. 34

*State v. Larsen*,
865 P.2d 1355 (Utah 1993) .............................................................................. 31

*Sterlin v. Biomune Sys*tems,
154 F.3d 1191 (10th Cir. 1998) .......................................................................... 37

*Stone v. Salt Lake City*,
356 P.2d 631 (Utah 1960) ................................................................................ 24

*Thomas v. Review Board of Indiana Employment Security Division*,
    450 U.S. 707 (1981) ............................................................................ 27

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) ........................................................ 18, 19

*Tucker v. Faith Bible Chapel International*,
    36 F.4th 1021 (10th Cir. 2022) ......................................................... 11

*Tyler v. Hennepin County, Minnesota*,
    598 U.S. 631 (2023) .............................................................................. 9

*U.S. v. McKibbon*,
    878 F.3d 967 (10th Cir. 2017) ......................................................... 22

*United Klans of America v. McGovern*,
    621 F.2d 152 (5th Cir. 1980) ........................................................... 37

*United States v. Lilly*,
    37 F.3d 1222 (7th Cir. 1994) ........................................................... 19

*United States v. Rasheed*,
    663 F.2d 843 (9th Cir. 1981) ........................................................... 20

*United States v. Snowden*,
    770 F.2d 393 (4th Cir. 1985) ........................................................... 20

*United States v. Wales*,
    686 F. App'x 577 (10th Cir. 2003) .................................................. 21

*Waller v. City and County of Denver*,
    932 F.3d 1277 (10th Cir. 2019) ......................................................... 1

*Watson v. Jones*,
    13 Wall. 679 (1871) .......................................................................... 15

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................................... 20

*Wolter v. Delgatto*,
    2006 WL 664214 (Tex. App. Mar. 16, 2006) ................................. 16

*Wright v. Downs*,
    972 F.2d 350 (6th Cir. 1992) ........................................................... 27

*Yazd v. Woodside Homes Corp.*,
   143 P.3d 283 (Utah 2006) ..................................................... 31

*Youngblood v. Auto-Owners Ins. Co.*,
   158 P.3d 1088 (Utah 2007) ................................................... 28

## Statutes

Utah Code Ann. 1953 § 13-22-23 .................................... 20, 22, 30

Utah Code Ann. 1953 § 13-22-4 ........................................ 21, 22

## Other Authorities

Restatement (Second) of Torts § 551(2) (Am. L. Inst. 1965) ....................... 30

# INTRODUCTION

For decades, Defendants, the Church of Jesus Christ of Latter-Day Saints ("LDS") and Ensign Peak Advisors, Inc. ("Ensign"), intentionally concealed from donors that they secreted tens of billions of donated dollars into an undisclosed fund. Their representatives have explicitly admitted that the purpose of this fund was to hide the extent of their holdings because if donors learned about it, they would not continue donating at the same rates. Alongside this, LDS made express representations about the charitable use to which donations would be put, all the while intending to divert all or a substantial amount of these donations to no charitable purpose. Throughout their various motions,[1] Defendants mischaracterize Plaintiffs' claims, setting up a paper tiger so that they can knock it down.

As Defendants put it, "Plaintiffs raise objections to the size of the Church's reserve funds," that "the church should use donations 'immediately,'" or otherwise "accuse the Church of misusing donations." LDS MTD at 5, 6, and 13. Defendants' arguments for dismissal are all downstream of this mischaracterization of Plaintiffs' claims.[2]

---

[1] Plaintiffs here address Defendants' two Motions to Dismiss: the Motion to Dismiss of the Church of Jesus Christ of Latter-Day Saints, a Utah Corporation Sole (ECF No. 79) ("LDS MTD") and the Motion to Dismiss of Ensign Peak Advisors, Inc. (ECF No. 80) ("Ensign MTD"). Plaintiffs are addressing separately the arguments raised by Defendants in their Motion to Strike Class Allegations (ECF No. 81).

[2] Much of Defendants' mischaracterization is an offshoot of its liberal reference to purported facts that appear nowhere within the four corners of Plaintiffs complaint. To be sure, Plaintiffs refer to several documents, such as the SEC Order, the "Letter to an IRS Director" (also referred to as the "Whistleblower report"), and a declaration from the Huntsman action, which are properly before the Court at this juncture. However, matters like the abundant recitation of certain passages of scripture, media stories about Defendants, or LDS annual reports and public statements do not appear in Plaintiffs complaint (*See, e.g.*, LDS MTD at 1-3, 33, 19, 28-29, 31-33, and notes 7, 8, 16, and 25; Ensign MTD at 13-14, ) and should be ignored by the Court for the purposes of these motions. *Waller v. City and Cty. of Denver*, 932 F.3d 1277, 1282

Plaintiffs, however, make no such claims. Plaintiffs challenge the deceit with which Defendants drove their solicitation of donations. Plaintiffs do not challenge Defendants' prerogative to spend funds or manage their affairs.

Plaintiffs allege, simply, that in the course of soliciting their donations, LDS misrepresented how those donations would be spent and failed to disclose that the vast majority of those funds were actually being directed to Ensign, which held the funds in vast reserves that were never directed towards any charitable purpose. By actively concealing the size of these reserves, Defendants fraudulently induced Plaintiffs and the class to donate more than they would have had Defendants not concealed their holdings.

## PLAINTIFFS' ALLEGATIONS OF FACT

On February 21, 2023, The United States Securities and Exchange Commission ("SEC") issued a Cease-And-Desist Order ("SEC Order") against Defendants. Consolidated Class Action Complaint, ECF 72 ("CAC"), at ¶¶ 13, 99.[3] With this Order, the SEC put an end to Defendants' deliberate, decades-long, illegal concealment of "the size of the Church's equity portfolio from the [SEC] and the public" through the:

---

(10th Cir. 2019). *See also, Hampton v. root9B Tech., Inc.*, 897 F.3d 1291, 1297 n.2 (10th Cir. 2018). Consideration of outside documents is only appropriate if the motion is converted to one for summary judgment, "unless the dismissal *can be justified without considering the outside materials.*" *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215-16 (10th Cir. 2007) (emphasis in original). Indeed, Defendants admit as much when conceding that the Court can ignore such references. *See* LDS MTD at 7, n.7. Clearly, if resolution of Defendants' motions requires reference to such matters, the motions are premature and discovery is necessary to assess the merits of Plaintiffs' claims.

[3] The SEC Order, cited in the complaint, is available at https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf.

creat[ion of] thirteen limited liability corporations ('LLCs'), including twelve similar LLCs (the "Clone LLCs") with addresses located throughout the U.S., for the sole purpose of filing Forms 13F and preventing public disclosure by Ensign of the Church's equity securities holdings. The Forms 13F that Ensign Peak filed in the names of these LLCs misstated, among other things, that they had sole investment and voting discretion over the listed securities, when Ensign at all times retained discretion over all investment decisions.

SEC Order, at 2. *Id.*

Ensign developed its approach to filing Forms 13F in the names of these LLCs with the knowledge and approval of the Church, which sought to avoid disclosure of the amount and nature of its assets. Through their institutionalized use of this approach for almost twenty years, Ensign's significant role in the securities markets as an institutional investment manager was not disclosed. SEC Order at 2 ("Summary"). Pursuant to the SEC Order, Defendants paid $5 million in civil penalties (LDS paid $1 million and Ensign paid $4 million) and ceased the practice of using 12 shell companies to conceal the extent of the Church's holdings managed by Ensign, which holdings include the donations at issue in this litigation. CAC at ¶ 14.

The reason for Defendants' illegal deception was simple: "[LDS] was concerned that disclosure of the assets in the name of [Ensign], a known Church affiliate, would lead to negative consequences in light of the size of the Church's portfolio." SEC Order ¶ 8.[4] The original $7 billion held by Ensign in 1997 had grown by 2020 to include $37.8 billion in (undisclosed) publicly traded securities.[5] SEC Order ¶¶ 3, 5. Roger Clarke, the President and Chief Operating Officer of Ensign, admitted that Defendants' reason for the cover-up of the billions of LDS funds

---

[4] This paragraph continues by making clear that "[Ensign] did not have the authority to implement this approach without the approval of [LDS]'s First Presidency."

[5] The full extent of Ensign's holdings around that time is estimated around $120 billion. CAC ¶ 105.

was "[s]o they never wanted to be in the position where people felt like, you know, they shouldn't make a contribution."[6] CAC ¶ 102.

Once the SEC pulled back the curtain on Defendants' deceit, Plaintiffs—a mixture of current and former members of LDS—first learned the true scope and extent of Defendants' deception of LDS donors like themselves. On October 31, 2023, Plaintiffs filed the first of several actions that were transferred to and consolidated before this Court. And, like the SEC action, these actions sought relief without reference to church doctrine or running afoul of the First Amendment. In their Consolidated Class Action Complaint, Plaintiffs outline the omissions, half-truths, and misrepresentations undertaken by Defendants to drive donations to LDS. Defendants both actively concealed the extent of their holdings and made representations to induce donations for purported charitable works.

Donations to LDS take three primary forms: tithes, fast offerings, and donations to LDS philanthropies. CAC ¶¶ 4-6. Defendants repeatedly represented that the solicitation and disposition of donations "compl[y] with all applicable law governing our donations, investments, taxes and reserves," that audits by the Church Auditing Department confirmed "in all material respects, contributions received, expenditures made, and assets of the Church . . . have been recorded and administered in accordance with approved Church budgets, policies, and accounting practices," and that Ensign's holdings are "irrevocably dedicated to religious, educational and charitable purposes." CAC ¶¶ 12, 81, 101. Not only are such representations

---

[6] Similarly, Ensign concealed the full extent of its holdings in filings with the IRS by deliberately understating by factors of tens of thousands its book value in its annual 990 reports. CAC ¶¶ 87-91.

belied by the SEC Order, and the millions paid in civil penalties by Defendants, they are at odds with representations made by LDS when soliciting donations.

LDS has continually and repeatedly represented that tithing funds are "always used" for purposes like building construction, missionary work, education of Church members, and care for the poor and needy. CAC ¶ 54. Indeed, starting in 2012, the tithing slips emphasize that such donations will be used "to further the Church's overall mission." CAC ¶ 55.

Fast offerings are another regular donation made by LDS members which are earmarked exclusively to aid the poor: "Every dollar given to the bishop as a fast offering goes to assist the poor. When donations exceed local needs, they are passed along to fulfill needs elsewhere." CAC ¶¶ 5, 57-59. The fast offerings that are not used locally are rolled up to LDS and given to Ensign. CAC ¶¶ 5, 59.

Similarly, LDS solicits donations more widely from both LDS members and non-members for the LDS Philanthropies. CAC ¶¶ 6, 60. As with fast offerings, donors are assured that monies given to an LDS Philanthropy are doing charitable work: "100 percent of all donations go to help those in need. No administrative costs are deducted by Philanthropies or our affiliated charities." CAC ¶ 64; *see also* ¶¶ 7, 67 ("One hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origins"), 69-77.

Defendants' inducements to donors, however, are false. Once LDS receives any of these donated funds, a substantial and significant amount is not directed to the promised good. *See, e.g.,* CAC ¶ 8 ("some if not all, of these donations . . . are permanently invested in accounts it never uses for any charitable work"). Rather, the funds are transferred through a web of LDS entities (much like Ensign used its shell companies) to Ensign where they are comingled and remain alongside monies from LDS' extensive network of businesses and other operations. *See,*

*e.g.,* CAC ¶ 79 (including a graph demonstrating cash flows between and through no less than 20 entities, including for-profit, taxable entities), ¶ 40 (listing various entities LDS does business as). Once donations reach Ensign, they are never used to fund religious, educational, or other charitable efforts; when the funds have been used at all, it has been for unrelated business ventures. *See, e.g.,* CAC ¶ 80, 83, 105, 114.

Two such examples are known to Plaintiffs so far. The first was when $600,000,000 in Ensign-held funds were used to bail out an insurance company led by high-ranking LDS authorities. CAC ¶¶ 106, 111. The second was the construction of City Creek Mall just next door to LDS headquarters, which required $1.4 *billion* of Ensign-held funds and repeated denials by LDS leadership that any tithing donations would be used. CAC ¶¶ 106-111. Any question about the propriety of the use of donated funds held by Ensign for these two for-profit undertakings is answered by the fact that Defendants distributed the Ensign funds indirectly through other LDS entities. CAC ¶ 111. Mr. Clarke, Ensign's President and CEO again explained Defendants' motivations: Defendants concealed the payments so that "people would not know [Ensign] was the source of this funding" and "it was important that people should not know [Ensign]'s role as the source of the funds." CAC ¶ 112. Of course, the millions in civil penalties Defendants later paid pursuant to the SEC Order likely added another inappropriate use of donated funds, and Plaintiffs expect there to be more. CAC ¶¶ 115.

In their first cause of action, Plaintiffs allege that LDS breached its fiduciary duty to Plaintiffs and the Class by failing to "fully disclose to them all material facts and information in connection with its disposition of the donations," and that Ensign breached its fiduciary duty by "concealing the use and disposition of funds it received, establishing shell companies and the use

of other deceptions to conceal the full extent of the funds it held, and putting funds to uses other than those for which they were solicited." CAC ¶¶ 150, 152.

In their second cause of action for Fraudulent Inducement, Plaintiffs allege that LDS falsely represented that "donated funds would be directed towards charitable purposes" and "used exclusively for those purposes," that these promises were false and made with no intent to perform, and that Ensign helped to conceal the truth about these representations by "accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of LDS's holdings." CAC ¶¶ 158-168.

In their third cause of action for Fraudulent Concealment, Plaintiffs allege that LDS "concealed the full extent of its holdings, and also concealed that it was directing funds to Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities," and that "Ensign contributed to LDS's fraud by accepting donated funds, directing those funds towards noncharitable activities without ever disbursing them towards charitable activities, and concealing the extent of the LDS's holdings." CAC ¶¶ 171-172. As a result, Defendants "induced donations by misleading donors to believe that LDS's assets are less extensive than they are." CAC ¶ 86.

In their fourth cause of action for Fraudulent Misrepresentation, Plaintiffs allege that "LDS made false statements of material fact that tithing funds would only be used for the LDS Church's published purposes and would not be used for the financing of City Creek Center." CAC ¶ 178.

In their fifth cause of action for Unjust Enrichment, Plaintiffs allege that "LDS misrepresented the full extent of its holdings, and also concealed that it was directing funds to

Ensign, for the purpose of investing those funds without ever disbursing them towards charitable activities," and that "Ensign contributed to LDS's fraud by accepting donated funds, and directing those funds towards noncharitable activities" and concealing the full extent of the Church's holdings. CAC ¶¶ 185-186.

All of these claims are limited to Defendants' misrepresentations and concealments regarding the extent of their holdings and how they would direct donations. Yet Defendants dedicate most of their briefing to claims that Plaintiffs do not bring. For example, Defendants dedicate three pages of their argument to the irrelevant point that Defendants managed their finances in compliance with relevant laws and regulations. LDS MTD at 7-9. Leaving aside that Defendants consented to pay civil penalties for violating SEC regulations, these arguments are completely irrelevant to Plaintiffs' claims, and Defendants never connect them to any argument that Plaintiffs' claims should be dismissed as a result. As a result, Defendants do not come close to carrying their burden on any of their dismissal arguments.

## STANDARD OF REVIEW

When reviewing a motion to dismiss made pursuant to Rule 12(b)(6), all allegations of fact are "taken as true" to determine whether the complaint states "a claim to relief that is plausible on its face." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). A claim has facial plausibility

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Additionally, "[t]he complaint does not need detailed factual allegations, but the factual allegations must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). Further, "[a] court must not weigh potential evidence that the parties might present at trial, but assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Checkley v. Allied Prop. & Cas. Ins. Co.*, 635 F. App'x 553, 555–56 (10th Cir. 2016) (quotations omitted). "The Court accepts all well-pleaded facts as true, along with reasonable inferences from those facts." *Purple Innovations, LLC v. Honest Revs., LLC*, 2017 WL 3172810, at *10 (D. Utah July 25, 2017) (quotation omitted).

"The movant's burden is high: A 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Layton Constr. Co., Inc. v. Wrapid Specialty, Inc.*, 2015 WL 7312896, at *6 (D. Utah, Nov. 19, 2015) (quotations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "At this initial stage of the case, [plaintiff] need not definitively prove [its] injury or disprove the [defendant's] defenses." *Tyler v. Hennepin Cnty., Minnesota*,

598 U.S. 631, 637 (2023). Plaintiff need "plausibly plead[] on the face of her complaint that she suffered financial harm from the [defendant's] action, and that is enough for now." *Id.*

## ARGUMENT

### I.     The Church Autonomy Doctrine Does Not Foreclose Plaintiffs' Claims.

Defendants argue for a sweepingly broad reading of the church autonomy doctrine, which, if adopted, would effectively immunize any defendant that is a religious institution or claims that it was acting on behalf of a religious institution. Autonomy from the law is the exception, however, not the rule. Courts regularly decline to dismiss claims that arise out of church-affiliated defendants creating the impression they would do one thing, while actually doing another. Plaintiffs' claims about Defendants' deceptive efforts to drive donations fall squarely outside of the reach of this doctrine.

Plaintiffs' claims are based entirely on Defendants' deceptive solicitation of donations: LDS actively solicited donations, which it claimed would be directed towards specific purposes, but which it in fact covertly directed in substantial part towards Ensign, which actively worked to conceal the holdings and their size from donors. These included general donations, made either in the form of a tithe (which Defendants focus on exclusively), as well as donations solicited on behalf of specific philanthropies and donations of fast offerings, "every dollar" of which the Church represented "goes to assist the poor." The doctrine has no more role in this litigation than it did in the SEC enforcement action against Defendants for their use of shell corporations to deceive the public and avoid "negative consequences".

**A. The Doctrine is an affirmative defense which is not appropriate for decision on the pleadings.**

As an initial matter, Defendants' motion is premature. Defendants invoke the church autonomy Doctrine as part of their challenge to the pleadings. The only recitation of Church doctrine that appears in the record so far is in page after page of quotation and citations in Defendants' various motions. The Complaint manifestly challenges only Defendants' conduct in soliciting donations, not their religious beliefs or internal decision-making processes. The church autonomy Doctrine is an affirmative defense that may be raised if and when a matter of doctrinal independence comes squarely to the foreground; it is not a jurisdictional bar. *See, e.g., Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012) (noting in a case applying the "ministerial exception" that the doctrine is "not a jurisdictional bar"); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028–29 (10th Cir. 2022) ("The ministerial exception "operates as an affirmative defense to an otherwise cognizable claim," just "[l]ike the church autonomy doctrine" does.") As a result, the question requires "a fact-intensive inquiry rather than a straight legal conclusion." *Id.* at 1031.

Accordingly, courts, including the Supreme Court of Utah, have addressed the church autonomy doctrine at various stages in a litigation, including up through jury verdict. *See, e.g. Jeffs v. Stubbs*, 970 P.2d 1234, 1250–51 (Utah 1998) (noting that "[t]he trial court's award was carefully crafted to be the least restrictive means available to further the state's compelling interest, [and t]he remedy provided the claimants redress for their injuries in a manner that minimizes the burden upon free exercise."); *Bell v. Judge Mem'l Cath. High Sch.*, 2023 WL 3585247, at *14 (D. Utah May 22, 2023) (noting the defense is factual in nature and denying summary judgment).

Because Plaintiffs' allegations do not raise or rely on resolution of any doctrinal question or challenge any doctrinal independence Defendants may enjoy, any examination of the church autonomy doctrine is premature.

### B. *The Church Autonomy Doctrine does not apply here.*

Even accepting Defendants' extraneous recitation of doctrine and doctrinal history, Plaintiffs' claims are not foreclosed by the church autonomy doctrine. Plaintiffs' claims are centered on Defendants' statements and concealments regarding the fact of what they would do with donated funds, not their religious beliefs or internal decision-making processes. To the extent that plaintiffs' claims include actions taken in the course of inducing tithes, Plaintiffs do not challenge the doctrine of tithing or how Defendants should use them under their own rules— they solely challenge Defendants' misrepresentations and concealments that induced Plaintiffs and others to give tithes. Because these claims do not implicate religious beliefs or require an examination of the church's internal organization, they do not implicate the church autonomy doctrine.

"[C]ourts serve neither the church nor its members by placing their affairs in a special law-free zone. Law free is also lawless, and the consequence is that neither the faithful, nor the church or those with which it deals, can rely on the other parties playing by the rules, for there are then no enforceable rules." *Jeffs*, 970 P.2d at 1251 (quotation and citation omitted). "When a case can be resolved by applying well-established law to secular components of a dispute, such resolution by a secular court presents no infringement upon a religious association's independence. Thus, the doors of the courts must remain open to disputes involving churches which can be decided by the 'neutral principles of law.'" *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). "Simply having a

religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery." *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022).

These decisions are built on the critical limitation the Supreme Court has set on the Doctrine invoked by Defendants when fraud is in play. The First Amendment "embraces two concepts, freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. State of Connecticut*, 310 U.S. 296, 303–04 (1940). Defendants studiously avoid *Cantwell* in their briefing, but this is the one Supreme Court decision that addresses the solicitation of donations by religious entities. There, the Court struck down a law requiring organizations soliciting donations to apply for a license and demonstrate they were a *bona fide* religious entity, on the grounds that such an inquiry would impermissibly entangle the state in religious questions. *Id.* at 306–07. In doing so, however, it made clear that "[n]othing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. . . . Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury. Without doubt a state may protect its citizens from fraudulent solicitation. . . ." *Id.* at 306.

Thus, the First Circuit has held that those who run a church "may freely exercise their religion, but they cannot use the cloak of religion to exert undue influence of a non-religious nature with impunity. . . . [Although] gift[s] might have their seeds in the religious beliefs of plaintiff, . . . they were both nurtured and brought to fruition by misstatements and distortions of facts that had no basis either in the religious tenets [of the church] or the plaintiff's religious beliefs." *In re The Bible Speaks*, 869 F.2d 628, 645–46 (1st Cir. 1989). Put another way, "[t]he [Free Exercise] clause does not allow purely secular statements of fact to be shielded from legal

action merely because they are made by officials of a religious organization." *Id.* at 645. The First Circuit went further and concluded, as is applicable here, that prior caselaw "merely holds that there can be no claim that a professed religious tenet was not honestly advanced. It does not hold that a religious organization may make such secular statements as it chooses in seeking contributions, so long as they serve a charitable purpose." *Id*. (quoting *Sec. & Exch. Comm'n v. World Radio Mission, Inc.*, 544 F.2d 535, 537 n. 3 (1st Cir. 1976)).

Applying these principles, this Court, in *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, ("*Gaddy II*") 551 F. Supp. 3d 1206 (D. Utah 2021), dismissed claims that arose out of the Church's statements regarding the foundational events of its history and Joseph Smith's revelations; but it also held that for "secular representations concerning the use of money received by the Church. . . the church autonomy doctrine does not apply as a defense" even if such statements were made by Church officials. *Id.* at 1226.

Here, Plaintiffs' claims hinge on just those kinds of secular representations concerning the use of money received by the Church. Plaintiffs do not challenge the doctrinal basis for tithing; they simply allege that LDS induced donations through misrepresentations and omissions, and that Ensign worked to further these inducements by concealing its holdings so that they went uncorrected.

Defendants' attempt to claim a complete "autonomy" from secular law and a "prohibition" on the Court's hearing Plaintiffs' claims (LDS MTD at 9) glosses over the inapposite nature of the cited cases as well as crucial limitations in their holdings. Two of these cases involve intra-church property disputes where factions vied for control of church property. However, the Supreme Court made clear in *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich* that the case "essentially involves not a church property dispute, but a

religious dispute [over leadership of the church] which under our cases is for ecclesiastical and not civil tribunals." 426 U.S. 696, 709 (1976).[7] Similarly, facing a lawsuit arising from a schism in the Presbyterian Church, the Supreme Court found that judicial action in that case was tantamount to "establishing" a religion, but made clear that the doors of the courts must remain open to disputes involving churches which remain subject to the "neutral principles of law". *Presbyterian Church in U.S.*, 393 U.S. at 449.[8] Thus, the Supreme Court in *Our Lady of Guadalupe Sch. v. Morrissey-Berru* clarified that churches may make "internal management decisions that are essential to the institution's central mission . . . [like] the selection of the individuals who play certain key roles," but do not "enjoy a general immunity from secular laws." 591 U.S. 732, 746 (2020).[9]

Defendants' litany of lower-court cases supporting their argument are, at base, irrelevant. Plaintiffs' claims are fundamentally different from those at issue in *Bell v. Presbyterian Church*

---

[7] *Kedroff*, cited by Defendants in support of the notion that the church autonomy doctrine protects its "decisions" about financial disclosures (LDS MTD at 16) is wholly inapposite. *Kedroff* involved a challenge to a New York statute passed in the wake of the Russian Revolution that reassigned church property according to the demands of the local parish against the wishes of the Church's central hierarchy. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 95-97 (1952). However, *Kedroff* made clear that "the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine *which does not violate the laws of morality and property, and which does not infringe personal rights*, is conceded to all." *Id.* at 114 (quoting *Watson v. Jones*, 13 Wall. 679, 728 (1871)) (emphasis added). It was only the internecine fight over ecclesiastical authority which counseled against judicial intervention in *Kedroff*.

[8] Although not at issue in the case *sub judice*, even matters pertaining to the selection of church leadership or the decisions of such leadership regarding property may be subject to court review when "fraud or collusion" are present. *Serbian E. Orthodox Diocese*, 426 U.S. at 713.

[9] While the ministerial exception is an offshoot of the church autonomy doctrine, the hiring of ministers inherently involves internal church decisionmaking. *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 656 (10th Cir. 2002). "The church autonomy doctrine is not without limits, however, and does not apply to purely secular decisions, even when made by churches." *Id.* at 657.

*(U.S.A.)*, 126 F.3d 328, 331-32 (4th Cir. 1997), where the plaintiff argued that the defendant churches had a duty to continue funding his parachurch organization; or *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419 (D.C. 1996), where the plaintiffs argued that the defendant failed to follow proper accounting practices, but left the Court second guessing the business decisions of the defendant because the plaintiff failed to plead that the Defendant had ever held itself out as adhering to any particular accounting standard. *Id.* at 428. In *In re Godwin*, the plaintiff claimed that Defendants were "poor stewards of church funds and failed to use the church's resources for 'good church purposes,'" but not that they solicited any donations under fraudulent circumstances. 293 S.W.3d 742, 750 (Tex. App. 2009). The plaintiffs in *Harris* likewise only argued that the church's leadership board made improper expenditures using church funds, without alleging any fraud in soliciting donations. *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007).

Other cases cited by defendants involve disputes over the defendant churches' internal bylaws, which necessarily necessitated an inquiry into their governance. The plaintiff in *Wolter* argued that the church's disposition of a bequest was not executed in conformance with its internal governing principles, the Book of Order, and therefore his claims "ultimately concern[ed] whether [the church] properly followed procedures prescribed by the Book of Order." *Wolter v. Delgatto*, 2006 WL 664214, at *2 (Tex. App. Mar. 16, 2006). *El Pescador* involved a dispute over a board election, which could only be resolved by examining the church's governing documents. *El Pescador Church, Inc. v. Ferrero*, 594 S.W.3d 645, 658 (Tex. App. 2019). Similarly, the court in *Ambellu* dismissed claims disputing which church members had voting rights in church elections under the church autonomy doctrine because they too closely implicated church governance, but declined to do the same for RICO claims that the

church leadership "illegally took control of the Church and its assets" by falsely "promising that a vote" for church control would be held (though the court ultimately dismissed these claims for failing to plead predicate acts). *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 79 and 86 (D.D.C. 2019). Here, Plaintiffs' claims do not require any examination of Defendants' internal rules. They are based entirely on Defendants' ultimate public statements and their obligations under statutory and common law.

Finally, when arguing that Defendants' decisions about the disclosures must be free from legal challenge (LDS MTD at 15-16), Defendants rely on *Church of Scientology Flag Svc. Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993) which involved a municipal ordinance mandating disclosures and reporting from any charity or religious organization that solicited funds within the city funds. *Id.* at 1531. The court held that the ordinance violated the First Amendment because it was crafted to target a specific religion.[10] *Id.* at 1544. In doing so, however, it affirmed that "the state does indeed have a compelling interest in protecting church members from affirmative material misrepresentations designed to part them from their money," and that only "[w]hen no affirmative misrepresentations are made concerning the uses for which funds will be employed, either explicitly or by clear implication," does the state lack a "compelling interest in requiring members or the public to be made aware of such matters." *Id.*

Unlike in these cases, Plaintiffs here bring exactly the kinds of exclusively secular fraud claims that courts regularly consider. Indeed, as Defendants concede, "the First Amendment does not allow churches to commit fraud" by "solicit[ing] funds for purposes of advancing the mission

---

[10] The case principally dealt with whether there was a compelling state interest for the ordinance, which is not at issue here. *See Groff v. DeJoy*, 600 U.S. 447, 460 (2023); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022).

of a church but then us[ing] those funds for personal purposes." LDS MTD at 14 n.2. But personal use is not an element of fraud—misrepresenting or concealing material facts is. In cases where plaintiffs claim that religious actors requested funds for one purpose and use them for another, the church autonomy doctrine is irrelevant.

In *Ramirez v. World Mission Soc'y, Church of God*, for instance, a plaintiff donor brought various claims sounding in fraud against a church and related individuals, based in claims that they coerced her "into donating ten percent of her income to the church based on misrepresentations that the money would be used for charitable purposes and that none of the money would be used to fund salaries," along with other claims that the church concealed the identity of the church's leadership and its "mother goddess." 2024 WL 1366445 at *1, (D.N.J. Apr. 1, 2024). The court dismissed claims regarding the identity of leadership and the truth of doctrine on church autonomy grounds, but allowed claims regarding the church's representations of how it would use the money to proceed. *Id.* at *6 n.2.[11]

Similarly, in *Tilton v. Marshall*, the Texas Supreme Court upheld a trial court's decision not to dismiss claims against church entities and a pastor, where the pastor solicited donations (packaged as prayer requests) from the general public with the promise that he would "personally and actually read, touch, and pray over each" request without actually doing so. 925 S.W.2d 672, 679 (Tex. 1996). While the court recognized that the church autonomy doctrine foreclosed any fraud claim "if it rests on a representation of religious doctrine or belief—even if insincerely made," and so barred any claims regarding whether the prayer requests would actually work, it

---

[11] While the *Ramirez* court allowed claims of negligence and intentional fraud based on false representations to proceed, it dismissed claims for fraudulent concealment. However, its dismissal of these claims was based on deficiencies in the pleadings and not the church autonomy doctrine.

held that the fraud claims based on whether the defendants actually read, touched, and prayed over each prayer request did "not infringe upon [the defendant's] constitutional rights," because they were "based not on statements of religious doctrine or belief, but on [the defendant's] alleged promises to perform particular acts." *Id.* Because these claims implicated promises to perform certain "concrete acts," the factfinder could evaluate whether the acts were actually performed without having to determine the truth or falsity of religious belief. *Id.*[12] The Supreme Court of Mississippi has similarly held that, where a religious institution solicited funds "for a particular purpose," it is subject to liability for "improperly diverting designated funds." *Schmidt v. Cath. Diocese of Biloxi*, 18 So.3d 814, 830 (Miss. 2009). The Northern District of Georgia likewise found that the church autonomy doctrine does not preclude claims that "raise what amounts to a secular factual question: whether the Defendants solicited funds for one purpose (*i.e.*, Christian evangelism) but instead used those funds for another purpose (*i.e.*, to perpetuate and cover up sexual abuse)," because the claims center "on the defendants' actions, not their beliefs, and can be decided according to state statutes and common law principles." *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, 2022 WL 1540206, at *6 (N.D. Ga. May 13, 2022), quoting *Puri v. Khalsa*, 844 F.3d 1152, 1167 (9th Cir. 2017) (internal quotations omitted).

Courts have also heard criminal charges against religiously affiliated defendants for fraud. *See, e.g., United States v. Lilly*, 37 F.3d 1222, 1226 (7th Cir. 1994) (upholding conviction of pastor for fraud when he solicited parishioners to buy scam investment instruments over First

---

[12] Following such precedent, the Texas Court of Appeals made clear in *Libhart v. Copeland*, 949 S.W.2d 783 (Tex. App. 1997) that even when proper, internal Church procedures are followed, fraud will not be countenanced: "[e]quity will compel fair dealing, disregarding all forms and subterfuges, and looking only to the substance of things." *Id.* at 794.

Amendment objections, because the charges "pertained solely" to how the defendant made "fraudulent misrepresentations and omissions of material fact" in the first place); *United States v. Snowden*, 770 F.2d 393, 395-96 (4th Cir. 1985) (upholding conviction of pastor for participating in kickback scheme where defendants characterized kickbacks as unreviewable "love offerings"); *United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981) (distinguishing religious belief from "what one does with one's faith [which] may not enjoy the same absolute protection," because the "First Amendment does not protect fraudulent activity performed in the name of religion."), *citing Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) and *Cantwell*, 310 U.S. at 303-04.

Simply put, the First Amendment "does not hold that a religious organization may make such secular statements as it chooses in seeking contributions, so long as they serve a charitable purpose." *World Radio Mission*, 544 F.2d at 537, n.3. Here, Plaintiffs allegations fall squarely into the kind of fact-based, secular claims that are not foreclosed by the church autonomy doctrine.

## II.      Plaintiffs' Claims Are Well-Pleaded.

### A.    *Plaintiffs state a claim for breach of fiduciary duty.*

Utah law imposes fiduciary duties on anyone who solicits charitable donations for any purpose. The Utah Charitable Solicitations Act ("Charitable Solicitations Act") states: "Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity." Utah Code Ann. 1953 § 13-22-23. Under the heading "Action for damages," the Act

also makes clear that "[n]othing [herein] precludes any person damaged as a result of a charitable solicitation from maintaining a civil action for damages or injunctive relief." *Id.* at § 13-22-4.

Defendants try to convince the Court that the Charitable Solicitations Act does not mean what it plainly says. Unsurprisingly, this falls flat. Defendants cite *Gaddy I* and other caselaw for the proposition that a fiduciary relationship does not arise from "purely ecclesiastical relationships." LDS MTD at 17-18 (citing, *inter alia*, *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 451 F. Supp. 3d 1227, 1240 (D. Utah 2020); *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198 (Utah 2001)).[13] This argument is irrelevant; Plaintiffs do not argue that the fiduciary relationship exists because they are Defendants' parishioners, and Defendants likewise cannot argue that Defendants are immunized from ever being fiduciaries to Plaintiffs through any other context. The Utah Legislature created an independent fiduciary duty in the Charitable Solicitations Act without regard to church membership. Indeed, neither *Gaddy I* nor *Franco* involved any claims about charitable

---

[13] The remaining cases Defendants cite for this proposition are *Petrell v. Shaw*, 902 N.E.2d 401, 406 (Mass. 2009); *Bryan R. v. Watchtower Bible and Tract Society of New York, Inc.*, 738 A.2d 839, 846 (Me. 1999); *United States v. Wales*, 686 F. App'x 577, 581 (10th Cir. 2003); and *Pearson v. Univ. of Chicago*, 2018 WL 3214219, at *10 (N.D. Okla. June 29, 2018). LDS MTD at 18. None of these involved either the Utah Charitable Solicitations Act or claims involving donations, and they therefore have no application here. Defendants also cite to *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints ("Gaddy III")*, 665 F. Supp. 3d 1263, 1292 (D. Utah 2023)) for the same proposition, though the case—like *Gaddy I*— concerned neither charitable solicitations nor the Charitable Solicitations Act. Defendants correctly point out (LDS MTD at 19 n.14) that *Gaddy III* says the Act does not create a private cause of action—but there, the *Gaddy* plaintiffs made no claim for breach of the specific fiduciary duty the Act creates, and, as the Court noted, simply acceded to the defendant's argument that only state government officials can enforce the Act. But as Defendants note here, the Act expressly provides that "*any person* … [can] maintain[] a civil action for damages or injunctive relief." Utah Code Ann. 1953 § 13-22-4 (emphasis added).

solicitations, and the holdings of those cases necessarily do not preempt or negate the rights the statute confers on Plaintiffs.

Defendants only acknowledge the plain language of the Charitable Solicitation Act by claiming that § 13-22-23 "does not say charities owe a fiduciary duty *to donors*[.]" LDS MTD at 19, Ensign MTD at 5-6. They claim the Act's fiduciary duty only extends "to the charity." *Id*. (citing Restatement of the Law, Charitable Nonprofit Associations §§ 2.02, 2.04). This interpretation is squarely at odds with the plain language of the Act. *See U.S. v. McKibbon*, 878 F.3d 967, 974 (10th Cir. 2017) ("Without any Colorado case law to the contrary, we have no authority on behalf of Colorado to insert any new limiting adjective" into a statute). Section 13-22-23 of the Utah Code explicitly makes persons engaged in the solicitations of donations fiduciaries. If the fiduciary duty of an organization soliciting donations is solely to itself, the Act is pointless. Defendants cite no authority in support of their characterization other than the Restatement, but the sections Defendants cite to just describe the general duties of care and loyalty owed to a charity by its fiduciaries—they do not discuss the Charitable Solicitations Act at all, let alone what additional duties it specifically creates.

Defendants also argue that because they made money by squirreling away Plaintiffs' donations instead of using them as they promised, they could not have breached any fiduciary duties. LDS MTD at 19. This defense is based in statements not supported by the record and mischaracterizes Plaintiffs claims. Plaintiffs do not argue that a nonprofit is not entitled to invest funds in reserve, but instead that where a nonprofit solicits donations through misrepresentations and misleading partial disclosures regarding how it will use those donations, it violates its fiduciary duty to its donors.

Finally, again ignoring the existence of the Charitable Solicitation Act and its plain language, Defendants challenge Plaintiffs' standing to bring claims for breach of fiduciary duty, citing *Siebach v. Brigham Young Univ*., 361 P.3d 130, 135 (Utah App. 2015). LDS MTD at 19-20, Ensign MTD at 6. In *Siebach*, the Utah Court of Appeals dismissed plaintiffs' claims attempting to enforce their donative intent based on the general rule that donors do not have standing to enforce the terms of the gift. 361 P.3d at 134. In doing so, however, the court explicitly "conclude[d] that claims alleging the improper *inducement* of a charitable donation are distinguishable from claims seeking to enforce donative intent and that improper inducement claims do not fall within the common-law donor-standing rule." *Id*. at 140 (emphasis in original). In doing so, the court cited the Charitable Solicitations Act as support for the notion that a donor plaintiff has standing to bring a claim based on wrongful solicitation, as Plaintiffs do here. *Id*. at 139-40.[14]

### B. Plaintiffs state claims for fraudulent inducement and fraudulent misrepresentation.

As Plaintiffs describe *supra* at pp. 2-8, Plaintiffs allege that Defendants solicited donations from Plaintiffs and other donors by claiming that certain donations would be directed towards specific causes, that all donations were solicited and accounted for in compliance with relevant laws and regulations and would be directed towards charitable purposes. However, Defendants knew that this was not true. LDS funneled donations to Ensign, obscuring the extent of its holdings through a series of shell corporations. Once these donations were channeled to

---

[14] Defendants also argue that Plaintiffs lack standing because the Charitable Solicitations Act does not create a private right of action. But the Charitable Solicitations Act likewise does not foreclose private plaintiffs from bringing common law claims, as Plaintiffs do here.

Ensign, no donor would know that these holdings were put to no charitable purpose, but were used—if at all—to finance at least two unrelated business ventures and eventually pay fines to the SEC. Plaintiffs reasonably relied on these representations, and, to their detriment, donated to LDS, which funneled their donations to Ensign. CAC at ¶¶ 180-182.

Ignoring every one of these facts, Defendants make two distinct arguments challenging the adequacy of Plaintiffs' fraudulent misrepresentation and inducement claims. First, they claim that they are not bound by their statements about how funds would be directed. Second, they argue Plaintiffs "fail to plead falsity" because Plaintiffs purportedly "assert[] that 'tithing' was used without saying what they mean," LDS MTD at 23-24, Ensign MTD at 8. Third, they fault Plaintiffs' pleading of reliance as "conclusory." LDS MTD at 24-27, Ensign MTD at 10. Both challenges fail.

Defendants rely on *Stone v. Salt Lake City* to argue that they can never be held liable for investing donated funds. 356 P.2d 631, 633–34 (Utah 1960). *Stone*, however, stands for the uncontroversial proposition that donors do not have a right to control funds after they are donated. *Id.* The Plaintiff in *Stone* did not allege fraud in the inducement; he only argued that the distribution was at odds with the Church's bylaws and that, as a donor, he had standing to challenge it. *Id.* As a result, the *Stone* court only considered whether the Church had the right to disburse the funds as it wished under its articles of incorporation, not whether it could conceal those expenditures when soliciting donations.

Defendants also argue that proving falsity requires Plaintiffs to define "tithing funds" by pointing to the summary judgment record in *Huntsman* to conjure up a granular "definition" requirement, but the pleading standard does not demand Plaintiffs chart the flow of every specific dollar all the way from donors' pockets to the City Creek Mall project—especially when

they plausibly allege that Defendants falsely stated they spend no tithing funds on City Creek. Specifically, Plaintiffs allege that Ensign paid for the City Creek Mall using donated dollars exclusively. CAC ¶ 106 & n.51 (citing Whistleblower report at 7 & n.h, which notes "[t]hese checks [for City Creek] were cut from the [Ensign] Treasury account, not from any liquidation of allocated capital. Only never-invested tithing surplus enters th[is] account.").

Defendants also argue that "Plaintiffs' reliance allegation for their fraudulent misrepresentation claim is [] conclusory." LDS MTD at 24. For this, Defendants rely on *Chinitz v. Ally Bank*, 2020 WL 1692817 (D. Utah Apr. 7, 2020), in which this Court aptly observed there are "any number of reasons why" someone would open a bank account and thus rejected the plaintiff's tautological argument that reliance was established by the fact he opened an account. *Id*. at *7. Here, Plaintiffs donated in reliance of Defendants' solicitations: Defendants intended those statements to induce donations, and as a foreseeable result, Plaintiffs donated in reliance on those statements.

Although reliance is an element of both fraudulent inducement and fraudulent misrepresentation claims, "[r]easonable reliance must be considered with reference to the facts of each case, and is usually a question for the jury to determine." *Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987). Here, Plaintiffs expressly plead that they relied on Defendants' myriad representations aimed at soliciting donations. ¶¶ 117, 119, 121, 123, 125, 127, 129, 131.

As Plaintiffs allege, Defendants use standard solicitation methods, all representing that donations—whether for tithing or for other purposes—are used only for the purposes specified. *See generally* ¶¶ 53-78; *see also* ¶¶ 55-56 (tithing slips reciting particular uses of tithing and fast offering donations), ¶ 64 (Philanthropies website representation that "100 percent of all

donations go to help those in need. No administrative costs are deducted by Philanthropies or our affiliated charities"), ¶ 69 (Philanthropies website representation that "one hundred percent of every dollar donated is used to help those in need without regard to race, religion, or ethnic origin"). In circumstances like these, courts commonly draw an inference of reliance in assessing the justiciability of fraud claims. *See, e.g., CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1090 (10th Cir. 2014) ("an inference of reliance was appropriate where circumstantial evidence that can be used to show reliance is common to the whole class") (internal quotations omitted).

This Court did just that in *Roberts v. C.R. England, Inc*., 318 F.R.D. 457 (D. Utah 2017) in the class certification context:

> After a careful review of the record and the claims, the court concludes that an inference of reliance and causation is warranted in this case. Here, the circumstantial evidence of reliance is abundant. Individuals relied on promises of economic opportunity when they enrolled in and paid tuition to attend England's driving schools.

*Id*. at 514; *see also Murphy v. Gospel for Asia, Inc*., 327 F.R.D. 227, 238-41 (D. Ark. 2018) (drawing inference of reliance after noting "this is a classic case of fraud, where the putative class argues that Defendants solicited monetary donations after representing that those donations (which were for particular items) would in fact be spent in the field.").[15]

---

[15] Ensign also argues that Plaintiffs lack standing to bring claims against it because Plaintiffs identify no misrepresentations made by Ensign. As Plaintiffs plead, however, Ensign represented it is operated exclusively "to benefit, perform the functions of, or carry out the purposes of" the Church and its "property is irrevocably dedicated to religious, educational, and charitable purposes." ¶ 81. Moreover, Defendants represented that all of the accounting and reporting made about the donations and their holdings were all legal and above board, severely understated their holdings in IRS filings, and actively concealed the extend of Ensign's holdings. *See* ¶¶ 87-90, 93-99. Plaintiffs also allege that by failing to disclose its holdings, Ensign

The facts Plaintiffs allege warrant the Court's drawing the same inference at the pleading stage.

Lastly, the Court should reject Defendants' argument that it cannot consider the question of reliance without improperly entangling itself in religion. LDS MTD at 26-27; Ensign MTD at 13. Courts regularly consider the perspective of reasonable religious believers without implicating the First Amendment. For instance, in *Wright v. Downs*, 972 F.2d 350 (6th Cir. 1992), the Sixth Circuit analyzed how a reasonable person would understand a church's characterization of notes when it solicited investments from the public. Courts evaluating religious discrimination claims involving hostile work environments likewise inquire into whether a defendant's actions "would detrimentally affect a reasonable person of the same religion in that position". *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 292 (3d Cir. 2009) (quoting *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 277 (3d Cir. 2001)). The Fifth Circuit has held that the establishment clause does not prevent courts from considering a plaintiff's religious belief when evaluating whether they took reasonable mitigation efforts. *Munn v. Algee*, 924 F.2d 568, 574 (5th Cir. 1991). And even where courts decline to consider a plaintiffs' reasonableness in light of their religious beliefs, the proper course of action is simply to accept a plaintiff's religion instead of dismissing the case entirely. *See, e.g., Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715 (1981) (declining, in a religious accommodation case, to analyze the reasonableness of an employee's interpretation of Jehovah's Witness beliefs where they did not comport with those of other members of his faith, and instead accepting his statement of "honest conviction").

—————————————————

contributed to LDS's misrepresentations regarding the extent of its holdings and what it was doing with them.

In support of their argument, Defendants cite no cases that consider the impact of the church autonomy doctrine on considerations of reliance, and only one that even considers the question of tithing in regard to the doctrine, *Hawthorne v. Couch*, 911 So.2d 907 (La. Ct. App. 2005). In *Hawthorne*, a plaintiff sued a church and pastor for influencing him to donate in excess of the biblical requirement coupled with threats of damnation, which the court concluded it could not adjudicate without improperly determining whether these statements were fraudulent and coercive "or rather a literal interpretation of the Bible as believed by" defendants. 911 So.2d at 911. That is, *Hawthorne* stands only for the uncontested (and irrelevant) rule that courts cannot consider fraud claims that contest the truth of a religious belief, which Plaintiffs do not do here.

Again, nothing in Plaintiffs' claims requires an evaluation of the doctrine of tithing. Plaintiffs' claims are centered entirely on Defendants' misrepresentations about how the funds would be used. That does not require the Court to dictate, or even investigate, church doctrine. *See Youngblood v. Auto-Owners Ins. Co.*, 158 P.3d 1088, 1096 (Utah 2007) ("[T]he determination of reasonableness is not based on the subjective state of mind of the person claiming he was misled, but rather is to be based on an objective test, *i.e.*, what would a reasonable person conclude under these circumstances"); *see also In re The Bible Speaks*, 869 F.2d 628, 646 (1st Cir. 1989).

Plaintiffs' fraudulent inducement and fraudulent misrepresentation claims are based solely on Defendants' concealment of the extent of their holdings and what they did with them. These claims do not implicate religious doctrine at all, and this court should not accept Ensign's invitation to dismiss them just because Defendants argue that Plaintiffs should not have relied on these statements out of religious duty.

### *C. Plaintiffs state a claim for fraudulent concealment.*

Defendants argue that Plaintiffs have not adequately pleaded sufficient facts to support materiality or a duty to disclose. LDS MTD at 27-28, Ensign MTD at 11-12. Specifically, they argue that they had no duty to disclose, and the Court cannot determine materiality of the omission as that would require a secular examination of religious beliefs. Again, Defendants try to raise extraneous religious matters in attempt to create the appearance that Plaintiffs' straightforward claims are hopelessly entangled in doctrine. But Plaintiffs' fraudulent concealment claims are bog-standard: Defendants concealed the Ensign-held funds to drive donations, and consequently, had a duty to disclose this material fact.

As Plaintiffs plead, Defendants were under a duty to disclose both because they were in a fiduciary relationship with plaintiffs and because their partial representations about how they would use donated funds were at odds with their intentions and practice. CAC at ¶ 173-174. A duty to disclose "may arise from a relationship of trust between the parties, an inequality of knowledge or power between the parties, or other attendant circumstances indicating reliance." *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 333 (Utah 1997); *see also DeBry v. Valley Mortg. Co.*, 835 P.2d 1000, 1007 (Utah Ct. App. 1992) ("If [the circumstances of the case] include a relation of trust or confidence, or inequality of condition, a duty may exist."). A duty to disclose also arises when "a speaker makes a material statement of fact that is misleading unless the speaker also includes 'all material facts a listener would need to keep that statement from being misleading.'" *Gaddy II*, 551 F. Supp. 3d at 1222 (quoting *Blackmore/Cannon Dev. Co., LLC v. U.S. Bancorp d/b/a U.S. Bank*, 2010 WL 1816275, at *8 (D. Utah May 3, 2010).

Both of these factors gave rise to a duty to disclose on the part of LDS. First, the Charitable Solicitations Act creates a fiduciary relationship between a nonprofit and its donors.

*See* Utah Code § 13-22-23. Indeed, preventing the type of fraud alleged here is exactly the

purpose of the Charitable Solicitations Act. *See Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241,

1247 (10th Cir. 2000) ("The Act's general declarations and specific prohibitions clearly target

fraud."); *see also* discussion *supra* at II.A.

Defendants also had a duty to disclose because they knew the extent of their holdings and

how donated funds were directed, but Plaintiffs and putative class members did not. To maintain

this misconception, LDS and Ensign took steps to actively misrepresent and conceal Ensign's

true nature and purpose. *See, e.g.*, ¶¶ 10, 81, 84, 86-103, 112. Taken together, this gives rise to an

inequality of knowledge that creates a duty to disclose. *Jensen*, 944 P.2d at 333. *See also Ludvik*

*Elec. Co. v. Vanderlande Indus., Inc.*, 2023 WL 8789379, at *9 (D. Utah Dec. 19, 2023)

(recognizing duty to disclose where one party has information it "knows to be necessary to

prevent his partial or ambiguous statement of the facts from being misleading") (quoting

Restatement (Second) of Torts § 551(2) (Am. L. Inst. 1965)); *Shinde v. Nithyananda Found.*,

2014 WL 12597122, at *7 (C.D. Cal. Jan. 3, 2014) (duty to disclose extends to party receiving

donation when it failed to disclose that donations were not directed towards the uses for which

they were solicited).

Defendants also had a duty to disclose because they made material statements of fact

regarding what the donated funds would be used for, *see, e.g.*, ¶¶ 108-110, including the specific

purposes for the targeted donations for the fasting offerings and specific Philanthropies. These

misstatements would mislead any listener as to the true use of the funds and thus created a duty

of disclosure by LDS.[16]

_____

[16] The duty to disclose here also arises because the Church made specific promises about
how the tithing funds would and would not be used while not intending to follow through on

Next, Defendants argue that Plaintiffs fail to plead that a reasonable person would find how donated funds were actually used to be material to their decision to donate. LDS MTD at 28-29, Ensign MTD at 12-14. The ultimate ends of how donated funds were used are of course material, as Plaintiffs themselves allege, CAC at ¶ 175. As Ensign's leadership admitted, Defendants hid the extent of LDS's assets so to avoid the outcome where "people felt like, you know, they shouldn't make a contribution." CAC at ¶ 102.

As Defendants concede, materiality is based on an objective reasonable person standard. *See* LDS MTD at 28. Whether a fact is material "can be gauged by the degree to which the information could be expected to influence the judgment of a person." *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 289 (Utah 2006). As a result, materiality is "generally a question of fact for the fact finder." *Chinitz*, 2020 WL 1692817, at *7 (quoting *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 458 (Utah Ct. App. 1994)); *see also State v. Larsen*, 865 P.2d 1355, 1363 (Utah 1993) ("The bottom line is that the question of materiality as it relates to the importance or significance of the omitted information [in a securities fraud case] is, at least on one level, a factual issue to be determined by the jury."); *Coalville City v. Lundgren*, 930 P.2d 1206, 1209 (Utah Ct. App. 1997) ("What constitutes material breach [of contract] is a question of fact."). Thus, Defendants' materiality arguments are, at best, premature.

In any event, Plaintiffs plead that Defendants' concealments and misrepresentations were material. Plaintiffs were led to believe that their donations would be used for the Church's charitable purposes, and they expressly plead they found that material. *See, e.g.*, ¶¶ 117, 119,

---

those promises, making the statements misleading. *See Gaddy II*, 551 F. Supp. 3d at 1222 (discussing how a duty to disclose arises when the speaker makes a misleading material statement of fact without including all other material information that prevents misleading); ¶ 174.

121, 123, 125, 127, 129, 131. These statements are corroborated by those of the LDS's own officers, who admitted that Defendant concealed the extent of Ensign's holdings to drive donations.

Defendants argue that Plaintiffs fail to plead materiality because they would have—or should have—donated even if the use of these funds were disclosed because they have a religious obligation to tithe. LDS MTD at 28-29, Ensign MTD at 12-14. First, tithes are only one of the three forms of donations at issue in this litigation. Second, Plaintiffs plainly allege to the contrary in their complaint. While Defendants may argue that a Plaintiff's faith may be an affirmative defense available to them, it is not a sword they can level at Plaintiffs at odds with their claims about themselves. *Cf. In re The Bible Speaks*, 869 F.2d at 646 (Defendant "may raise only its free exercise claims, not those of the plaintiff.") They cite no authority for this proposition because there is none.

Ensign additionally argues that Plaintiffs' allegations regarding Ensign's purposefully inaccurate IRS filings (substantially undervaluing the extent of its holdings) and the concealment declared illegal by the SEC are immaterial to their claims, and therefore should be struck. Ensign MTD at 16. These acts are material to Plaintiffs' fraudulent concealment claims, however: these are examples of the on-going efforts Defendants made in concert to conceal from donors, like Plaintiffs, the extent of their holdings and to induce donations.

### D. Plaintiffs state a claim for unjust enrichment.

Defendants argue that Plaintiffs' unjust enrichment claims fail because donations are made without anything in return, with no expectation of benefit. But as Defendants acknowledge, this is not an element of an unjust enrichment claim.

Plaintiffs have expressly pleaded that they conferred a benefit upon Defendants, and that Defendants appreciated those benefits. *See* CAC ¶¶ 187-190. Plaintiffs have further identified – throughout the course of the complaint – the circumstances that make the retention of that benefit inequitable. *See* CAC ¶¶ 184-186, 190-91; *see also* CAC, *passim*. Nothing more is required.

Defendants attempt to graft an additional element onto Plaintiffs' unjust enrichment claims by arguing that the claims can only survive if the Plaintiffs made the payments with the expectation that they would receive something in return, but the case they cite for the proposition supports the opposite conclusion. In *Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 167 P.3d 1080 (Utah 2007), a group of physicians sued Salt Lake County for services provided to inmates, and the trial court dismissed the unjust enrichment claim on the basis that the physicians had not conferred a benefit to the county because the inmates were the recipients of the care and any benefit to the County was incidental only. 167 P.3d at 1082. In reversing the trial court, the Supreme Court of Utah embraced a broad and flexible interpretation of what kind of "benefit" would support an unjust enrichment claim, including "anything which adds to **the defendant's** security or advantage." *Id.* at 1086 (internal punctuation omitted, emphasis added), citing *Baugh v. Darley,* 184 P.2d 335, 337 (Utah 1947). Notably absent from the analysis is any reference to the party conferring the benefit appreciating it as such; rather, it is viewed exclusively from the perspective of the party receiving the benefit, using a broad and forgiving standard. *Id*. Because the receipt of money from any source objectively confers a benefit upon the recipient, plaintiffs have conferred a benefit upon Defendants.

Ensign is likewise not absolved of liability under an unjust enrichment theory on the basis that plaintiffs only allege that they directly conferred a benefit upon LDS, and that any benefit to Ensign flowed through LDS. Ensign MTD at 14-15. There is no requirement under Utah law that

the benefit provided pass directly from the plaintiff to the defendant. "The critical inquiry is not whether the benefit is conferred directly on the defendant, but whether the plaintiff can establish that the relationship between his detriment and the defendant's benefit flows from the challenged conduct." *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1292 (D. Utah 2020) (cleaned up), *quoting In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 864 (E.D. Mich. 2014). Plaintiffs have alleged facts that make it clear that their donations made their way into Ensign's holdings, which satisfies Plaintiffs' pleading obligation with respect to conferring a benefit upon Ensign. *See* CAC, *passim*.

### III.      Plaintiffs' Claims Are Not Time-Barred.

Defendants argue that Plaintiffs' fraud and breach of fiduciary claims are time-barred because plaintiffs had constructive notice of Defendants' conduct more than three years before filing their claims. The question of when Plaintiffs had constructive notice of their claims, however, is a fact-dependent one that should not be resolved on a motion to dismiss.

While Plaintiffs' claims are subject to statutory discovery rules, even where the statutory rule is clear, the factual question of "*when* a plaintiff either discovered or should have discovered his or her cause of action, thereby triggering the running of the statute of limitations," must still be determined. *Bistline v. Parker*, 918 F.3d 849, 881 (10th Cir. 2019). *See also Spears v. Warr*, 44 P.3d 742, 753 (Utah 2002) ("The applicability of the statute of limitations and the discovery rule also involves a subsidiary factual determination–the point at which a person reasonably should know that he or she has suffered a legal injury. This is a question of fact."); *Hill v. Allred*, 28 P.3d 1271, 1276 (Utah 2001) ("the questions of when a plaintiff should reasonably begin inquiring about the defendant's wrongdoing and whether, once on notice, the plaintiff has acted with

reasonable diligence to discover the facts forming the basis of the cause of action are all highly fact-dependent legal questions").

Where a plaintiff pleads that a defendant took affirmative steps to conceal its conduct, a Plaintiff can avoid full operation of the discovery rule by making a *prima facie* showing of fraudulent concealment and showing that a reasonable plaintiff would not have discovered the claim earlier. *Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996) "The fraud statute of limitations," in particular, "almost always presents a question of fact as to when plaintiff did discover or should have discovered the defendants' wrongdoing." *Bistline*, 918 F.3d at 881. Even where the facts of a case "*could* be interpreted to indicate plaintiffs' duty to inquire further," courts "cannot say as a matter of law that plaintiffs should have suspected defendants of wrongdoing" where there is a factual question regarding the point at which a reasonably prudent person in these unusual circumstances should have become suspicious of defendants." *Id.*

In articulating this standard, the Utah Supreme Court made clear that in all but the most extreme circumstances, the question of when plaintiffs had constructive notice is a question for the factfinder to decide. *Berenda* 914 P.2d at 53-54. There, directors in a closely held corporation sued a former director for self-dealing. *Id.* at 47. One of the plaintiff-directors suspected the defendant several years before the complaint was filed, and wrote two letters to the other plaintiffs: one raising vague suspicions about "questionable acts by the Chairman," and a later letter more specifically detailing concerns about a proposed merger. *Id.* at 48-49. After both letters, the defendant denied the accusations. *Id.* A few years later, as here, the plaintiffs learned from an SEC civil enforcement action that the defendant had falsified information related to the merger and had, in fact, engaged in self-dealing. *Id.* at 49. After plaintiffs filed suit in response, the district court dismissed their case after finding that the two letters, which were written

outside of the statute of limitations period, established that the plaintiffs had constructive notice of the conduct at issue in their complaint. *Id.* at 50.

The Utah Supreme Court reversed, noting that "the reasonableness of the plaintiff's conduct in light of the defendant's steps to conceal the cause of action necessitates the type of factual findings which preclude summary judgment in all but the clearest of cases." *Id.* at 54. While it "agree[d]" that the first letter "support[ed] an inference" that Plaintiffs had sufficient notice to trigger inquiry notice, it ultimately concluded that "[s]uch close calls are for juries, not judges, to make." *Id.* at 54, quoting *Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1186 (Utah 1989).

Here, Defendants similarly argue that Nielsen's 2019 YouTube video and subsequent news coverage of it should have put plaintiffs on notice of their claims. Plaintiffs, by contrast, aver that this then-unsubstantiated internet video was not, on its own, enough to trigger an independent inquiry, especially in light of Defendants' continued denials and obfuscations.[17] As a result, Plaintiffs allege, they only became truly aware of Defendants' conduct when the SEC

---

[17] Defendants assert ¶¶1-3, 8-11, 12-13, 14, 79-91, 92-99 and 104-115 of the CAC as being based on the IRS Letter and Ensign's Form 13F filings discussed in the text. Following its publication, Defendants actively engaged in a public relations campaign to deny the factual allegations contained in the IRS Letter. For example, on December 17, 2019, LDS issued a statement "in response to media stories"—a direct reference to the IRS letter—that LDS "complies with all applicable law governing our donations, investments, taxes and reserves" *See* CAC ¶12. The LDS statement further assured that "[c]laims being currently circulated are based on a narrow perspective and limited information. The Church complies with all applicable law governing our donations, investments, taxes, and reserves." *Id.* at n. 4. Plaintiffs allege in their CAC that Defendants continued to misrepresent their use of funds "even after the whistleblower came forward in 2019." *See id.* at ¶15; *see also* ¶47. Thus, Defendants publicly denied the factual allegations in the IRS letter and continued to misrepresent the use of funds after its publication. At best, a public denial by the accused "gives rise to competing inferences" to bystanders such as Plaintiffs. *See*, *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 967-68 (N.D. Cal. 2010).

Order was made public and, thereafter, in May of 2023 when 60 Minutes ran an exposé on the whistleblower report and related matters.[18] When faced with this kind of "close call," a court should decline to dismiss the matter at the pleadings stage. *Berenda*, 914 P.2d at 54.

None of the cases cited by Defendants compel a different result. None apply Utah's standard for deciding on the discovery rule, and all involve additional factors not present here. *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) applied Colorado's discovery rule on summary judgment. Further, the plaintiff there was a sophisticated investor who admitted he read the news articles that put him on notice. *Id.* at 1349. The court distinguished his inquiry duty from that which existed in other cases where "the lack of expertise of the plaintiff or imprecision of the public information" meant that the publication of some relevant facts would create constructive notice. *Id.* at 1349-1350. The court in *Grynberg* itself contrasted the facts of the case with those of *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381 (10th Cir. 1985), in which "the mere fact that there were public statements concerning the possible link between radiation and leukemia" was not enough to establish, as a matter of law, that unsophisticated plaintiffs "should have known that emissions from the uranium processing plant . . . were the likely cause of the leukemia". *Id.*, citing *Maughan*, 758 F.2d at 1383. *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1204 (10th Cir. 1998) similarly concerned the distinct question of whether a sophisticated investor in a securities action was put on inquiry notice by an article in an industry trade magazine.[19]

_____

[18] Several of the Plaintiffs in this consolidated proceeding explicitly referenced that program as their introduction to the problems that form the basis of the instant complaint in their original, individual class action complaints. *See e.g.*, Judson Complaint, ¶¶ 94-95; Long Complaint, ¶¶ 98-99; Risdon Complaint, ¶¶ 94-95; Brawner Complaint, ¶¶ 96-98.

[19] The other cases cited by Defendants are from outside the circuit and do not apply Utah law. *See Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (deciding that where local press coverage of relevant acts was widespread and defendant had not denied responsibility that the "significant amount of media attention" led "no reasonable factfinder" to conclude plaintiff

For the same reasons, Plaintiffs' unjust enrichment claims are not time-barred, even accepting that they are subject to the same statute of limitations as their fraud claims. Defendants argue that the unjust enrichment claims are barred because the limitations period began when they first received notice that "they would not receive any secular benefit in return for their donations," which is to say, at the time they made the donations. LDS MTD at 35, Ensign MTD at 19-20. The lone authority that Defendants cite in support of this argument did not involve charitable donations at all, but a plaintiff who "was aware of the breach" at issue five years before she filed suit. *Pero v. Knowlden*, 336 P.3d 55, 59 (Ut. App. 2014).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated: November 12, 2024

Respectfully submitted,

**MAGLEBY CATAXINOS, PC**

*/s/ James E. Magleby*
James E. Magleby
Yevgen Kovalov

***Interim Liaison Counsel***

**SEEGER WEISS LLP**
Christopher A. Seeger (*pro hac vice*)
Scott Alan George (*pro hac vice*)
Frazar W. Thomas (*pro hac vice*)

---

was not on inquiry notice of her claims); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) (notice where the attorney general held a widely-covered press conference detailing results of extensive investigation into relevant actions). Others are wholly inapposite. In *McIntyre v. United States*, 367 F.3d 38, 55 (1st Cir. 2004), the First Circuit held that impartial news coverage of relevant facts did *not* put plaintiffs on notice of their claims in light of defendant's continued denials.

**KITNER WOODWARD PLLC**
Scott A. Kitner (*pro hac vice*)
Martin Woodward (*pro hac vice*)

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (*pro hac vice*)
Beena M. McDonald (*pro hac vice*)

***Interim Class Counsel***

**CERTIFICATE OF SERVICE**

On this 12th day of November 2024, I hereby certify that I electronically filed the filed the foregoing **Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss** with the Clerk of the Court using the CM/ECF system, which will send an electronic notification to counsel of record for all parties.

/s/ H. Evan Gibson