IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br>*This document relates to all actions.* | **MEMORANDUM DECISION AND ORDER**<br><br>**(MDL Pretrial Order No. 5)**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiffs in this consolidated Multidistrict Litigation allege that over decades they have collectively donated hundreds of thousands of dollars to the Church of Jesus Christ of Latter-Day Saints. Plaintiffs allege that beginning in about 1997 the Church established Ensign Peak Advisors, Inc. to act as a "slush fund" for charitable donations, including tithing from Church members. Plaintiffs contend the Church did this to conceal its accounts, to prevent donors from learning about the scale of its financial holdings, and to obfuscate the Church's use of its funds. Based largely on a 2019 whistleblower report, Plaintiffs maintain the Church accumulated well over one hundred billion dollars in accounts while making no contributions to support the charitable purposes it identified when soliciting donations. Instead, Plaintiffs claim the Church spent about two billion dollars on for-profit Church-owned enterprises, lied to the Internal Revenue Service about the extent of its assets and holdings, and utilized a complex series of shell companies as part of its scheme to secret the true value of its holdings.

Seeking to represent a nationwide class of all individuals who donated funds to the Church since 1998, Plaintiffs ask the court to enjoin the Church's "unlawful and deceptive practices"; order regular public accounting by the Church concerning the collection, use, and

1

disposition of donated funds; appoint a Special Master to monitor the Church's collection and use of donated funds; and to enter a judgment requiring the Church to pay damages, including return of monies donated (including tithing paid by Church members), restitution, disgorgement, and attorneys' fees.

The Church denies Plaintiffs' allegations. It maintains it manages its finances in compliance with the laws and regulations that govern churches and other charities. Beyond that, the Church argues claims like those brought by Plaintiffs in this case cannot be adjudicated in secular courts because they necessarily implicate matters of religious belief and autonomy. But even if the court considers Plaintiff's claims on their merits, the Church argues the claims are time-barred by the controlling statutes of limitation and are otherwise legally defective under the Federal Rules of Civil Procedure.

For the reasons explained below, the court agrees with the Church that Plaintiffs' claims are barred by the statute of limitations and are not adequately pled. Because the statute of limitations bar prevents any attempt to amend, Plaintiffs' Consolidated Class Action Complaint is dismissed with prejudice.

## PRELIMINARY STATEMENT

Now before the court are three motions in this consolidated, proposed class action brought by Daniel Chappell, Masen Christensen, John Oaks, Mark Wilson, Joel Long, Brandall Brawner, Kevin Risdon, Gene Judson, and Michelle Judson (collectively, Plaintiffs) against The Church of Jesus Christ of Latter-day Saints and its subsidiary, Ensign Peak Advisors, Inc. (collectively, Defendants). The Church and Ensign both filed separate motions to dismiss

Plaintiffs' Consolidated Class Action Complaint.[1]  The Church and Ensign also jointly filed a motion to strike the class allegations in Plaintiffs' Consolidated Complaint.[2]

For the following reasons, the court (1) GRANTS the Church's Motion to Dismiss, (2) GRANTS Ensign's Motion to Dismiss, and (3) DENIES as moot Defendants' Motion to Strike.

## FACTUAL BACKGROUND

The following facts are principally drawn from Plaintiffs' Consolidated Class Action Complaint.[3]  As required on a motion to dismiss, the court accepts all well-pleaded allegations in the Consolidated Complaint as true.[4]  The court also draws from documents referenced in the Consolidated Complaint.[5]

---

[1] *See* ECF 79, *Motion to Dismiss of the Church of Latter-Day Saints, a Utah Corporation Sole and Memorandum in Support* (*Church Motion to Dismiss*); ECF 80, *Motion to Dismiss of Ensign Peak Advisors, Inc. and Memorandum in Support* (*Ensign Motion to Dismiss*). Unless otherwise referenced, the docket citations contained herein refer to the master docket listed in the caption.

[2] *See* ECF 81, *Defendants' Motion to Strike Class Allegations and Memorandum in Support* (*Motion to Strike*).

[3] ECF 63, *Consolidated Class Action Complaint* (*CCAC*).

[4] *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) ("We accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same.") (alteration and citation omitted).

[5] *See* ECF 143-1, *Exhibit A: Letter to an IRS Director* (*Whistleblower Report*); *First Presidency Statement on Church Finances*, The Church of Jesus Christ of Latter-day Saints Newsroom (Dec. 17, 2019), https://perma.cc/YQE4-LRST (*First Presidency Statement*); *Ensign Peak Advisors, Inc. & The Church of Jesus Christ of Latter-day Saints*, Exchange Act Release No. 96951, 2023 WL 2160756 (Feb. 21, 2023) (*SEC Order*). The court may consider these documents in evaluating Defendants' Motions to Dismiss because the documents are central to Plaintiffs' claims, and Plaintiffs do not dispute their authenticity. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)); *see also* ECF 113, *Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss* (*Consolidated Opposition*) at 1 n.2 (stating that "the SEC Order, the 'Letter to an IRS Director' (also referred to as the 'Whistleblower report'), and a declaration from the Huntsman action" are "properly before the [c]ourt at this juncture").  Plaintiffs appear to protest the court's consideration of the First Presidency Statement on the grounds that it does not appear in the CCAC. *Id.*  ("[M]atters like . . . public statements do not appear in Plaintiffs['] [C]omplaint.").  However, the CCAC expressly cites the First Presidency Statement at paragraph 12 n.4 and appears to cite the First Presidency Statement at paragraphs 133 and 158.

3

## I.    The Church of Jesus Christ of Latter-day Saints

The Church is "a worldwide Christian church with a growing membership of over 17 million."[6]  Legally, the Church operates as a Utah corporation.[7]  In this capacity, the Church owns and operates "a significant number of for-profit and non-profit entities,"[8] including "dozens of office and apartment buildings, four universities, and three media companies."[9]  It also does business under a long list of trade names, including "Deseret Transportation, Latter-Day Saint Philanthropies, Deseret Industries, Tabernacle Choir At Temple Square, Deseret Soap, Mormon Tabernacle Choir, Deseret Pasta, Joseph Smith Memorial Building, Millennial Star Network, Vernon Utah Livestock, Mortgage Loan Service, Farm Management Company, Beehive Clothing, and Elberta Valley Ag."[10]

As a religious and philanthropic institution, the Church "promote[s], advertise[s], provide[s] instructions for, administer[s], over[sees], and collect[s]" donations from individuals "throughout Utah and the United States."[11]  These donations generally take three forms: tithing, fast offerings, and philanthropic contributions.  "Tithing is the practice of donating a fixed percentage of earning to the [C]hurch."[12]  The Church "expects, as part of membership," that its members "tithe ten percent of their income and profits."[13]  The Church "publicly, continually,

---

[6] *Church Motion to Dismiss* at 1.

[7] *CCAC* ¶ 35.  Prior to 2019, the Church was organized as two entities: the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints and the Corporation of the President of the Church of Jesus Christ of Latter-day Saints.  *CCAC* ¶¶ 36–38.  The court refers to those entities, as well as the current Church organization, as "the Church."

[8] *Id.* ¶ 39.

[9] *Id.*

[10] *Id.* ¶ 40.

[11] *Id.* ¶ 41.

[12] *Id.* ¶ 53.

[13] *Id.* ¶¶ 4, 53.

and repeatedly" represents "that tithing funds are 'always used' for purposes like building construction, missionary work, education . . . and care for the poor and needy."[14]

"Fast offerings" are an additional form of donation.[15]  Once a month, the Church encourages members to fast for two meals and contribute a donation "at least equal to the value of the food that would have been eaten."[16]  The Church represents that fast offerings are "earmarked exclusively for aid to the poor."[17]

Philanthropic contributions are charitable donations the Church receives from Church members and nonmembers alike.[18]  The Church's philanthropic department, The Church of Jesus Christ of Latter-day Saints – Philanthropies (Philanthropies), solicits these donations for the benefit of the Church and its affiliated charities.[19]  Philanthropies operates a website where it actively solicits donations to three specific funds: a Humanitarian Aid Fund,[20] a General Missionary Fund,[21] and a Church General Fund.[22]  The Humanitarian Aid Fund is intended to "provide[] aid to people around the world without regard to cultural or religious affiliation,"[23] and the General Missionary Fund is intended to "provide needed funding so that all who want to serve a full-time mission may do so."[24]  The Church represents that its organizational practices

---

[14] *Id.* ¶ 54.

[15] *Id.* ¶ 57.

[16] *See* Joseph B. Wirthlin, *The Law of the Fast*, The Church of Jesus Christ of Latter-day Saints (April 2001), https://perma.cc/HD4K-P7P6.

[17] *CCAC* ¶ 57; *see also id.* ¶¶ 58–59 (alleging statements Church leaders made about fast offerings).

[18] *Id.* ¶¶ 6, 60, 78.

[19] *Id.* ¶¶ 61, 66.

[20] *Id.* ¶ 67; *see also id.* ¶¶ 7, 65, 69.

[21] *Id.* ¶ 71.

[22] *Id.* ¶ 73.  Until recently, Philanthropies solicited online donations for additional funds, including a Church History Fund.  *Id.*

[23] *Id.* ¶ 67; *see also id.* ¶¶ 7, 65, 69.

[24] *Id.* ¶ 71.

meet "generally accepted standards" for philanthropic giving,[25] and that it collaborates with "well-known charitable organizations having reputations for 'honest, effective service.'"[26] It also represents that "100 percent of all donations" given to Philanthropies "go to help those in need."[27]

Church members can tithe, make fast offerings, and tender other charitable contributions through a Church-affiliated website or by submitting "tithing slips."[28] Tithing slips are physical documents that allow members to submit donations to the Church and direct their donations toward particular matters.[29] Prior to 2012, tithing slips allowed members to itemize their donations across nine categories: "Tithing," "Fast Offering," "Ward missionary," "General missionary," "Book of Mormon," "Humanitarian aid," "Temple construction," "Perpetual education," and "Other (specify)."[30] Since 2012, however, revised tithing slips direct donors to only six categories: "Tithing," "Fast Offering," "Ward missionary," "General Missionary," "Humanitarian aid," and "Other (specify)."[31] Additionally, the revised tithing slips state: "Though reasonable efforts will be made to use donations as designated, all donations become the Church's property and will be used at the Church's sole discretion to further the Church's overall mission."[32]

---

[25] *Id.* ¶ 63.

[26] *Id.*

[27] *Id.* ¶ 64.

[28] *Id.* ¶ 55.

[29] *Id.* ¶¶ 55–56.

[30] *Id.*

[31] *Id.*

[32] *Id.*

## II.    Ensign Peak Advisors

Ensign is a Utah non-profit corporation affiliated with the Church.[33]  The Church formed Ensign in 1997 as a Section 501(c)(3) organization to "benefit, perform the functions of, [and] carry out purposes of" the Church.[34]  Consistent with this mission, Ensign is governed by senior Church leaders,[35] and all of Ensign's property is "irrevocably dedicated to religious, educational and charitable purposes."[36]  As a practical matter, Ensign serves as the Church's investment manager.[37]  The Church transfers "a substantial and significant" portion of the donated funds it receives—tithes, fast offerings, and philanthropic contributions alike—to Ensign,[38] and Ensign holds and invests those funds.[39]  Ensign represents that it maintains this investment reserve to support "prophetic initiatives," supplement the Church's budget, backstop the Church's pension plan, backstop the Church's "taxable entities," and provide collateral for Church projects.[40]

## III.    The Whistleblower Report

In December 2019, a self-styled whistleblower published a report regarding Ensign and its role in Church finance (the Report).[41]  Based on the Report, Plaintiffs allege the Church "deliberately ke[pt] its use of Ensign shrouded in secrecy."[42]  For example, Plaintiffs allege Ensign "doesn't . . . have a sign on [its] building," employs a relatively small staff of

---

[33] *Id.* ¶ 42.

[34] *Id.* ¶ 81.

[35] *Id.* ¶ 43.

[36] *Id.* ¶ 81.

[37] *SEC Order* at *2.

[38] *CCAC* ¶ 79; *see also id.* ¶¶ 8, 59, 80.

[39] *See id.* ¶¶ 80, 82–83.  In 2013, Ensign represented the Church granted it approximately $1 billion per year during the preceding several years.  *Id.* ¶ 114.

[40] *Id.* ¶ 114; *see also Whistleblower Report* at 43.

[41] *CCAC* ¶ 11.

[42] *Id.* ¶ 84.

approximately 75 people, and "silo[es]" those employees from each other.[43]  Plaintiffs also allege Defendants, "in coordination," misreported Ensign's assets on multiple Internal Revenue Service disclosures.[44]  According to the whistleblower, in 2007 Ensign reported the "Book value of all assets at end of year" was $1,000,000.00 when it was actually $38,000,000,000.00,[45] and in 2010, Ensign reported the "[b]ook value of all assets at end of year" was $1,000,000.00 when it was actually $40,000,000,000.00.[46]  Plaintiffs allege Defendants did so in order to conceal Ensign's significant wealth—approximately $120 billion in 2019—and to continue to induce donations.[47]  Finally, Plaintiffs allege Ensign "has never made a single [distribution] for any religious, educational, or charitable objective," and that it has no plans to make any such distributions.[48]  Rather, Plaintiffs allege Ensign has made unplanned distributions to the Church's commercial ventures: (1) a $600 million distribution to Beneficial Life, a for-profit, Church-owned life insurance company in 2009, and (2) $1.4 billion in cumulative distributions between 2010 and 2014 to Church entities involved in the development of the City Creek Mall in Salt Lake City, Utah.[49]  Plaintiffs allege Defendants channeled these distributions through other Church-affiliated entities to conceal the fact that Ensign was funding commercial ventures with donated funds.[50]

---

[43] *Id.*

[44] *Id.* ¶¶ 87–90.

[45] *Id.* ¶¶ 88–89.

[46] *Id.* ¶¶ 89–90.

[47] *Id.* ¶¶ 86, 105.

[48] *Id.* ¶¶ 83, 104.

[49] *Id.* ¶¶ 105–06.  Plaintiffs allege, "based on the pattern and practice suggested by these known [distributions], that discovery will uncover additional transfers from Ensign" to Church-affiliated business interests.  *Id.* ¶¶ 113–15.

[50] *Id.* ¶¶ 111–12.

Before and after Ensign distributed these funds, however, the Church represented tithing funds would not be used to finance commercial ventures.  Specifically, at an October 8, 2003 press conference concerning the City Creek Mall, Church leader David Burton stated "[n]one of this money comes from the tithing of our faithful members . . . that is not how we use tithing funds."[51]  Similarly, in a December 2006 issue of the Church-owned magazine *Ensign*, the Church stated "no tithing funds will be used in the redevelopment" of the mall.[52]  And the Salt Lake Tribune reported on October 5, 2012 that Church leader Keith McMullin said that "not one penny of tithing goes to the [C]hurch's for-profit endeavors."[53]  The article similarly reported "the Church has said no tithing went toward City Creek."[54]

The Church's First Presidency responded to the Whistleblower Report with a statement asserting "[t]he vast majority of [donated] funds are used immediately to meet the needs of the growing Church," but acknowledged a "portion" of donations "is methodically safeguarded through wise financial management and the building of a prudent reserve for the future."[55]  The Church further asserted that it "complies with all applicable law governing . . . donations, investments, taxes, and reserves."[56]

## IV.    The SEC Investigation

In February 2023, the Securities and Exchange Commission instituted cease-and-desist proceedings against the Church and Ensign.[57]  The SEC alleged that beginning in 2001,

---

[51] *Id.* ¶ 108.

[52] *Id.* ¶ 109.

[53] *Id.* ¶ 110.

[54] *Id.*

[55] *See First Presidency Statement.*

[56] *Id.*; *see also CCAC* ¶¶ 12, 133, 158.

[57] *CCAC* ¶ 13.

Defendants illegally evaded SEC reporting requirements by using shell corporations to divide Ensign's assets and make Ensign's total portfolio appear smaller than it actually was.[58]  The SEC also alleged Defendants did so in order to avoid "negative consequences" stemming from "the size of The Church's portfolio."[59]  The SEC, the Church, and Ensign negotiated a settlement in which Defendants agreed to pay a combined $5 million in civil penalties and "cease and desist from committing or causing any violations and any future violations" of SEC rules.[60]  However, the settlement did not require Defendants to admit they violated the law.[61]

Plaintiffs allege the Church "actively concealed this scheme from its members" by sharing annual reports from its internal auditing department affirming that "contributions received . . . [were] recorded and administered in accordance with approved Church budgets, policies, and accounting practice."[62]  Plaintiffs likewise allege the Church's auditing department never "report[ed] the practice of isolating funds in Ensign without using or tracking them,"[63] and the Church was intentionally "somewhat anonymous" regarding its substantial investment activity.[64]  Plaintiffs allege the Church sought to "conceal the extent of [its] reserves from donors" so individuals would not "fe[el] like . . . they shouldn't make a contribution."[65]

---

[58] *Id.* ¶¶ 13, 92–97; *see also SEC Order* at *2 (summarizing the SEC's findings).

[59] *CCAC* ¶¶ 13, 92.

[60] *SEC Order* at *7.

[61] *Id.* at *1.

[62] *CCAC* ¶¶ 100–01.

[63] *Id.* ¶ 101.

[64] *Id.* ¶ 102.

[65] *Id.*

## V.     The Consolidated Complaint

In October 2023, Plaintiffs Daniel Chappell, John Oaks, and Masen Christensen filed in this court a Proposed Class Action Complaint naming as Defendants the Church and Ensign Peak Advisors.[66]  Between December 2023 and January 2024, Plaintiffs Joel Long, Kevin Risdon, Brandall Brawner, Mark Wilson, Gene Judson, and Michelle Judson filed similar Complaints in other federal district courts around the country.[67]  The Judicial Panel on Multidistrict Litigation transferred all the related cases to the undersigned in April 2024.[68]

To promote the efficient administration of the cases, the court issued a Case Management Order directing Plaintiffs to file a consolidated complaint.[69]  Plaintiffs jointly filed their Consolidated Class Action Complaint (Consolidated Complaint or CCAC) on July 12, 2024.[70]  The Consolidated Complaint names as Plaintiffs nine individuals who collectively donated hundreds of thousands of dollars to the Church between January 1, 1998 and the day the Consolidated Complaint was filed.[71]

Plaintiffs do not specifically allege whether their donations were tithes, fast offerings, charitable donations, or some combination.  Plaintiffs also do not identify when they made donations, why they donated, or what caused them to continue donating.  Except for Plaintiff

---

[66] *See* ECF 1, (case no. 2:23-cv-00794, originally filed in the District of Utah), *Proposed Class Action Complaint*.

[67] *See* ECF 1, (case no. 2:24-cv-00269-RJS-DAO, originally filed in the Southern District of Illinois), *Class Action Complaint*; ECF No. 1, (case no. 2:24-cv-00268-RJS-DAO, originally filed in the Eastern District of Washington), *Class Action Complaint and Jury Demand*; ECF No. 1, (case no. 2:24-cv-00277-RJS-DAO, originally filed in the Middle District of Tennessee), *Class Action Complaint*; ECF No. 1, (case no. 2:24-cv-00296-RJS-DAO, originally filed in the Central District of California), *Class Action Complaint*.

[68] *See* ECF 1 (case no. 2:24-md-3102), *Transfer Order*; ECF 6, *Conditional Transfer Order 1*.

[69] *See* ECF 60, *Initial Case Management Order*.

[70] *See* ECF 63, *Consolidated Class Action Complaint.*

[71] *Id.* ¶¶ 18–34, 116, 118, 120, 122, 124, 126, 128, 130.

Masen Christensen, whom Plaintiffs allege is an "active member" of the Church,[72] Plaintiffs do not specify whether they are current Church members, former Church members, or nonmembers. However, Plaintiffs each offer identical allegations that, based on the Church's statements, they "reasonably believed that [their] donations would be used only for the purposes represented by [the Church]."[73]  Similarly, Plaintiffs all allege that "[b]ecause of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign," they "could not appreciate the true manner in which the [Church] actually intended to (and did) use [their] donations."[74]  Finally, Plaintiffs collectively allege they "did not believe and had no reason to ever suspect that [the Church] would take any portion of their donations and invest it into Ensign, where it would sit and accumulate interest in perpetuity," nor that funds would "be used in manners antithetical to the purported mission of [the Church] and Ensign."[75]  Plaintiffs generally allege they relied on the Church's public statements, including its representations that "the 'vast majority' of donated funds were 'used immediately' and that [the Church] complied with 'all applicable laws.'"[76]  Plaintiffs seek to represent a class of similarly situated individuals.[77]

Plaintiffs' Consolidated Complaint includes five causes of action: (1) breach of fiduciary duty, (2) fraudulent inducement, (3) fraudulent concealment, (4) fraudulent misrepresentation, and (5) unjust enrichment.[78]  Plaintiffs request an array of relief in connection with these claims,

---

[72] *Id.* ¶ 22.

[73] *Id.* ¶¶ 117, 119, 121, 123, 125, 127, 129, 131.

[74] *Id.*

[75] *Id.* ¶ 132.

[76] *Id.* ¶ 133.

[77] *Id.* ¶¶ 134–45.

[78] *Id.* ¶¶ 146–92.

including (1) certification of the proposed Class, (2) "a declaration that Defendants' practices are illegal and a breach of their duties to Plaintiffs and the Class," (3) "an injunction on these illegal practices," (4) "an order requiring regular public accounting by Defendants as to the collection, use and disposition of collected funds and interest and income earned form these funds," (5) "the appointment of a Special Master or an equally authorized panel of neutrals to monitor the collection, use and disposition of collected funds and income earned from these fund," (6) "[c]osts, restitution, damages, and disgorgement," (7) pre- and post-judgment interest, and (8) attorney's fees.[79]

Defendants responded with Motions to Dismiss, as well as a joint Motion to Strike Plaintiffs' Class Allegations.[80]  Thereafter, several *amici curiae* filed briefs in support of Defendants' Motions to Dismiss.[81]  The Motions are fully briefed,[82] and the court heard oral argument on the Motions on January 17, 2024.[83]

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' Consolidated Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b).[84]  To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual

---

[79] *Id.* at 50–51.

[80] *See* ECF 79, *Church Motion to Dismiss;* ECF 80, *Ensign Motion to Dismiss;* ECF 81, *Defendants' Motion to Strike*.

[81] *See* ECF 102, *Amicus Brief of Ayuda Incorporated, CharityVision, Five.12 Foundation, and Thanksgiving Point, In Support of Motion to Dismiss of the Church of Jesus Christ of Latter-Day Saints*; ECF 103, *Brief of the General Conference of Seventh-Day Adventists and National Association of Evangelicals as Amici Curiae in Support of Defendants*; ECF 104, *Brief of the J. Reuben Clark Law Society as Amicus Curiae in Support of Defendants*.

[82] *See Consolidated Opposition*; ECF 112, *Plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike Class Allegations*; ECF 134, *Consolidated Reply in Support of Defendants' Motions to Dismiss* (*Consolidated Reply*); ECF 135, *Reply in Support of Defendants' Motion to Strike the Class Allegations in Plaintiffs' Consolidated Class Action Complaint*.

[83] *See* ECF 144, *Minute Entry for Motion Hearing Held on 1/17/2025*.

[84] *Motion to Dismiss* at 1.

allegations "to state a claim to relief that is plausible on its face."[85]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86]  In other words, a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully."[87]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient.[88]  Nevertheless, a court must accept as true all well-pleaded factual allegations in a plaintiff's complaint and draw reasonable inferences based on those facts in the plaintiff's favor.[89]  Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard when "alleging fraud or mistake."[90]

## ANALYSIS

The Church advances in its Motion to Dismiss three main sets of arguments.[91]  First, the Church maintains Plaintiffs' claims are untimely and barred by the applicable statute of limitations.  Second, the Church contends that Plaintiffs' claims are inadequately pled under the Federal Rules of Civil Procedure.  Finally, the Church argues Plaintiffs' claims must be dismissed under the "church autonomy doctrine."[92]

The church autonomy doctrine is a judicially created doctrine designed to effectuate religious protections arising under the Establishment and Free Exercise clauses of the First

---

[85] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[86] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[87] *Id.*

[88] *Id.*

[89] *Id.*; *Checkley v. Allied Prop. & Cas. Ins. Co.*, 635 F. App'x 553, 556 (10th Cir. 2016).

[90] Fed.R.Civ.P.9(b); *see also Tellabs, Inc. v. Makor Issues &Rights, Ltd.* 551 U.S. 308 (2007) (stating Rule 9(b) is a "heightened pleading standard" compared to the "short and plain statement" required under Federal Rule of Civil Procedure 8(a)).

[91] Ensign's Motion to Dismiss largely incorporates the same set of arguments.

[92] *See generally, Church Motion to Dismiss.*

14

Amendment.[93]  At its core, the church autonomy doctrine operates to guard "the fundamental rights of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"[94]  Courts sometimes invoke the church autonomy doctrine to avoid entangling themselves with various religious disputes, especially those relating to ecclesiastical questions, matters of faith, and church administration.

The Church's Motion raises significant questions about the preclusive effect of the church autonomy doctrine on Plaintiffs' claims.  Indeed, the Church's foremost arguments in support of its Motion to Dismiss rest on its contention that the church autonomy doctrine bars the court from even considering Plaintiffs' Consolidated Complaint.[95]  To be sure, this case and the nature of Plaintiffs' claims present complex, potentially novel questions concerning the application of the church autonomy doctrine to civil fraud claims.  But however those questions might be answered, the First Amendment does not constrain the court's consideration of other deficiencies with Plaintiffs' claims—including procedural bars and inadequate pleading under the governing rules.[96]  Indeed, the judicial canon of constitutional avoidance requires the court to

---

[93] *See generally, Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, 451 F.Supp.3d 1227 at 1233–35 (D. Utah 2020).

[94] *Id.* (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002)).

[95] *See Church Motion to Dismiss* at 9–17; *Ensign Motion to Dismiss* at 3 ("The unconstitutionality of Plaintiffs' claims is addressed thoroughly in the Church's motion, and Ensign Peak incorporates those arguments fully by reference here.").

[96] *See, e.g.*, *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 792 (9th Cir. 2025) (declining to treat the church autonomy doctrine as a structural bar preventing it from reaching the merits of Huntsman's fraud claims against the Church that concern facts nearly identical to those presented here); *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) ("[w]hen a case can be resolved by applying well-established law to secular components of a dispute, such resolution by a secular court presents no infringement upon a religious association's independence.").

focus on nonconstitutional failures before reaching the church autonomy doctrine.[97]  Ultimately, the court does not reach Defendants' church autonomy doctrine arguments here because the pending Motions compel dismissal of Plaintiffs' Consolidated Complaint on other grounds.

Considering Defendants' Motions to Dismiss together, the court concludes (1) Defendants' statute of limitations defense precludes each of Plaintiffs' claims and, in any event, (2) Plaintiffs plead insufficient facts under Federal Rules of Civil Procedure 12(b) and 9(b) to show they are entitled to relief.  Accordingly, the court dismisses each of Plaintiffs' claims with prejudice and denies as moot Defendants' Motion to Strike.

## I.    Statute of Limitations

Defendants argue Plaintiffs' claims each fail as a matter of law because they are time-barred under the applicable statute of limitations.[98]  Defendants contend, and Plaintiffs do not dispute,[99] that Utah's three-year statute of limitations for fraud-based claims applies to each of Plaintiffs' claims.[100]  Defendants maintain Plaintiffs had at least constructive notice of Defendants' allegedly fraudulent conduct no later than February 2020, such that their claims

---

[97] *See, e.g.*, *Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *Baer v. Meyer*, 728 F.2d 471, 474 (10th Cir. 1984) ("The principles of American jurisprudence caution us not to decide a constitutional issue if a proper construction of a statute or an interpretation of existing case law could be controlling.").

[98] *Church Motion to Dismiss* at 30–36; *Ensign Motion to Dismiss* at 17–21.

[99] *See, e.g.*, *Consolidated Opposition* at 34 (acknowledging "Plaintiffs' [fraud and breach of fiduciary duty] claims are subject to statutory discovery rules"); *id.* at 38 ("Plaintiffs' unjust enrichment claims are not time-barred, even accepting that they are subject to the same statute of limitations as their fraud claims.").  Because Plaintiffs did not specifically contest this issue in their *Consolidated Opposition* or at oral argument, the court considers it waived.

[100] *Church Motion to Dismiss* at 31, 35; *Ensign Motion to Dismiss* at 17, 19–20.  *See also Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 (D. Utah 2017) ("The Utah Supreme Court has held the three year statute of limitations applies to all common law claims that are grounded in fraud."); *Hill v. Allred*, 28 P.3d 1271, 1276 (Utah 2008) (applying Utah's statute of limitations for fraud to claims for "fraudulent conversion or unjust enrichment, breach of implied contract, money laundering, fraudulent misrepresentation, racketeering, and intentional infliction of emotional harm" because they each "flow[ed]" from the plaintiff's fraud allegations).

became time-barred in February 2023.[101]  Plaintiffs argue "the question of when [they] had constructive notice of their claims . . . is a fact-dependent one that should not be resolved on a motion to dismiss."[102]

The court agrees with Defendants.  Utah's statute of limitations for fraud, Utah Code § 78B-2-305(3), "begin[s] running from the date a plaintiff either discovered or should have discovered his or her claim."[103]  In other words, the statute of limitations begins running when a plaintiff has "actual or constructive knowledge of the relevant facts forming the basis of [their] claim]."[104]  Constructive knowledge arises when "by reasonable diligence and inquiry," a plaintiff "should know[] the relevant facts of the fraud perpetrated against [them]."[105]  If a plaintiff "has opportunity of knowing the facts constituting the alleged fraud," they "cannot be inactive and afterwards allege a want of knowledge."[106]

Courts may impute constructive knowledge based on the existence of news articles about the facts forming the basis of a plaintiff's claims.[107]  In *Grynberg v. Total S.A.*, for example, the Tenth Circuit affirmed the district court's grant of summary judgment for the defendants and determined the plaintiff's claims were barred by a Colorado statute of limitations because he

---

[101] *Church Motion to Dismiss* at 32–34; *Ensign Motion to Dismiss* at 18–19.

[102] *Consolidated Opposition* at 34.

[103] *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 746 (Utah 2005).

[104] *Id.*

[105] *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 156 P.3d 806, 811 (Utah 2007) (quoting *Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993)).

[106] *Id.*

[107] *See e.g.*, *Stelin v. Biomune Sys.*, 154 F.3d 1191, 1201–03 (10th Cir. 1998) (holding that news article in widely-read investor publication triggered investor's duty to exercise reasonable diligence); *Thompson v 1-800 Contacts, Inc.*, No. 2:16-cv-1183-TC, 2018 WL 2271024, at *13 (D. Utah May 17, 2018) ("Publicly available documents may be sufficient to charge a plaintiff with constructive knowledge.  For example, in cases alleging securities fraud, investors had reason to track the companies in which they invested."); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1139 (C.D. Cal. 2011) (stating "press reports and earlier-filed lawsuits placed [the plaintiff] on notice regarding the . . . element of its claim" because "[a]ll the facts had been widely-reported").

"should have known" that he could bring claims against the defendants once the Wall Street
Journal, New York Times, Financial Times, and Los Angeles Times published articles
concerning the underlying facts.[108]  Although the court considered the fact that plaintiff admitted
to reading only one of these articles,[109] the Tenth Circuit reasoned that a person of the plaintiff's
wealth and business acumen, acting "with reasonable diligence," could have "learn[ed] of
matters reported in the leading business newspapers circulated in this country."[110]  It also noted
that "[w]here events receive . . . widespread publicity, plaintiffs may be charged with knowledge
of their occurrence."[111]

The *Grynberg* court relied on several out-of-circuit cases as examples where plaintiffs
could fairly be charged with knowledge of public information: *Patterson v. United States*, where
the First Circuit held a "cause of action accrued when [the] FBI's involvement in [the] plaintiffs'
father's death received widespread publicity"[112]; *In re Briscoe*, where the Third Circuit held
"plaintiffs had a 'reasonable opportunity to discover the alleged wrong' due to 'extensive
publicity' regarding dangerous diet drugs that injured them"[113]; and *Fulcher v. United States*,
where the Fourth Circuit held a "'prudent landowner exercising reasonable diligence should . . .
have discovered the government's open and notorious occupation of the land' because of
'extensive publicity and discussion.'"[114]

---

[108] *Grynberg v. Total S.A.*, 538 F.3d 1336, 1348–49 (10th Cir. 2008).

[109] *Id.*

[110] *Id.* at 1349.

[111] *Id.* (quoting *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000)).

[112] *Id.* (quoting *Patterson v. United States*, 451 F.3d 268, 271 (1st Cir. 2006)).

[113] *Id.* (quoting *In re Briscoe*, 538 F.3d 201, 223–24 (3d. Cir. 2006)).

[114] *Id.* (quoting *Fulcher v. United States*, 696 F.2d 1073, 1077 (4th Cir. 1982)).

The Tenth Circuit then contrasted those situations with several cases in which plaintiffs could not fairly be charged with knowledge of public information,[115] including *Maughan v. SW Servicing, Inc.*[116]  In *Maughan*, the "plaintiffs sued a uranium mill for wrongful death, alleging that the mill had caused leukemia that killed their children and spouses."[117]  The *Maughan* court determined that publicly available information documenting a connection between radiation exposure and leukemia did not imbue the plaintiffs with constructive notice because "the average layman would [not] understand, after reading that fall-out from atomic bombs causes cancer, that the local uranium mill may have caused leukemia."[118]  Further, it reasoned that not even "the doctors who had been consulted by the plaintiffs' decedents . . . correlate[d] the leukemia with the mill."[119]

Here, there is abundant evidence establishing Plaintiffs were on constructive notice of Defendants' alleged conduct more than three years before they brought suit.  The Whistleblower Report—published in 2019[120]—is clearly "the genesis" of Plaintiffs' Consolidated Complaint and the factual basis of many of Plaintiffs' allegations.[121]  Plaintiffs do not plead they were

---

[115] *Id.* at 1349–51.

[116] *See id.* at 1349–50 (citing *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1383 (10th Cir. 1985)).

[117] *Id.*

[118] *Id.* (quoting *Maughan*, 758 F.2d at 1389).

[119] *Id*.

[120] *See* CCAC ¶ 11 ("In December 2019, a whistleblower with extensive knowledge of Defendants' finances divulged that over the past two decades, [the Church] has funneled billions of dollars of donations into covert permanent investments through Ensign.").

[121] *See* ECF 145, *Transcript of Motion Hearing Held on January 17,* 2025 (*Hearing Transcript*) at 47:1–3 and *CCAC* ¶¶ 39, 79, 81–85, 88, 90, 105–06, 110–15.  Plaintiffs likewise cite a YouTube video affiliated with the Whistleblower Report.  *See CCAC* ¶¶ 87, 89.

individually aware of the Report near or at the time of its publication,[122] but it was a readily accessible document from which Plaintiffs could have learned the core facts underlying their claims. It "strains credulity" that reasonably diligent individuals who had donated substantial sums of money to the Church and were otherwise interested in Church affairs would not have "learn[ed] of matters" described in the Report at or near the time of its release.[123] No imprecise information, scientific uncertainty, or lack of expertise would have "hampered" Plaintiffs' discovery of the key facts upon reasonably diligent investigation.[124] And yet Plaintiffs filed the earliest of the individual suits underlying the present multidistrict litigation in October 2023, approximately three years and ten months after the Whistleblower Report was published.

Moreover, a deluge of local and national reporting followed the release of the Whistleblower Report. Two such articles are cited in Plaintiffs' Consolidated Complaint: (1) a February 8, 2020 Wall Street Journal article titled *The Mormon Church Amassed $100 Billion, It Was the Best-Kept Secret in the Investment World*,[125] and (2) a February 8, 2020 Salt Lake Tribune article titled *LDS Church Kept the Lid on Its $100B Fund for Fear Tithing Receipts Would Fall, Account Boss Tells Wall Street Journal*.[126] The court takes judicial notice of these

---

[122] At oral argument, Plaintiffs' counsel made somewhat contradictory statements about Plaintiffs' awareness of the Whistleblower Report. *Compare, e.g.*, *Hearing Transcript* at 97:12–14 ("To be sure, in 2019 there was the letter to an IRS director published. The plaintiffs were not involved in that. The plaintiffs didn't know about it."); *with id.* at 100:16–19 ("To be sure, this IRS letter goes out and is published. It got a lot of press. It was sent around."). But by citing the Whistleblower Report in their Complaint, *see, e.g.*, *CCAC* ¶ 11, citing the Church's response to the Report through the First Presidency Statement, *see, e.g., id.* ¶ 12, and pleading they "relied on Defendants' affirmative representations regarding their use of donated funds," *see, e.g., id.* ¶ 48, Plaintiffs at least imply they obtained some basic awareness of the Report's existence at or near the time of its release.

[123] *Grynberg*, 538 F.3d at 1349.

[124] *Id.* at 1350.

[125] *CCAC* ¶ 102 n.46 (citing Ian Lovett & Rachael Levy, *The Mormon Church Amassed $100 Billion, It Was the Best-Kept Secret in the Investment World*, Wall Street Journal (Feb. 8, 2020, 5:07 PM), https://perma.cc/578H-2SYV).

[126] *Id.* ¶ 102 n.47 (citing Peggy Fletcher Stack, *LDS Church Kept the Lid on Its $100B Fund for Fear Tithing Receipts Would Fall, Account Boss Tells Wall Street Journal*, Salt Lake Tribune (Feb. 8, 2020, 1:40 PM), https://perma.cc/2Z7V-9TYV).

articles, [127] as well as the following thirteen media reports between December 16, 2019 and February 6, 2020, to demonstrate the extensive nationwide reporting on Defendants' alleged fraud that quickly followed publication of the Whistleblower Report:[128]

- Benjamin Wood, *Whistleblower Claims That LDS Church Stockpiled $100 Billion in Charitable Donations, Dodged Taxes*, Salt Lake Tribune (Dec. 16, 2019, 8:25 PM), https://perma.cc/3226-3FLK.
- Jon Swaine, Douglas MacMillan, & Michelle Boorstein, *Mormon Church Has Misled Members on $100 Billion Tax-Exempt Investment Fund, Whistleblower Alleges*, Washington Post (Dec. 17, 2019), https://perma.cc/25ZZ-SQ5R.
- Tad Walch, *Church Responds to Allegations Made by Former Employee in IRS Complaint*, Deseret News (Dec. 17, 2019, 12:43 PM), https://perma.cc/4GP6-MJES.
- Jerad Giottonini, *Whistleblower Alleges Church Misused $100 Billion in Accounts Intended For Charitable Purposes*, ABC4 News (Dec. 17, 2019, 12:12 PM), https://perma.cc/YPT3-P52Y.
- Cristina Flores, *Will LDS Church Suffer Consequences After Whistleblower Claims It Sits on $100B?*, KUTV News (Dec. 17, 2019, 8:15 PM), https://perma.cc/GHX9-DLSE.
- Caleb Parke, *Mormon Church Misled Members on Tax-Exempt Investment Fund, Whistleblower Claims*, Fox News (Dec. 18, 2019, 1:28 PM), https://perma.cc/X9EN-63EL.
- Cheri Mossburg & Stephanie Becker, *Mormon Church Accused of Stockpiling Billions, Avoiding Taxes*, CNN (Dec. 18, 2019, 8:50 PM), https://perma.cc/RJ39-DBD7.
- Jack Jenkins, *LDS Church Fund Unlikely to Face IRS Backlash, Experts Say*, Salt Lake Tribune (Dec. 19, 2019, 6:03 PM), https://perma.cc/9X7C-V57K.
- Larry Curtis, *LDS Church Releases Explanation of Its Use of Tithes, Donations After $100B Fund Revealed*, KUTV News (Dec. 20, 2019, 5:39 PM), https://perma.cc/PH4F-WRCH.

---

[127] Taking judicial notice of these articles is proper because their publication is not subject to reasonable dispute and because the court considers them not for their truth but only as evidence of the information in the public realm shortly following the release of the Whistleblower Report. *See* Fed. R. Evid. 201(b)–(d) (stating the court "may judicially notice a fact that is not subject to reasonable dispute"); *Est. of Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir 2016) ("When courts have taken judicial notice of contents of news articles, they have done so for proof that something is publicly known, not for the truth of the article's other assertions.") (citation omitted).

[128] The thirteen publications referenced are from major national news media outlets (including the Washington Post, CNN, Fox News, Forbes, and the Associated Press), the two dominant Utah newspapers (the Salt Lake Tribune and Deseret News), as well as the CBS and ABC Utah television affiliates (ABC4 and KUTV). The Church also identifies in an exhibit submitted with its Motion to Dismiss an additional twelve publications between December 2019 and February 2020 in less prominent media outlets, including Utah radio outlets associated with National Public Radio (KUER and Radio West), The Christian Post, Mercury News, Inside Hook, the Star Tribune, 9 News, and others. *See* ECF 79-1, *Tithing Class Action Articles*.

- Peter J. Reilly, *More on the Mormon Ensigngate*, Forbes (Dec. 20, 2019, 2:35 PM), https://perma.cc/8DYY-T984.
- Nate Carlisle, *Excerpts Show How the LDS Church Tried to Keep a Lid on Its $100B Account, Even Freezing Out Apostle Boyd K. Packer*, Salt Lake Tribune (Dec. 22, 2019, 7:00 AM), https://perma.cc/MEB8-QZPM.
- Michelle Boorstein & Jon Swaine, *These Mormon Twins Worked Together on an IRS Whistleblower Over the Church's Billions—And It Tore Them Apart*, Washington Post (Jan. 16, 2020), https://perma.cc/5YZ5-4TET.
- Samuel Brunson, *What's A Church? That Can Depend on The Eye of The Beholder or Papers Filed With the IRS*, Salt Lake Tribune (Feb. 6, 2020, 11:06 AM), https://perma.cc/N4HY-F3RW.

Additionally, at least five individuals—presumably members of Plaintiffs' proposed class—initiated no fewer than three timely lawsuits based on the Whistleblower Report and associated media coverage years before any of the individual Plaintiffs in the present Multidistrict Litigation filed their individual suits.[129]  The first of these cases, a fraud and racketeering case filed less than three months after publication of the Whistleblower Report, is *Cook, Vessels, and Taggart v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, filed in this court on February 10, 2020.[130]  The core factual allegations in that suit are remarkably similar to the allegations in this case.  Plaintiffs there, as here, alleged "[t]he Church is currently engaged and has for decades been engaged in a scheme to extract tithing [] from its members, including Plaintiffs, based on false claims, pretenses, misinformation, misdirection, and lies."[131]  As here, plaintiffs in *Cook* further complained "the Church has amassed billions of dollars in savings and investment portfolios, which further prove that tithing and offerings are not being used as the Church claims to its members."[132]  The *Cook* plaintiffs

---

[129] *See, e.g.*, *In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp. 2d 496, 534–37 (E.D.N.Y. 2008) (finding plaintiffs were on inquiry notice of their claims based in part on the existence of comparable lawsuits and "the extensive media coverage they received").

[130] ECF 1, (case No. 2:20-cv-80-TS), *Complaint for Damages and Injunctive Relief for Violations of the Federal Racketeering Influenced and Corrupt Organizations Act*.

[131] *Id.* ¶ 3.

[132] *Id.* ¶ 14.

alleged they learned of the Church's fraud based on the December 17, 2019 Washington Post article referenced above, and that they provided a draft Complaint to the Church for review as early as January 20, 2020.[133]

A second lawsuit against the Church, *Gaddy v. The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*,[134] was filed approximately four months before the release of the Whistleblower Report.[135] The initial Complaint included claims focused primarily on the Church's teachings and beliefs.[136] But on March 30, 2020, Gaddy sought leave to file an amended complaint to incorporate allegations based on the Whistleblower Report.[137] Like the *Cook* lawsuit, Gaddy included in her Amended Complaint fraud and racketeering claims based in part on factual allegations similar to those here. Among other things, Gaddy alleged:

> In late 2019 an IRS whistleblower complaint was filed against [the Church]. It provides compelling documentation that [the Church] used tithing principal (not merely investment proceeds) for profit-making entity expenses, including but not limited to $1.4 billion in the development of City Creek Mall, Salt Lake City, despite repeated specific assurances by [Church] employees and agents that no tithing would be and/or was used for such a purpose. By comparison, [the Church] had donated just $1.1 billion in global humanitarian aid between 1985 and 2011."[138]

Similarly, Gaddy alleged "Ensign Peak Advisors is an asset and investment management firm created in 1997 which, upon information and belief, has accumulated profits from investing tithing to over $100+ billion in a mostly liquid fund used to finance for-profit businesses,

---

[133] *Id.* ¶¶ 69, 32.

[134] *See* ECF 2, (case no. 2:19-cv-00554-RJS-DBP, filed in the District of Utah), *Proposed Class Action Complaint*.

[135] *Id.*

[136] *Id.*

[137] *See* ECF 32, (case no. 2:19-cv-00554-RJS-DBP, filed in the District of Utah), *Plaintiff's Motion for Leave to File Amended Complaint* at 6–7. The court granted the Motion on May 13, 2020. *See* ECF 36, (case no. 2:19-cv-00554-RJS-DBP, filed in the District of Utah), *Docket Text Order Granting Motion for Leave to File*.

[138] ECF 32-1, (case no. 2:19-cv-00554-RJS-DBP, filed in the District of Utah), *[Proposed] Amended Class Action Complaint* ¶ 5.

including the development of SLC-based City Creek Mall."[139]  And she alleged Ensign provided

funds to "bail-out Beneficial Life Insurance, another for-profit [Church] affiliate, which as of

2009 has ceased to write insurance policies."[140]  And in support of her claims, Gaddy cited to

many of the same allegedly false statements from Church leaders that Plaintiffs in this lawsuit

infer they relied on.[141]

The third case, *Huntsman v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints et al.*, was filed on March 22, 2021.[142]  The Whistleblower Report was the stated impetus of the *Huntsman* suit, where the plaintiff asserted a single fraud claim based on allegations that the Church falsely represented that tithing funds would be used only for charitable purposes but instead used them to support commercial endeavors.[143]

The court takes judicial notice of the existence of these cases as additional evidence of the information in the public realm at or near the time the Whistleblower Report was published and widely reported in nationwide media and, in turn, as evidence that a reasonable individual who had made significant monetary donations and was otherwise interested in Church affairs had at least constructive knowledge of the Church's alleged fraud.[144]

---

[139] *Id.* ¶ 43.

[140] *Id.*

[141] *Id.* ¶ 85 (identifying several Church statements disavowing the use of tithing funds in the development of City Creek Mall).

[142] *See* ECF 1 (case No. 2:21-cv-02504, filed in the Central District of California), *Complaint for Fraud*.

[143] *Id.* ¶¶ 27–42.

[144] *C.f. Est. of Lockett*, 841 F.3d at 1111 (quoting *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.")); *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (holding a district court appropriately took judicial notice of materials including state court documents).

Plaintiffs do not expressly deny they were aware of the Whistleblower Report and related media coverage.[145]  Instead, they point to a YouTube video associated with the Whistleblower Report and argue the "then-unsubstantiated internet video was not, on its own, enough to trigger an independent inquiry, especially in light of Defendants' continued denials and obfuscations."[146]  Plaintiffs likewise argue "they only became truly aware of Defendants' conduct when the SEC Order was made public and, thereafter, in May 2023 when 60 Minutes ran an exposé on the [W]histleblower [R]eport and related matters."[147]  But Plaintiffs' argument misapprehends the constructive notice standard and disregards the volume of information in the public realm in late 2019 and early 2020.  A review of the sources cited in the Consolidated Complaint—the Whistleblower Report and the two February 2020 articles—as well as the articles and cases noted above, reveals there was extensive nationwide, publicly-available information regarding the Whistleblower's allegations.

In any event, the standard under Utah law for when the applicable statute of limitations began to run is not when Plaintiffs became "truly aware" of Defendants' conduct.  Rather, it began when a reasonable, similarly-situated individual would be sufficiently aware of the allegations against Defendants such that they would inquire further.[148]  Plaintiffs largely ignore

---

[145] *See supra* n.124.  The court acknowledges Plaintiffs "did not have the burden to plead on this issue," *see Bistline*, 918 F.3d at 866 n.12, but notes the Consolidated Complaint nonetheless raises the matter: "Plaintiffs and Class members did not discover and could not discover [Defendants' conduct] through the exercise of reasonable diligence," "[a]ny applicable statutes of limitation have been tolled by . . . Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein," "the hardship that enforcing any limitations period would impose on . . . Plaintiffs would outweigh any prejudice to Defendants," and "enforcing the limitations period here would be irrational and unjust."  *CCAC* ¶¶ 46–47, 50–51.

[146] *Consolidated Opposition* at 36.

[147] *Id.* at 36–37.

[148] *See* Utah Code § 78B-2-305(3) ("[T]he cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake."); *see also Intel Corp. Inv. Policy Comm. V. Sulyma*, 589 U.S. 178, 185 (2020) ("[T]he word 'discovery,' when used in a statute of limitations without qualification, 'encompasses not only those facts the plaintiff actually knew, but also those facts a reasonable diligent plaintiff would have known.'") (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010)).

this standard and fail to engage with it in their papers.  The Whistleblower Report, coupled with the extensive media coverage it received in reputable local and national publications, in addition to parallel lawsuits predating the SEC Order and the 60 Minutes "exposé," collectively compel the court to conclude that a reasonable individual with a personal interest in the Church's use of donated funds should have been aware of Defendants' alleged fraud no later than early 2020.

Plaintiffs separately argue that "[w]here a plaintiff pleads that a defendant took affirmative steps to conceal its conduct, a plaintiff can avoid full operation" of the applicable discovery rule "by making a *prima facie* showing of fraudulent concealment."[149]  Plaintiffs then point to the First Presidency's Statement in response to the Whistleblower Report to suggest they have made such a showing.[150]  But the rule Plaintiffs rely on is inapplicable here.  In *Russell Packard Development, Inc. v. Carson*, the Utah Supreme Court carefully distinguished between statutory discovery rules (applicable to statutes of limitation containing provisions that expressly toll the running of a statute of limitations) and equitable discovery rules (applicable to statutes of limitation that contain no such provision).[151]  Citing its prior decision in *Berenda v. Langford*, the *Carson* court acknowledged it had previously applied an exception to statutory discovery rules where a plaintiff did not become aware of the availability of a claim "because of [a] defendant's concealment or misleading conduct."[152]  However, the court "clarif[ied] and emphasize[d]" that this exception applied only to equitable discovery rules.[153]  The court explicitly identified Utah's statute of limitations for fraud as containing a statutory discovery rule

---

[149] *Consolidated Opposition* at 35.

[150] *Id.* at 36 n.17.

[151] 108 P.3d 741, 746–47 (Utah 2005).

[152] *Id.* at 747; *see also Berenda v. Langford*, 914 P.2d 45 (Utah 1996).

[153] *Russell Packard Dev.*, 108 P.3d at 747.

and stated "it would be inappropriate to apply the concealment version of the [equitable] discovery rule[s] in the context of the three-year statute of limitations for fraud."[154]  For this reason, it is inappropriate for the court to apply equitable tolling rules to Plaintiffs' claims sounding in fraud.

Plaintiffs also rely on the First Presidency Statement to argue this case presents a factual question about when a reasonable person would have suspected Defendants of wrongdoing, which they contend precludes resolution of Defendants' statute of limitations defense at this stage.[155]  Plaintiffs cite *Bistline v. Parker*[156] for this purpose.[157]  But *Bistline* concerned claims brought by former members of the Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS), which illegally practices polygamy, against attorneys for the FLDS Church's Prophet, Warren Jeffs.[158]  The Tenth Circuit found that although the complaint contained "allegations . . . that *could* be interpreted to indicate plaintiffs[] duty to inquire further, [it] could not say as a matter of law that plaintiffs *should* have suspected defendants of wrongdoing."[159]  Importantly, the court reached its decision "in light of the incredibly unique and extreme factual circumstances" alleged in the plaintiffs' complaint.[160]  The Tenth Circuit noted, for example, plaintiffs' allegations that, as members of the FLDS Church, they experienced "multi-generational entrenchment in a community entirely insulated from the outside world, a lack of outside education that could alert them to their legal rights and the impacts of defendants' action,

---

[154] *Id.* at 746–47.

[155] *See, e.g.*, *Consolidated Opposition* at 36 n.17.

[156] 918 F.3d 849 (10th Cir. 2019).

[157] *See Consolidated Opposition* at 34–35.

[158] *Bistline*, 918 F.3d at 854.

[159] *Id.* at 881.

[160] *Id.* at 884.

and in some cases specialized schooling to indoctrinate them against recognizing their legal claims."[161]  The Tenth Circuit likewise highlighted the plaintiffs' allegations that they "were continually informed in these severely isolated circumstances that defendants were their only legal resource, and thus one of their sole links to the outside world."[162]  The Tenth Circuit concluded these allegations raised a "factual question regarding the point at which a reasonably prudent person in these unusual circumstances should have become suspicious of Defendants."[163]

Plaintiffs' Consolidated Complaint is devoid of any comparable allegations and, by implication, any similar questions of fact.  For example, even accepting as true that the First Presidency Statement contained false statements concerning the Church's use of donated funds, the Consolidated Complaint does not allege Plaintiffs experienced community isolation, under-education, indoctrination, or any other circumstances that would prevent them from critically examining the Whistleblower Report and related Church statements.[164]  And no such circumstances prevented the *Cook, Gaddy,* and *Huntsman* plaintiffs from doing so.  That Plaintiffs generally trusted Defendants is insufficient; a plaintiff cannot overcome a statute of limitations defense by pleading willful ignorance.[165]

---

[161] *Id.* at 882.

[162] *Id.*

[163] *Id.* at 881.  Notably, the Circuit analogized the *Bistline* plaintiffs' circumstances to cases from the District of Arizona and Western District of Arkansas, where courts held statutes of limitations inapplicable due to "psychological manipulation" and "brainwashing"  *Id.* at 882–83 (citing *Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2009 WL 87447368 (D. Ariz. Nov. 4, 2009) (unpublished) and *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-cv-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013)).

[164] Neither do Plaintiffs state they ever saw or heard any Church statements they otherwise argue concealed the alleged fraud.

[165] *See Colosimo*, 156 P.3d at 811 ("[A] party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge.  Instead, if the facts known to a plaintiff would prompt a reasonably prudent person to further investigate, the plaintiff should make reasonable inquiry.") (internal citations and quotation marks omitted).

The court recognizes Utah's statute of limitations for fraud "almost always presents a question of fact as to when [a] plaintiff did discover or should have discovered the defendants' wrongdoing," such that a statute of limitations defense is rarely amenable to resolution at the pleading stage.[166]  Indeed, the court earlier analogized this case to *Grynberg*, an "inquiry notice" case resolved at the summary judgment stage.[167]  But the Tenth Circuit permits resolution of a statute of limitations defense "on a Rule 12(b)(6) motion when the dates given in the complaint make clear that the right sued upon has been extinguished."[168]  Such is the case here: Plaintiffs expressly cite the Whistleblower Report and related reporting in the Consolidated Complaint.[169]  Moreover, Plaintiffs do not respond to the Church's argument that "Plaintiffs' Consolidated Complaint . . . prove[s] Plaintiffs were on inquiry notice of the Church's alleged misconduct" by citing and relying on the December 2019 Whistleblower Report, a February 2020 Wall Street Journal article, and a February 2020 Salt Lake Tribune article.[170]  Nor do Plaintiffs acknowledge the extensive national and local media coverage Defendants submitted with their Motion to Dismiss.[171]  Additionally, Plaintiffs raised no objection at the January 17, 2025 motion hearing to the court taking judicial notice of the "26 separate media accounts about the whistleblower report

---

[166] *Bistline*, 918 F.3d at 881 (10th Cir. 2019).

[167] *Grynberg*, 538 F.3d at 1335.

[168] *Sierra Club v. Okla. Gas & Elec.*, 816 F.3d 666, 671 (10th Cir. 2016); *see also Saxena v. Allen*, No. 23-1212, 2023 WL 8476264, at *2 (10th Cir. Dec. 7, 2023) (unpublished) ("Here, the relevant dates appear in [Plaintiff's] complaint, and [Plaintiff] does not suggest otherwise on appeal, so the district court did not err on this basis."); *Nowell v. Medtronic, Inc.*, No. 19-2073, 2021 WL 4979300 at *4 (10th Cir. Oct. 27, 2021) (unpublished) ("Because the critical dates appear plainly on the face of [Plaintiff's] complaint, the statute of limitations defense was properly raised and resolved in the Rule 12(b) context."); *Susoeff v. Michie*, No. 6:16-cv-01287-JTM, 2016 WL 4990256, at *5 (D. Kan. Sept. 19, 2016) (charging Plaintiffs with constructive notice at the Rule 12 stage because they "offer nothing in the complaint or elsewhere to show they could not have reasonably discovered the basis of their claims" before the statute of limitations ran.).

[169] *See* ECF 145, *Transcript of Motion Hearing Held on January 17,* 2025 (*Hearing Transcript*) at 47:1–3 and *CCAC* ¶¶ 39, 79, 81–85, 88, 90, 102 n.46, 105–06, 110–15.  Plaintiffs likewise cite a YouTube video affiliated with the Whistleblower Report.  *See CCAC* ¶¶ 87, 89.

[170] *Church Motion to Dismiss* at 32.

[171] *See generally, Consolidated Opposition* at 35–37; *Tithing Class Action Articles.*

between December 2019 and February 2020 . . . in no fewer than 20 media outlets, including The Washington Post, the Salt Lake Tribune . . . Forbes, CNN, [and] Bloomberg."[172]

Critically, Plaintiffs nowhere argue or explain how the inquiry notice analysis could result in a different conclusion if the court defers ruling on the issue until Defendants raise it again in a Rule 12(c) or Rule 56 motion. Here, the court makes no determination concerning what Plaintiffs were actually aware of and when—only that the overwhelming information in the public domain by early 2020 would have inspired (and in fact did inspire) similarly-situated individuals to learn about the facts underlying their claims and file suit. Nothing gleaned in discovery could retroactively change the fact that this information existed in the public realm or that Plaintiffs' Consolidated Complaint expressly relies on this information. Even assuming the most favorable facts for the Plaintiffs—that they were not aware of the Whistleblower Report, the related media reporting, or the earlier filed lawsuits, or that they genuinely believed Church statements decrying any misconduct— the statute of limitations result would be no different.

The dates on the face of the Consolidated Complaint and the evidence of which this court takes judicial notice together "make clear" that a reasonably prudent person in Plaintiffs' position would have known the facts underlying the Church's alleged fraud such that they would have inquired further upon publication of the Whistleblower Report and the related reporting and lawsuits. Accordingly, Utah's three-year statute of limitations for fraud began running no later than early 2020 and barred Plaintiffs from initiating their individual suits in late 2023 and early 2024.

---

[172] *Hearing Transcript* at 97–107.

## II.    Failure to State a Claim

Even if the Consolidated Complaint raises a question of fact as to when Plaintiffs should be charged with inquiry notice, the court finds Plaintiffs nonetheless failed to adequately plead their claims.  Defendants argue Plaintiffs' individual claims each fail as a matter of law because Plaintiffs fail to plead facts establishing the requisite elements of their claims under Rule 12(b)(6) and fail to plead their fraud-based claims with the heightened degree of particularity required under Rule 9(b).[173]  The court considers these arguments regarding Plaintiffs' claims in the following order: (A) breach of fiduciary duty, (B) fraudulent inducement and fraudulent misrepresentation, (C) fraudulent concealment, and (D) unjust enrichment.

### A.    Breach of Fiduciary Duty

To state a common law claim for breach of fiduciary duty, a plaintiff must plead four elements: "(1) the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); (2) breach of the fiduciary duty; (3) causation, both actual and proximate; and (4) damages."[174]

Defendants argue Plaintiffs fail to state a claim for breach of fiduciary duty for two reasons.  First, Defendants argue they do not stand in a fiduciary relationship with Plaintiffs.[175]  Second, Defendants argue Plaintiffs lack standing to pursue their claim for breach of fiduciary duty under Utah's common law donor standing rule.[176]  The court agrees with Defendants that

---

[173] The parties agree Utah law governs Plaintiffs' claims.  *See CCAC* ¶¶ 14, 138; *Church Motion to Dismiss* at 8 n.9; *Ensign Motion to Dismiss* at 17 n.7.

[174] *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 417 P.3d 95, 109–10 (Utah 2018).

[175] *Church Motion to Dismiss* at 17–18; *Ensign Motion to Dismiss* at 5–6.

[176] *Church Motion to Dismiss* at 19–20; *Ensign Motion to Dismiss* at 6.  The Church also independently argues Plaintiffs fail to plead breach.  *See Church Motion to Dismiss* at 19.  The court resolves the claim on Defendants' two shared arguments and does not reach this issue.

Plaintiffs fail to plead the existence of a fiduciary relationship between themselves and Defendants and therefore the court need not decide whether Utah's common law donor standing rule applies to Plaintiffs' claim.[177]

Defendants' contend their relationships with Plaintiffs, whether as between church and parishioner or as between donee and donor, do not give rise to fiduciary duties.[178]  Plaintiffs accept Defendants' argument that no fiduciary relationship exists between them by virtue of their church-parishioner relationships,[179] but they contend their donee-donor relationship gives rise to a fiduciary relationship.[180]  Plaintiffs cite the following provision of the Utah Charitable Solicitations Act (UCSA) in support of their position:

> Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity.[181]

Defendants argue that Plaintiffs' interpretation of the UCSA is contrary its plain language and the prevailing understanding that a charity does not owe a fiduciary duty to its donors.  The court agrees.

---

[177] Utah's common law donor standing rule generally prohibits donors from suing to enforce the terms of their gifts. Plaintiffs and the Church cite *Siebach v. Brigham Young Univ.*, 361 P.3d 130 (Utah Ct. App. 2015) in support of their arguments regarding donor standing.  *Church Motion to Dismiss* at 19; *Consolidated Opposition* at 23.  There, the court impliedly distinguished between fraud claims that involve "improper inducement" and claims for breach of fiduciary duty by finding the former was not barred by Utah's common law donor standing rule while leaving in place the trial court's determination that the plaintiff's breach of fiduciary duty claim was barred.  *Siebach*, 361 P.3d at 140–41.  But here, because no fiduciary relationship exists between Plaintiffs and Defendants, the court need not decide this claim on that basis.

[178] *Church Motion to Dismiss* at 17–19; *Ensign Motion to Dismiss* at 5–6.

[179] *Consolidated Opposition* at 21 ("Plaintiffs do not argue that the fiduciary relationship exists because they are Defendants' parishioners.").

[180] *Id.* at 20–22.

[181] *See CCAC* ¶ 147 (citing Utah Code § 13-22-23).

The UCSA says nothing about donors, and Plaintiffs have not meaningfully explained why any canons of construction, legislative history, or other interpretive aid support reading the statute to impose fiduciary relationships between charities and their donors.[182]  A plain reading of the UCSA text suggests that individuals "soliciting, collecting, or expending contributions for charitable purposes" or "concerned with the solicitation, collection, or expenditure" of charitable contributions "act[] in a fiduciary capacity" with respect to the *organizations* on whose behalf they solicit, collect, and spend those contributions.

Furthermore, Plaintiffs cite no legal authority to support the notion that the UCSA (or any other legal framework) imposes fiduciary relationships between charities and their donors.  To the contrary, Plaintiffs' interpretation is inconsistent with how courts and other authorities typically understand fiduciary relationships.  For example, Defendants point to *Orlando Millenia, LC v. United Title Services of Utah, Inc.*[183]  There, the Utah Supreme Court explained that fiduciary relationships arise when one party "is required to act for the benefit of [the other] on all matters within the scope of their relationship,"[184] such as an attorney, who is "required to represent their clients' interests diligently," or a principal's agent, "who is required to act solely for the benefit of the principal in matters connected with the agency."[185]  Through that controlling lens, Plaintiffs' argument would yield an absurd result where an agent for a non-profit organization is required to "solely" act for the benefit of individual donors rather than for

---

[182] Plaintiffs cite *United States v. McKibbon*, 878 F.3d 967 (10th Cir. 2017) for the proposition that the court may not "insert any new limiting adjective" into the UCSA.  *See Consolidated Opposition* at 22.  But the court is adding no adjective or any other language here; rather, it is interpreting the plain language of the UCSA, noting the law of nonprofit organizations, and considering the potentially absurd results that would arise from Plaintiffs' reading of the statute.

[183] *See Ensign Motion to Dismiss* at 5.

[184] *Orlando Millenia, LC v. United Title Servs. of Utah, Inc.*, 355 P.3d 965, 971 (Utah 2015) (quoting *Fiduciary*, Black's Law Dictionary (9th ed. 2009) (alteration in original)).

[185] *Id.*

the organization itself.[186]  Defendants also cite the Restatement of Charitable Nonprofit

Organizations,[187] which states that charities are required to act for the benefit of their charitable

purpose—not for the benefit of their donors.[188]  The Restatement also provides that "[a] fiduciary

of a charity is a person who has substantial powers with respect to a charity"[189] and explains that

a fiduciary owes duties of care and loyalty to the charity itself—"to advance [the] charity's

purpose"[190]—and nowhere imposes similar duties with respect to donors.[191]  Because Plaintiffs'

interpretation of the UCSA lacks support, the court finds the UCSA does not create a fiduciary

relationship between Plaintiffs and Defendants.  Accordingly, Plaintiffs' claim for breach of

fiduciary duty must be dismissed for failure to state a claim.

### B.  Fraudulent Inducement and Fraudulent Misrepresentation

To state a claim for fraudulent inducement and fraudulent misrepresentation, a plaintiff

must plead the same nine elements:

> (1) that a representation was made (2) concerning a presently existing material fact
> (3) which was false and (4) which the representor (a) either knew to be false or (b)
> made recklessly knowing that there was insufficient knowledge upon which to base
> such a representation, (5) for the purpose of inducing the other party to act upon it
> and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did
> in fact rely upon it (8) and was thereby induced to (9) act to the party's injury and
> damage.[192]

---

[186] For example, Plaintiffs' interpretation of the statute would make every church, mosque, and synagogue in the
state of Utah a fiduciary to its donating members, and every political campaign a fiduciary to its financial backers.

[187] *See Church Motion to Dismiss* at 18–19.

[188] *See, e.g.*, Restatement of Charitable Nonprofit Organizations § 1.01(a) (Am. L. Inst. 2021) ("A charity is a legal
entity with exclusively charitable purposes, established for the benefit of indefinite beneficiaries, and prohibited
from providing impermissible private benefit.").

[189] *Id.* § 2.01(a).

[190] *Id.* § 2.02 cmt. a.

[191] *Compare id.* ch. 2, *with id.* ch. 6.

[192] *Webster v. JP Morgan Chase Bank, NA*, 290 P.3d 930, 936 (Utah Ct. App. 2012); *see also Keith v. Mountain
Resorts Dev., LLC*, 337 P.3d 213, 225–26 (Utah 2014) (applying these elements to a fraudulent inducement claim);
*Larsen v. Exclusive Cars, Inc.*, 97 P.3d 714, 716 (Utah Ct. App. 2004) (applying these elements to a fraudulent
misrepresentation claim).

Additionally, Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud."[193]  This means a plaintiff must "set forth the time, place and contents of the false representation, the identity of the party making the false statements, and the consequences thereof."[194]

Defendants argue Plaintiffs fail to state claims for fraudulent inducement and fraudulent misrepresentation for three reasons.  First, Defendants argue Plaintiffs fail to plead Defendants made any false statements.[195]  Second, Defendants argue Plaintiffs fail to plead reliance on any of Defendants' statements.[196]  Third, Defendants argue Plaintiffs fail to plead the essential facts of their claims with the required degree of particularity.[197]

The court declines to decide whether Plaintiffs adequately pled the falsity element of their claims.  However, Plaintiffs' attempt to plead generalized reliance as a group fails under Rule 12 because Plaintiffs do not identify whether each named Plaintiff actually heard or relied on any one or more specific representations and fail to explain in what way the allegedly false representations caused them to change their donating behavior.  In turn, Plaintiffs' claims also fail under the heightened pleading standard of Rule 9(b).

In support of their fraudulent inducement claim, Plaintiffs allege Defendants made four "false representations regarding contemporaneously existing material facts and made promises of future performance with no contemporaneous intent to perform": (1) "donated funds would be

---

[193] Fed. R. Civ. P. 9(b).

[194] *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

[195] *Church Motion to Dismiss* at 21–24; *Ensign Motion to Dismiss* at 8–10.

[196] *Church Motion to Dismiss* at 24–27; *Ensign Motion to Dismiss* at 10–11.

[197] *See, e.g.*, *Church Motion to Dismiss* at 21, 25, 27; *Ensign Motion to Dismiss* at 7, 10.  Ensign independently argues Plaintiffs fail to plead the first element of their fraudulent inducement and fraudulent misrepresentation claims—that Ensign made a representation.  *Ensign Motion to Dismiss* at 7.  The court need not decide this issue because it concludes Plaintiffs' claims fail on Defendants' shared arguments.

directed towards charitable purposes"; (2) "funds donated to specific church organizations would be directed toward those organizations and used exclusively for charitable purposes"; (3) "the 'vast majority' of donated funds would be used for charitable purposes"; and (4) "[the Church] followed all applicable laws regarding its use of donated funds."[198]  And as for Plaintiffs' fraudulent misrepresentation claim, Plaintiffs base their claim on statements made by the Church that no tithing funds would be used to finance City Creek mall.[199]

In the Consolidated Complaint, Plaintiffs only generally allege they "reasonably relied" on these representations.[200]  They do not plead they actually heard or read—individually or collectively—any specific representation, nor that any individual representation induced them to donate.  Nor do Plaintiffs plead when they started making donations or what first caused them to donate.  Thus, neither Defendants nor the court can ascertain whether any or all of the Plaintiffs began making donations before Defendants' allegedly false representations, nor whether any of the representations changed Plaintiffs' donating behavior.  Reading the Complaint as a whole, the court and Defendants are left to guess whether anyone relied on anything and to what end.  Plaintiffs' group-wide, conclusory allegations that they reasonably relied on the Church's various allegedly false representations are insufficient to give rise to a reasonable inference that Defendants are liable to them for fraud.

Plaintiffs argue the court may infer individualized reliance under the present circumstances.[201]  However, precedent does not support this approach.  Plaintiffs primarily rely

---

[198] *CCAC* ¶ 158.

[199] *Id*. ¶¶ 178–79.

[200] *CCAC* ¶¶ 48, 49, 117, 119, 121, 123, 125, 127, 129, 131, 133, 164, 181.

[201] *Consolidated Opposition* at 26.

on the undersigned's decision in *Roberts v. C.R. England* in support of this position.[202]  But *Roberts* concerned how a plaintiff may prove class action-wide reliance at the Rule 23(b) stage, not how it must be pled under Rule 12.  In the cited portion of *Roberts*,[203] the court considered the plaintiffs' motion for class certification—specifically, whether Plaintiffs had satisfied Rule 23(b)'s predominance inquiry.[204]  For purposes of this inquiry, the court held reliance was not an "individualized issue[] requiring evidence for each class member."[205]  Rather, the court held it could infer class-wide reliance under Rule 23(b) based on "abundant" circumstantial evidence.[206]

Plaintiffs cite no authority applying this principle to a threshold Rule 12 analysis for *named plaintiffs* seeking to represent a class.[207]  Every named plaintiff must have an actionable claim at the outset of a proposed class action.  Here, where there are no allegations demonstrating the named Plaintiffs actually relied on any specific representation to their own detriment, no court could rule that such Plaintiffs could adequately represent a class under Rule 23 because they failed to state plausible fraud claims in the first instance.

Because Plaintiffs fail to adequately plead the reliance element of their fraudulent misrepresentation and inducement claims under Rule 12, it naturally follows that they also fail to meet the heightened pleading requirements of Rule 9(b).[208]  This Rule requires a party to plead

---

[202] *Id.*

[203] *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 512 (D. Utah 2017) (quoting Fed. R. Civ. P. 23(b)(3)).

[204] Fed. R. Civ. P. 23(b) ("A class action may be maintained if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members.").

[205] *Roberts*, 318 F.R.D. at 513.

[206] *Id.* at 514.  Importantly, the class certification motion was resolved at the summary judgment stage with the benefit of a robust factual record supporting the inference for class certification purposes.

[207] The other cases Plaintiffs cite in support of their position likewise apply an inference of reliance in the class certification context.  See Consolidated Opposition at 26 (citing *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089–90 (10th Cir. 2014) and *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 238–40 (W.D. Ark. 2018)).

[208] *See, e.g., Church Motion to Dismiss* at 21, 25, 27; *Ensign Motion to Dismiss* at 7, 10.

the "who, what, where, when, and how" of the alleged fraud,[209] as well as "injuries they suffered as a result."[210]  The purpose of this Rule is to "afford [a] defendant fair notice of a plaintiff's claims and the factual grounds supporting those claims.[211]

Plaintiffs' allegations, taken as a whole, fail in this regard.  Generally, Plaintiffs' fraudulent inducement and fraudulent misrepresentation claims allege the Church solicited three types of donations—tithing, fast offerings, and charitable contributions—for particular charitable purposes, and that the Church acted inconsistently with representations it made to donors regarding the use and management of donated funds.  But the Consolidated Complaint infrequently identifies "who" made these statements, "what" the statements were, and "where" and "when" the statements were made.  But even where the Complaint identifies these facts,[212] Plaintiffs fail to plead "how" the statements were fraudulent or in what manner they caused a specific injury—that is, the "consequences thereof."[213]

For example, the individual Plaintiffs plead in conclusory fashion that they donated to the Church based on its various representations.[214]  But as discussed above, Plaintiffs fail to allege specific facts giving rise to a reasonable inference that any one or more specific representations induced any particular conduct (including any donations).  By extension, it is unclear which statements caused harm to which Plaintiffs and why (i.e., the consequences of Defendants'

---

[209] *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).

[210] *Id.* at 1279 (explaining a plaintiff "must' allege "injuries they suffered as a result' of [defendant's] fraudulent misrepresentations" to satisfy Rule 9(b)).

[211] *Id.* at 1277.

[212] *See CCAC* ¶¶ 59, 67, 77, 108, 110, 133.  The parties' papers also refer to Defendants' alleged representation that tithing funds were "always used" for certain purposes.  *See, e.g., id.* ¶ 55; *Church Motion to Dismiss* at 21.  But Plaintiffs do not point the court to the time and place of Defendants' alleged representation, nor the identity of the individual making it.

[213] *Koch*, 203 F.3d at 1236.

[214] *See, e.g., CCAC* ¶¶ 116–17.

alleged fraud). Plaintiffs do not indicate whether their donations represent tithing, fast offerings, charitable contributions, or some combination of the three. Likewise, no Plaintiffs plead the dates of their donations (except that they occurred after January 1, 1998 and before July 2024). In other words, Plaintiffs do not sufficiently allege any "causal link" between the alleged fraud and any subsequent actions.[215]

These collective deficiencies are fatal given that "Plaintiffs have the best knowledge of their own experiences and whether there was ever a particular misrepresentation that caused them" to donate to the Church.[216] Accordingly, under Rule 9(b), Defendants are without adequate notice of the factual circumstances underlying Plaintiffs' fraudulent inducement and misrepresentation claims.

### C. Fraudulent Concealment

To state a claim for fraudulent concealment, a plaintiff must plead (1) the existence of a legal duty to communicate, (2) that a defendant failed to disclose information known to them, and (3) that the nondisclosed information was material.[217] A party's nondisclosure "must amount to fraud."[218] In other words, it "must amount to an affirmation that a state of things exists which does not exist, and the uninformed party must be deprived to the same extent as if a positive assertion has been made."[219] "To be material, the information must be 'important.' Importance, in turn, can be gauged by the degree to which the information could be expected to

---

[215] *See Chinitz v. Ally Bank*, No. 2:19-cv-00059, 2020 WL 1692817, at *7 (D. Utah Apr. 7, 2020) (requiring Plaintiffs to allege a "causal link between [Defendant's] alleged misrepresentation and the actions [Plaintiff] took"); *see also Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 665 F. Supp. 3d 1263, 1284 (D. Utah 2023) (*Gaddy III*).

[216] *Gaddy III*, 665 F. Supp. 3d at 1288.

[217] *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006); *HKS Architects, Inc. v. MSM Enters. Ltd.*, 496 P.3d 228, 239 (Utah Ct. App. 2021).

[218] *McDougal v. Weed*, 945 P.2d 175, 179 (Utah 1997).

[219] *Id.*

influence" an individual to act.[220]  However, courts do not judge materiality from the perspective

of an individual who claims they were misled.[221]  Materiality is evaluated from the perspective of

an objectively reasonable individual.[222]

Defendants argue Plaintiffs fail to state a claim for fraudulent concealment for two

reasons.  First, Defendants argue they did not owe Plaintiffs a duty to disclose.[223]  Second,

Defendants argue Plaintiffs do not plead materiality because they do not and cannot "plead what

facts [were] material to a 'reasonable person' in deciding whether to give tithes to the

Church."[224]  Plaintiffs respond that Defendants owed them a duty to disclose by nature of the

parties' fiduciary relationship and Defendants' incomplete representations, and they contend they

pleaded materiality in alleging they would not have donated funds, or would have donated lesser

amounts, had they known how their funds were being used.[225]

The court has serious doubts that Defendants owed Plaintiffs a legal duty to disclose

Defendants' disposition of donated funds.  But even accepting that a such duty existed, the court

agrees with Defendants that Plaintiffs have not adequately pled materiality.[226]  Plaintiffs broadly

premise their fraudulent concealment claim on Defendants' failure to affirmatively disclose

Ensign's existence, the Church's use of Ensign to hold and invest donated funds, and the amount

of Defendants' holdings.[227]  Yet, the Consolidated Complaint is devoid of any allegations

---

[220] *Yazd*, 143 P.3d at 289.

[221] *Gilbert Dev. Corp. v. Wardley Corp.*, 246 P.3d 131, 140–41 (Utah Ct. App. 2010).

[222] *Id.*  The parties agree on this point.  *See Church Motion to Dismiss* at 28; *Ensign Motion to Dismiss* at 12; *Consolidated Opposition* at 31.

[223] *Church Motion to Dismiss* at 28; *Ensign Motion to Dismiss* at 11–12.

[224] *Church Motion to Dismiss* at 28–29.  *See also Ensign Motion to Dismiss* at 12–14.

[225] *Consolidated Opposition* at 31–32.

[226] The court has further concerns regarding Plaintiffs' ability to plead materiality without encountering a church autonomy doctrine problem, but it does not address this issue here.

[227] *See generally CCAC* ¶¶ 168–76.

identifying why and how this information would be material to an objectively reasonable donor—be they a tithe payer, fast-offeror, charity contributor, or all three. Plaintiffs do not plead why Ensign's existence and investment activities would dissuade the typical church member, who accepts that the Church has an ecclesiastical directive to collect tithes, from paying tithing.

Plaintiffs contend they adequately pled materiality in alleging they "reasonably believed that [their] donations would be used for the purposes represented by [the Church]," and that "[b]ecause of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign, [they] could not appreciate the true manner in which the [Church] actually intended to (and did) use [their] donations."[228] But beyond inserting the term "reasonably," these allegations—which are the only ones purporting to touch upon the materiality element—are specific to the individual Plaintiffs. As such, these allegations do not convey why the information would be material to an objective, reasonable donor.[229] Plaintiffs therefore do not properly allege the materiality element of their fraudulent concealment claim.

Plaintiffs also argue that the question of materiality is highly fact dependent and thus improper for decision at the pleading stage.[230] But even so, this does not excuse Plaintiffs from their obligation to plead plausible claims. Plaintiffs must plead some factual basis for their claim, which requires that specific nondisclosed information would have influenced an

---

[228] *Consolidated Opposition* at 31–32 (citing *CCAC* ¶¶ 117, 119, 121, 123, 125, 127, 129, 131).

[229] At least in view of Plaintiffs' claims and theories, this is not just a technical failing. Even if materiality need not be pled in every instance in terms of the reasonable person standard, it is essential here where there are multiple modes of donation and numerous unspecified potential facts that may materially impact similarly situated donors. And as noted, weighty First Amendment issues may be implicated depending on Plaintiffs' unexpressed theories concerning materiality. The failure to plead materiality here except in the most conclusory fashion deprives Defendants of meaningful arguments that Plaintiffs' fraudulent concealment claim is barred in whole or in part by the church autonomy doctrine.

[230] *Id.* at 31.

objectively reasonable donor to act.[231]  Plaintiffs have not done this, and it is fatal to their claim for fraudulent concealment.

### D.  Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must plead "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[232]

Defendants contend Plaintiffs fail to state a claim for unjust enrichment for two reasons. First, Defendants argue Plaintiffs premise the "unjustness" of Defendants' "enrichment" on Defendants' alleged fraud while failing to adequately plead each of their fraud claims.[233] Second, Defendants argue they have not inequitably retained any benefit because "a donation is made without [the] expectation of anything in return."[234]  Plaintiffs do not respond to

---

[231] In Reply, Defendants argue the special pleading requirements of Federal Rule of Civil Procedure 9(b) apply to Plaintiffs' fraudulent concealment claim, and that Plaintiffs fail to plead the materiality element of their claim with the required degree of particularity.  *Consolidated Reply* at 20.  Upon review of relevant caselaw, the court is inclined to agree that Rule 9(b) applies.  *See Koch*, 203 F.3d at 1235 (applying Rule 9(b) to a general fraud claim "alleg[ing] that the Defendants misrepresented and concealed information"); *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008) (stating "fraudulent concealment," as an equitable means of tolling a statute of limitations, "must be pleaded with particularity"); *Marcovecchio v. Wright Med. Grp., Inc.*, No. 2:18-cv-00274, 2019 WL 1406606, at *8 (D. Utah Mar. 28, 2019) (applying Rule 9(b) to a fraudulent concealment claim under Utah law); *DP Creations, LLC v. Ortiz*, No. 2:19-cv-00948-HCN-DBP, 2021 WL 2895239, at *5 (D. Utah Mar. 5, 2021) (same).  The court is also inclined to find Plaintiffs broadly fail to plead the factual bases of their claim with the requisite degree of particularity, including the specific affirmative statements (or other factual circumstances) giving rise to Defendants' alleged duty to disclose its disposition of donated funds, the specific undisclosed information that would make Defendants' affirmative statements non-misleading, and the specific ways in which the undisclosed information was material.  Still, the court does not decide the issue on these grounds because Defendants only raise Rule 9(b) in Reply and Plaintiffs' claim fails for independent reasons under Rule 12.

[232] *Berrett v. Stevens*, 690 P.2d 553, 558 (Utah 1984).

[233] *Church Motion to Dismiss* at 29.  *See also Ensign Motion to Dismiss* at 14–15.

[234] *Church Motion to Dismiss* at 29.  *See also Ensign Motion to Dismiss* at 14–15.

Defendants' first argument, but contend Defendants' second argument fails because it "attempt[s] to graft an additional element onto Plaintiffs' unjust enrichment claim[]."[235]

Plaintiffs implicitly concede the premise that their unjust enrichment claims are predicated on their fraud allegations by failing to address Defendants' first argument.[236] As outlined in the preceding sections, Plaintiffs have not properly stated fraud claims under Rule 12 or Rule 9. Accordingly, Plaintiffs also fail to state a claim for unjust enrichment.[237]

---

[235] *Consolidated Opposition* at 32–34.

[236] *See Digital Ally, Inc. v. Utility Associates, Inc.*, 882 F.2d 974, 977 (10th Cir. 2018) (concluding a failure to address an alternate bases in a dispositive motion "amounts to a concession"); *Hinsdale v. City of Liberal, Kan.*, 19 Fed. App'x 749, 769 (10th Cir. 2001) (affirming dismissal of a claim after the district court concluded the plaintiff abandoned the claim in failing to address it in his opposition memorandum); *Bella Monte Owners Ass'n, Inc. v. Vial Fotheringham, LLP*, No. 2:19-cv-00212-TC-JCB, 2021 WL 5961566, at *7 (D. Utah Dec. 16, 2021) ("If a party fails to make an argument in opposition to a motion for summary judgment, that argument is waived."); *Fullen v. City of Salina, Kan.*, No. , 2021 WL 4476780, at *14 (D. Kan. Sept. 30, 2021) (finding the plaintiffs "tacitly concede[d]" their claim by failing to respond to the defendants' argument on a motion to dismiss).

[237] *See, e.g.*, *Storey v. Seipel*, No. 2:22-cv-00486-RJS-DAO, 2024 WL 4436609, at *6 (D. Utah Oct. 24, 2024) ("Plaintiff's claim[] for unjust enrichment . . . [is] based almost entirely on allegations of fraud. As such, [it is] subject to the heightened pleading requirements of Rule 9(b).").

## CONCLUSION

For the foregoing reasons, the court GRANTS the Church's Motion to Dismiss[238] and GRANTS Ensign's Motion to Dismiss.[239]  Because the court decides the Motions first and foremost on the statute of limitations issue, the court dismisses each of Plaintiffs' claims with prejudice.  Finally, the court DENIES as moot Defendants' joint Motion to Strike.[240]  The Clerk of Court is directed to close the case.

DATED this 17th day of April 2025.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[238] ECF 79.

[239] ECF 80.

[240] ECF 81.